# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE DELAWARE PUBLIC SCHOOLS LITIGATION | ) ) | C.A. No. 2018-0029-JTL COUNTY TRACK |

## OPINION

Date Submitted: January 17, 2020
Date Decided: May 8, 2020

Richard H. Morse, COMMUNITY LEGAL AID SOCIETY, INC., Wilmington, Delaware; Karen Lantz, ACLU FOUNDATION OF DELAWARE, INC., Wilmington, Delaware; Saul P. Morgenstern, Peta Gordon, Jessica Laguerre, Travis W. Clark, ARNOLD & PORTER KAYE SCHOLER LLP, New York, New York; *Counsel for Plaintiffs Delawareans for Educational Opportunity and the NAACP Delaware State Conference of Branches.*

Gary W. Lipkin, Brian E. O'Neill, Alexandra D. Rogin, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Wilmington, Delaware; Rosemarie Tassone-DiNardo, Aaron C. Baker, CITY OF WILMINGTON LAW DEPARTMENT, Wilmington, Delaware; *Counsel for Plaintiff City of Wilmington.*

Mary A. Jacobson, Adam Singer, Nicholas J. Brannick, NEW CASTLE COUNTY OFFICE OF LAW, New Castle, Delaware; *Counsel for Defendant David M. Gregor, Chief Financial Officer for New Castle County.*

William W. Pepper, Sr., Gary E. Junge, SCHMITTINGER & RODRIGUEZ, P.A., Dover, Delaware; *Counsel for Defendant Susan Durham, Director of Finance for Kent County.*

Herbert W. Mondros, Helene Episcopo, MARGOLIS EDELSTEIN, Wilmington Delaware; *Counsel for Defendant Gina Jennings, Director of Finance for Sussex County.*

**LASTER, V.C.**

The NAACP Delaware State Conference of Branches (the "NAACP-DE") and Delawareans for Educational Opportunity (the "DEO") contend that Delaware's public schools fail to provide an adequate education for students from low-income households, students with disabilities, and students whose first language is not English (collectively, "Disadvantaged Students"). The failure to provide an adequate education for Disadvantaged Students is not just a problem for Disadvantaged Students. It affects the in-school educational environment for all students, including non-Disadvantaged Students. Ultimately, it affects the larger community of which we are all a part.

As one reason why Delaware's public schools fall short, the NAACP-DE and the DEO point to a broken system for funding schools. One third of the funding for Delaware's public schools comes from local taxes. When school districts levy local taxes, they are required to use the assessment rolls prepared by Delaware's three counties. If there are problems with the counties' assessment rolls, then those problems affect the school districts' ability to levy local taxes.

The NAACP-DE and the DEO proved at trial that when preparing their assessment rolls, the counties fail to comply with two legal requirements. First, under the Delaware Code, "[a]ll property subject to assessment shall be assessed at its true value in money." 9 *Del. C.* § 8306(a) (the "True Value Statute"). The Delaware Supreme Court has held that a property's true value in money is the same as its present fair market value. Second, under the Delaware Constitution, "[a]ll taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax . . . ." Del. Const. art. VIII, § 1

(the "Uniformity Clause"). The Delaware Supreme Court has held that the Uniformity Clause requires all taxpayers within the same general class to be treated the same.

It is undisputed that when preparing their annual assessment rolls, the counties use valuations from three and four decades ago. Sussex County uses valuations that became effective in 1974. New Castle County uses valuations that became effective in 1983. Kent County uses valuations that became effective in 1987. Each county refers to its valuation year as its "base year."

Making matters worse, two of the three counties do not even use their full base-year valuations. Sussex County uses 50% of its base-year valuations. Kent County uses 60%.

The NAACP-DE and the DEO proved that assessing properties using base-year valuations from three and four decades ago—much less using 50% or 60% of those valuations—is not the same as assessing properties at their present fair market value. The NAACP-DE and the DEO thus proved that the counties fail to comply with the True Value Statute.

The NAACP-DE and the DEO also proved that the counties fail to comply with the Uniformity Clause. During the thirty-three, thirty-seven, and forty-six years since the counties' base-year valuations became effective, different properties have appreciated at different rates. By continuing to use the decades-old valuations when preparing their assessment rolls, the counties treat owners of similar properties differently. Owners of the same general class of property may pay taxes at the same nominal rate per dollar of assessed valuation, but the outdated valuations mean that owners of the same general class of property pay effective rates that are quite different. Owners whose properties have

2

appreciated more pay a lower effective rate than owners whose properties have appreciated less. The counties' outdated assessments conceal a reality of non-uniformity beneath a cloak of uniformity.

The City of Wilmington also filed suit against New Castle County. The Delaware Code gives each municipality the right to "elect to use the assessments and supplementary assessments for property in the municipality as established annually or quarterly by the [county] in which such municipality is located, subject to statutory judicial appeals, as the assessment roll of such municipality for municipal taxation." 22 *Del. C.* § 1101. A municipality that exercises this right "shall be entitled to receive a copy of the county assessments for the properties in the municipality . . . ." *Id.* § 1103. In addition, the pertinent county officials are obligated to "certify the total assessed valuation for properties in the municipality to each municipality . . . ." *Id.* § 1104. By ordinance, the City chose to exercise its rights under these statutes (collectively, "the Assessment Roll Statutes").

The City of Wilmington proved that New Castle County's persistent use of property valuations from 1983 violates the True Value Statute and the Uniformity Clause, leading to inaccurate assessments and certifications. The City proved that by providing inaccurate assessments and certifications, New Castle County violates its obligations under the Assessment Roll Statutes.

This decision declares that all three counties use assessment methodologies that violate the True Value Statute and the Uniformity Clause. This decision declares that New Castle County violates the Assessment Roll Statutes by using its assessment methodology.

3

This decision does not reach the issue of remedy, which will require further proceedings. The court originally bifurcated the merits determination from the remedial phase because of the need to consider carefully what the remedy would be and how it would be implemented. Both Delaware's public schools and the counties depend on the current, albeit broken, system of property tax assessments. It could cause significant disruption to important public services if the administration of that system was suddenly brought to a halt. Any remedial calculus must take into account a range of equities and considerations.

While this decision was under submission, the novel coronavirus emerged, resulting in the Covid-19 pandemic. One of the minor consequences of the pandemic was to delay the issuance of this decision. One of the major consequences of the pandemic was to place many households, businesses, and local and state governments under financial strain. While the effects of the pandemic do not mean that the counties can continue indefinitely to operate a local tax system that violates the Delaware Constitution and the Delaware Code, the effects of the pandemic likely will introduce additional and significant considerations for the remedial calculus, particularly regarding the timing of a remedy. Evaluating those and other issues must await the remedial phase.

## I.    FACTUAL BACKGROUND

During a two-day trial, the court heard live testimony from five fact witnesses and one expert witness.[1] The parties introduced ninety-six exhibits into evidence and lodged

---

[1] Jea Street, M.V., A.Y., Denzil Hardiman, and James Taylor testified live as fact witnesses. Richard Almy testified live as an expert witness. Initials are used to protect the

4

depositions from fourteen fact witnesses.[2] The parties reached agreement on 101 stipulations of fact.[3] The following facts were established by stipulation or proven by a preponderance of the evidence.

## A. The Role Of Local Taxes In Funding Delaware's Public Schools

Delaware's public schools receive funding from state, local, and federal sources. PTO ¶ 3. The State of Delaware provides approximately sixty percent of the funding that Delaware's public schools receive. *Id.* ¶ 4. Local taxes generate approximately thirty-one percent. *Id.* ¶ 10. Federal sources make up the rest.

School districts generate local funding by levying taxes on non-exempt property located in their districts. *Id.* ¶ 11; *see* 14 *Del. C.* § 1902(a). The amount of local funding depends on two variables: the assessed value of the property and the tax rate per dollar of assessed value. PTO ¶ 16.

---

confidentiality of two individuals who testified about their minor children. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript.

[2] Citations in the form "JX — at —" refer to trial exhibits with the page designated by the last three digits of the control or JX number. If a trial exhibit used paragraph or section numbers, then references are by paragraph or section. The parties lodged depositions for the following witnesses: Susan Durham, David Gregor, Denzil Hardiman, Reba Hollingsworth, Jane Hovington, C. Linwood Jackson, Gina Jennings, Chris Keeler, Judy Mellen, Jeffrey Sayers, Gary Shannon, Jea P. Street, Susan Wilson, and A.Y. Initials again are used to protect the confidentiality of witnesses who testified about their minor children. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript.

[3] Citations in the form "PTO ¶ —" refer to stipulations of fact in Part II of the pre-trial order. Dkt. 200.

When levying local taxes, the school districts do not prepare their own property tax assessments. By statute, the school districts must use the assessed values that the counties establish. 14 *Del. C.* § 1912.

**B.     The Counties' Obligations When Assessing Property**

The counties are required to assess property for tax purposes "at its true value in money." PTO ¶ 19 (internal quotation marks omitted). A property's true value in money is the same as its fair market value. *Id.* ¶ 20. Fair market value is "the price which would be agreed upon by a willing seller and a willing buyer, under ordinary circumstances, neither party being under any compulsion to buy or sell." *Id.* ¶ 21 (internal quotation marks omitted).

The Delaware Code does not specify when or how frequently a county must conduct a general assessment to establish current and uniform values for the properties within its jurisdiction. Instead, the Delaware Code requires that each county make an annual determination of assessed value when preparing its written statement of assessments, otherwise known as the assessment roll. *See* 9 *Del. C.* § 8301 ("Annual assessment of all assessable property and persons"); *Id.* § 8303 ("Each board of assessment or Department of Finance or Department of Land Use shall make a written statement of their assessments . . . ."). Although there are slight variations from county to county, each county follows the same basic process. *See id.* § 8301. As part of this annual process, "[e]ach board of assessment or Department of Finance or Department of Land Use shall revise all valuations and assessments of assessable property in their counties, and lower or increase the assessments or valuations." *Id.* § 8302(a).

6

To ensure that the annual process is followed, the Delaware Code imposes a monetary fine of up to $100 per property on any member of a board of assessment who knowingly assesses property at something other than true value in money. *See id.* § 8306(b). The Delaware Code also imposes a fine of up to $100 on any receiver of taxes, county treasurer, or other person authorized to collect school taxes who neglects or fails to perform any of the duties imposed on that person by law. *See* 14 *Del. C.* § 1920.

### 1. Sussex County's Obligations

The Sussex County Department of Finance is responsible for determining the value of taxable property in Sussex County, preparing the county's assessment rolls, sending tax bills, and collecting property taxes. PTO ¶ 25; *see* 9 *Del. C.* § 7004(c). The Director of Finance heads the Department of Finance and is responsible for ensuring that Sussex County's tax assessments comply with Delaware law. PTO ¶ 27; *see* 9 *Del. C.* § 7004(b).

Not later than February 15 of each year, the Department of Finance must prepare a tax assessment roll for the year and present it to the Sussex County Board of Assessment Review. PTO ¶ 28; *see* 9 *Del. C.* § 7004(j). During the month of March, the Board of Assessment Review must review the roll and the methods that the Director of Finance used to establish the assessments. *See* 9 *Del. C.* § 7004(j). Not later than June of each year, the Board of Assessment Review must "certify to the Department of Finance a true and correct assessment roll for the year." *Id.* Not later than July of each year, the Director of Finance must "certify to the county government the total value of all property in the County and the total value of all property which has been assessed and is subject to taxation." *Id.*

7

## 2. Kent County's Obligations

Kent County's process largely tracks Sussex County's. The Kent County Department of Finance is responsible for determining the value of taxable property in Kent County, preparing the county's assessment rolls, sending out bills, and collecting property taxes. PTO ¶ 62; *see* 9 *Del. C.* § 4124. The Director of Finance heads the Department of Finance and is responsible for ensuring that Kent County's tax assessments comply with Delaware law. PTO ¶ 63; *see* 9 *Del. C.* §§ 4123(b), 4124(b).

Not later than April 1 of each year, the Department of Finance must prepare and present to the Kent County Board of Assessment Review a copy of the tax assessment roll for the year. PTO ¶ 64; *see* 9 *Del. C.* § 4124(b). From April 1 through April 15, the Board of Assessment Review reviews the roll and makes additions, alterations, or corrections to the assessments. After completing its review, the Board of Assessment Review must "certify to the Department of Finance a true and correct assessment roll for the year." 9 *Del. C.* § 4124(b). Not later than May 1, the Director of Finance must "'certify to the county government the total value of all property in the County and the total value of all property which has been assessed and is subject to taxation.'" PTO ¶ 66 (quoting 9 *Del. C.* § 4124(b)).

## 3. New Castle County's Obligations

The process in New Castle County differs from the other counties in form but not in substance. The New Castle County Office of Finance is responsible for assessing the value of all property subject to taxation in the county, preparing the county's assessment rolls, sending out bills, and collecting property taxes. PTO ¶ 41; *see* 9 *Del. C.* §§ 1322,

8

1371(1) & (3), 1375. The Chief Financial Officer for New Castle County manages the Office of Finance, has the responsibilities of the general manager of the Department of Finance that are referenced in the Delaware Code, and is ultimately responsible for ensuring that New Castle County's tax assessments comply with Delaware law. PTO ¶ 42; *see* 9 *Del. C.* §§ 1322(b), 1371.

Not later than February 15 of each year, the Office of Finance must prepare a tax assessment roll for the year. PTO ¶ 43; *see* 9 *Del. C.* § 1322(a). The New Castle County Board of Assessment Review reviews the roll and the methods that the Director of Finance used to establish the assessments. *See* 9 *Del. C.* § 1318. Not later than April 30 of each year, the Office of Finance must certify to the Chief Financial Officer that the assessments are correct. *See* PTO ¶ 45; 9 *Del. C.* § 1322(b). Not later than May 31 of each year, the Chief Financial Officer must "certify to the County Council the total value of all property in the County and the total value of all property which has been assessed and is subject to taxation." 9 *Del. C.* § 1322(b). The County Council uses the information to set the county's tax rate. *See* PTO ¶ 45; 9 *Del. C.* § 8314(a).

## C. Assessed Values In The Three Counties

Although Delaware's statutory regime requires that the counties assess property for tax purposes at its true value in money, the reality is quite different. All three counties persist in using the assessed values established by their last general assessments, which at this point took place over three decades ago. Each county refers to the year in which its last general assessment became effective as its "base year." None of the counties have any plan

9

or intention to update their base-year valuations. Each thus uses an indefinite-base-year method of property assessment.

### 1. The Reality In Sussex County

Sussex County's indefinite-base-year method of assessment relies on values from 1974, which is when Sussex County's last general assessment became effective.[4] Sussex County assesses properties for tax purposes at 50% of the values that were established in 1974. PTO ¶ 33. As a result, when determining the fair market value of a property in 2020, Sussex County uses half of its value in 1974. Sussex County thus equates a property's present fair market value with 50% of its value from forty-six years ago. *See id.* ¶ 36.

Under Sussex County's version of the indefinite-base-year method, if a property was valued as part of the general assessment, then that value continues to be its assessed value. If Sussex County has to value a property that did not exist in 1974, then the assessors try to determine what value it would have been given in 1974. *See id.* ¶¶ 24, 34. To do that, Sussex County assessors use replacement cost data derived from the cost manuals that the

---

[4] PTO ¶ 32. During discovery, Sussex County informed the plaintiffs that the general assessment which became effective in 1974 established property values as of a date "prior to 1974." JX 36 at 5. The record in this case does not reveal how much "prior to 1974," but a reference in a Delaware Supreme Court decision suggests that the general assessment used a valuation date in 1970. *See Bd. of Assessment for New Castle Cty. v. Stewart*, 378 A.2d 113, 116 (Del. 1977). It is thus likely that Sussex County actually assesses property at 50% of its value in 1970. The earlier date makes Sussex County's assessments even more stale and further undermines its system of taxation for purposes of the True Value Statute and the Uniformity Clause. For simplicity, and because the assumption favors Sussex County, this decision assumes that Sussex County's indefinite-base-year method uses valuations from 1974.

10

H. L. Yoh Company provided as part of the 1974 general reassessment. *Id.* ¶ 34. Sussex County assessors use the same approach when valuing property attributes that did not exist in 1974, such as solar panels or wind farms. *See id.* ¶ 35 & n.28.

Sussex County officials recognize that replacement cost in 1974 has no correlation to present fair market value. *Id.* ¶ 37. They recognize that the values of nearly all taxable properties in Sussex County have changed since 1974. *Id.* ¶ 38. They likewise understand that during the forty-six years since 1974, properties values in Sussex County have not changed at uniform rates. Property values in different areas have changed at different rates, as have properties with different uses. *See id.* ¶ 39. Sussex County officials agree that in some parts of Sussex County, fair market values have increased greatly, while in other parts, fair market values stagnated. *See, e.g.*, Jennings Dep. 62; Keeler Dep. 104–06.

The total assessed value of taxable property on the Sussex County Assessment Roll for fiscal year 2018 was $3,464,256,423. PTO ¶ 30. Everyone agrees that a general reassessment would increase the total assessed value. *Id.* ¶ 17.

Sussex County has no plans to update its assessments. *Id.* ¶ 83. Sussex County intends to continue assessing properties using values from 1974. *Id.*

### 2. The Reality In Kent County

Kent County's indefinite-base-year method of assessment relies on values from 1987, which is when Kent County's last general assessment became effective.[5] Kent

---

[5] *Id.* ¶ 68. Kent County's general assessment appears to have determined fair market value as of a date in 1986. JX 33 at 5; *see* PTO ¶¶ 72–74. As with Sussex County, the earlier date makes Kent County's assessments one year older and further undermines them

County assesses properties for tax purposes at 60% of the values that were established in 1987. PTO ¶ 70; *see id.* ¶ 23 n.17. As a result, when determining the fair market value of a property in 2020, Kent County uses 60% of its value in 1987. Kent County thus equates a property's present fair market value with 60% of its value from thirty-three years ago.

When preparing the annual assessment roll, the Kent County Department of Finance starts with the taxable assessed values from the 1987 assessment, then adjusts for any material changes that might affect the value of property. *Id.* ¶ 71. When making adjustments, the Kent County Department of Finance uses construction cost data from the 1987 assessment. *Id.* ¶ 72. When assessing property that did not exist in 1987, the Department of Finance uses construction cost data from the 1987 assessment. *Id.* ¶ 73. When raw land in Kent County is subdivided and must be assessed, the assessors determine the value it would been given in 1987. *Id.* ¶ 74. The overarching goal of the Department of Finance is to ensure that all taxable property is assessed at the value it was or would have

---

for purposes of the True Value Statute and the Uniformity Clause. Additional problems arise under the Uniformity Clause because a Kent County official testified that the county uses a valuation date of July 1, 1987, when assessing properties or attributes that did not exist when the general assessment was conducted. *See* Durham Dep. 82–83. Kent County thus assesses some properties using a valuation date in 1986 and others using a valuation date in 1987. For simplicity, and because the assumption favors Kent County, this decision assumes that Kent County's indefinite-base-year method uses valuations from 1987.

been given in 1987. *See id.* ¶ 75. Kent County gives no weight to the actual sales price of a property when determining its assessed value. *See id.* ¶ 76.

The total assessed value of taxable properties on the Kent County Assessment Roll for fiscal year 2018 was $3,580,074,950. *Id.* ¶ 67. Everyone agrees that a general reassessment would increase the total assessed value. *Id.* ¶ 17.

Kent County has no plans to update its assessments. *See id.* ¶¶ 83–84. Kent County intends to continue assessing properties using values from 1987. *Id.*; *see* Durham Dep. 111–13.

### 3. The Reality In New Castle County

New Castle County's indefinite-base-year method of assessment relies on values from 1983, which is when its last general assessment became effective. PTO ¶ 51. Unlike Sussex County and Kent County, New Castle County assesses properties at 100% of their values from 1983. As a result, when determining the fair market value of property in 2020, New Castle County uses its value in 1983. New Castle County thus equates a property's present fair market value with its value from thirty-seven years ago.

Under New Castle County's version of the indefinite-base-year method, if a property was valued in 1983, then New Castle County continues to use that value. If New Castle County has to assess a new property, then its assessors try to give the property the value it would have been given in 1983. *See id.* ¶¶ 24, 53. For property types that did not exist in 1983, the assessor tries to come up with a value from 1983. *See id.* ¶ 56. The assessor might estimate the construction cost in 1983. *Id.* ¶ 54. Or the assessor might use a sales price or income approach to determine a value from 1983. *Id.* ¶ 55. In each case, the

13

assessor's goal is to determine what the value of a property in its current condition would have been as of July 1, 1983. *See id.* ¶ 56 n. 48.

The total assessed value of taxable properties on the New Castle Assessment Roll for fiscal year 2018 was $19,438,388,450. *Id.* ¶ 48. The Chief Financial Officer of New Castle County acknowledged that the same properties have a present fair market value of $58 billion (plus or minus 10%). *Id.* ¶ 49. He candidly conceded that the taxable assessed values from 1983 are not the same as present fair market value. *Id.* ¶ 60. In its answer to the City of Wilmington's complaint, New Castle County admitted that its assessments for residential properties may be less than 20% of present fair market value or more than 50% of present fair market value. Dkt. 127, Ans. ¶ 32. New Castle County admitted that for commercial properties, the assessments deviate from present fair market value to a greater degree. *Id.* Everyone agrees that a general reassessment would increase the total assessed value of property in New Castle County. PTO ¶ 17.

New Castle County has no plans to update its assessments. *Id.* ¶ 83. New Castle County intends to continue assessing properties using values from 1983. *Id.*

**D.  The Problems That The Indefinite-Base-Year Method Creates For Delaware's Public Schools**

The counties' persistent use of an indefinite-base-year method of assessment creates problems for Delaware's public schools and undermines Delaware's system for funding public schools. Delaware policy makers have long recognized this fact. *See, e.g.*, JX 3 at 6; JX 4 at 1–2.

14

### 1. The Report Of The 2008 Reassessment Committee

In June 2008, the 144th General Assembly enacted House Joint Resolution 22, which instructed specified state agencies to "provide the Governor and the General Assembly with recommendations for a fair and equitable reassessment of all real property for the purpose of ad valorem taxation by county governments and school districts." Del. H.J. Res. 22 syn., 144th Gen. Assem. (2008). The resulting committee (the "2008 Reassessment Committee") issued a final report dated November 26, 2008. JX 3.

In its report, the 2008 Reassessment Committee observed that "[p]roperty reassessment is a common topic among Delaware policy makers" and that "[t]he lack of regular and consistent valuation of property is seen as the cause of many problems . . . ." *Id.* at 4. Delaware's public schools figured prominently among the groups that suffered from the harmful effects of outdated property assessments. The 2008 Reassessment Committee found that the counties' failure to assess property at its present fair market value (i) affected the ability of school districts to raise local funding and (ii) undermined the school districts' ability to receive their fair share of equalization funding. *See id.* at 6.

### 2. The Effect Of Stale Assessments On Local Tax Revenue

Consistent with the findings made by the 2008 Reassessment Committee, the NAACP-DE and the DEO proved at trial that the counties' use of the indefinite-base-year method of assessment undermines the ability of school districts to levy local taxes. When property has not been reassessed in decades, the assessed values lag behind present fair market values. As a result, a given tax rate per dollar of assessed value fails to generate as

15

much in local school taxes as it would if properties were assessed at present fair market value.

In theory, a taxing jurisdiction could address a revenue shortfall arising from the failure to update property assessments by simply increasing the tax rate. *The counties can do this, because their governing bodies have discretion to adjust the tax rates they levy.* 9 *Del. C.* § 8002. The counties' revenues are thus not affected by the counties' failure to assess properties at present fair market value, because the counties can compensate by increasing the tax rate.

School boards do not enjoy the same discretion to adjust tax rates. Before a school board can increase the tax rate, the school board must "call a special election to be held at the polling place or places designated by the Department of Elections conducting the election." 14 *Del. C.* § 1903. The outcome of the special election determines whether the new tax rate will go into effect. *See id.* § 1911.

The counties' failure to update their assessments to reflect present fair market value means that year after year, the value of a school district's tax base remains flat. The amount of money that the static tax base generates at the prevailing tax rate likewise remains flat. The cost of running a school district, however, does not remain flat. Each year, inflation erodes the purchasing power of the school district's budget, requiring more dollars to achieve the same results. Even if a school district did not introduce any new initiatives and just maintained the status quo, the absence of regular and systematic assessments inevitably generates a funding gap.

To raise tax rates and close the gap, a school board must call for a referendum and ask voters to approve a tax increase. Generally speaking, in Delaware, a school district needs to prevail in a referendum every three to five years. *See Young v. Red Clay Consol. Sch. Dist.*, 159 A.3d 713, 800-18 (Del. Ch. 2017).

Prevailing in a referendum is difficult, and referendums often fail. *See id.* Some residents object as a matter of principle to having their taxes increased. Others object to the frequency of the requests. It takes time and effort to understand Delaware's complex system for funding public schools, including the direct link between the counties' persistence in using decades-old property assessments and the need for recurring referendums. Confronted with regular requests for tax increases, some residents infer that school officials are wasting money or engaging in empire building. *See* JX 13 at 6 (describing school districts as facing "a heavy burden" when attempting to replace revenue by increasing the tax rate through a referendum).

By not assessing properties at their present fair market values, the counties force school districts to call referendums more often. If properties were assessed at their present fair market values, then assessed values would increase with inflation. School district revenue would rise with property values, and the same tax rates would generate more money for the school districts. Rather than being forced to seek voter approval for tax rate increases necessary to cover the same expense base, school districts could reserve referendums for situations when they truly needed more money for new initiatives.

The burden of calling referendums is not trivial. School districts, school personnel, and parent volunteers must devote time and effort to pursuing referendums that they

17

otherwise could devote to educational purposes. School districts that suffer failed referendums must make do with less money in real-dollar terms. And regardless of whether or not the referendums are successful, school districts risk backlash from voters confronted with recurring requests to have their taxes raised.

### 3.     The Effect Of Stale Assessments On Equalization Funding

The failure to value property at its true value in money also complicates the State of Delaware's efforts to support less wealthy school districts. The General Assembly recognized long ago that the value of the tax base varies across school districts, enabling some school districts to raise local revenue more easily than others. To promote equity in school funding, the General Assembly designates a portion of the State's contribution to the public schools as "Equalization Funding," which is intended to provide financial support for less wealthy school districts.

The formula for allocating Equalization Funding is complex, but essentially pegs the amount to a combination of each school district's "effort index" and "ability index." 14 *Del. C.* § 1707(b)(1)–(3) & (c). The effort index is the ratio by which the district's tax burden exceeds the average tax burden across the state. The ability index is the district's aggregate property value.

Because assessed values remain tied to valuations from decades ago, assessed values cannot be used to measure the district's relative ability. In an effort to correct for the outdated values, the General Assembly introduced an additional formula that requires an initial determination of the "total full valuation of all taxable real property within the school district." *Id.* § 1707(b)(5). That figure is derived by dividing the total assessed

18

valuation of the taxable property in the district "by the average of the 3 most current assessment to sales price ratios." *Id.* § 1707(b)(11) (the "Full Value Formula"). The governing statute instructs the Office of Management and Budget to "conduct, in accordance with nationally accepted standards and practices, an assessment to sales price study, by school district, on an annual basis in order to establish the most current ratios and such studies shall be open to public review." *Id.* The statute provides that "in the event a county completes a general reassessment during the period between studies, the county's assessment to sales price ratio shall be equal to its rate of assessment, until a subsequent assessment to sales price study is completed." *Id.*

The General Assembly's decision to allocate Equalization Funding using the Full Value Formula, rather than using current assessed values, implicitly recognizes that (i) the assessed values are not accurate and (ii) the inaccurate assessments undermine the school-funding regime. The General Assembly's decision to use reassessed values only "until a subsequent assessment to sales price study is completed" implicitly recognizes that property values can change materially in as little as one year and that it would be inequitable to use older values to allocate Equalization Funding.

The General Assembly established a committee to oversee the allocation of Equalization Funding (the "Equalization Committee"). The General Assembly charged the Equalization Committee with making recommendations annually on the use of the Full Value Formula and "other issues and concerns related to equalization that impact the State's ability to achieve the basic purpose of equalization for Delaware's school districts." *Id.* § 1707(i).

19

In 2016, the Equalization Committee issued its recommendations for 2017. *See* JX 9 (the "2016 Equalization Report").

> The committee unanimously agree[d] that a major issue in attempting to equalize school finances is the inconsistencies in current assessment practices related to property valuation. As the committee has tried over time to correct misalignment of equalization dollars due to the lack of reassessment, the formula has grown more and more unreliable. The data on which the equalization formula relies, property assessments, must be made current in order for the Equalization formula to adequately serve its purpose.

*Id* at 3.

The Equalization Committee further explained how the counties' failure to update their property assessments shortchanges school districts:

> As the market value of property in a district (as determined by the assessment-to-sales price study) increases, it is deemed to be wealthier and is expected to generate more revenues from local taxes thereby entitling it to less equalization funding. However, since there is no consistent reassessment practice in place, the district's tax base is not increasing in proportion to its market value. . . . So while a district losses equalization funding, the funding is not replaced by an increase in the tax base. It can only be replaced by a change in the tax rate through referendum. This is an unintended consequence of the formula and has placed a heavy burden on many local districts. It will likely cause even greater problems if the market value of real estate continues to change at current rates. To further compound the problem, the effect of these changes is to lower a district's effort which may further reduce what they are eligible to receive in equalization funding.

*Id.* at 6; *accord id.* at 8. The counties' failure to assess property at its present fair market value thus deprives school districts of their fair share of Equalization Funding. The Equalization Committee concluded that accurate property assessments were necessary to "provide more reliable data on a district[']s wealth, ensure equity among taxpayers, and allow for the equalization model to function as intended." *Id.* at 6.

20

The Equalization Committee historically tried to mitigate the problems created by the counties' failures to assess property at present fair market value. *See id.* at 7–8. In the 2016 Equalization Report, the Equalization Committee explained that the assessments had become so outdated, the General Assembly needed "to establish a new methodology to determine the distribution of equalization dollars in the future." *Id.* at 3. Lacking a meaningful way to allocate funds equitably, the Equalization Committee recommended "holding the Fiscal Year 2017 per unit equalization values consistent with Fiscal Year 2009 values." *Id.* In other words, the Equalization Committee determined that because property is not assessed at its true value in money, the Full Value Formula could not be administered fairly. *See id.* at 6.

The Equalization Committee made the same observations and determinations in 2017 as part of its recommendation for 2018. *See* JX 13 (the "2017 Equalization Report"). The Equalization Committee again made the same observations and determinations in 2018 when making its recommendations for 2019. *See* JX 21 (the "2018 Equalization Report").

The record in this case includes a report titled *Assessment-to-Sales Ratio Study for Division III Equalization Funding: 2017 Project Summary*. *See* JX 84 (the "2017 Division III Study"). A sales ratio captures the relationship between the assessed value of a property and its fair market value by expressing the former as a function of the latter: The sales ratio is derived by dividing the assessed value by the price paid in a recent arms' length sale. PTO ¶ 93.

Professor Edward C. Ratledge of the University of Delaware prepared the 2017 Division III Study to inform the deliberations of the Equalization Committee in making its

21

recommendations for the 2017 fiscal year. The 2017 Division III Study contains a table spanning the years from 1996 through 2016 that chronicles the steady, year-by-year decline in sales ratios as market values diverged from the assessed values established in 1974, 1983, and 1987. *See* JX 84 at 13.

**E.    The Problems That The Indefinite-Base-Year Method Creates For The City Of Wilmington**

New Castle County's failure to assess property at its true value in money creates problems for the City of Wilmington. Delaware law gives every municipality in the state the right to elect to use the assessments prepared by the county where it is located for purposes of levying municipal taxes. 22 *Del. C.* § 1101. Once a municipality has elected to use county assessments, the municipality is entitled to receive a copy of the county assessment roll for properties within its jurisdiction and to have the accuracy of the total assessed value certified by county officials. *See id.* §§ 1103, 1104.

The City of Wilmington has exercised its right to use New Castle County's assessments. *See* JX 8. Property tax revenues represent a significant revenue source for the City and are essential for providing public safety and other services to its more than 70,000 residents as well as non-resident property owners and visitors.

The evidence at trial demonstrated that New Castle County's use of an indefinite-base-year method fails to assess property at its true value in money. This failure in turn deprives the City of Wilmington of its right to use county assessments. It also deprives the City of its right to receive an accurate determination of total assessed value that has been certified by county officials.

22

The evidence at trial demonstrated that New Castle County's use of an indefinite-base-year method also exacerbates the frequency of property appeals, which has a destabilizing effect on the City of Wilmington's budget. Each year, officials for the City attempt to anticipate, estimate, and budget for losses in property tax revenue caused by property appeals. The following chart shows the budgeted amounts and the actual losses incurred:

| Fiscal Year | Budgeted Loss | Actual Loss |
|---|---|---|
| 2015 | $250,000 | $500,000 |
| 2016 | $350,000 | $50,000 |
| 2017 | $500,000 | $261,000 |
| 2018 | $250,000 | $1,300,000 |
| 2019 | $250,000 | $408,000 |

The loss for each year is not a one-time event, but rather a reduction in recurring revenue that affects every subsequent year until a reassessment. In some cases, assessment appeals have retroactive effect, requiring the City to give the property owner a credit against future property taxes or issue a refund. *See* Taylor Tr. 96–97.

Since 2008, appeals of county assessments have contributed to a decline in the total assessed value of non-exempt properties in the City of Wilmington from $2.3 billion to $2.16 billion, despite an upward trend in fair market value over the same time frame. *See id.* at 98, 100. The bulk of these losses took place between FY2015 and FY2019, when the City lost $126 million from its tax base due to property appeals.[6]

---

[6] This amount is established through simple algebra. The record reflects that during this period, the City lost $2,519,000 in revenue from adverse results in appeals, and the

New Castle County recognizes that a large number of property owners in the City of Wilmington file tax appeals. *See* Dkt. 127, Ctcl. ¶ 61 ("Hundreds of property owners within the City's jurisdiction appeal the assessed value of their properties . . . ."). New Castle County correctly observes that property owners would have the right to file appeals regardless of the assessment methodology that the county used, but the county's present use of the indefinite-base-year method exacerbates the problem. Moreover, the problem increases over time, because as the base year becomes more stale, a property owner can mount stronger arguments that the property in its current condition would have a different value if assessed in that condition in 1983. With thirty-seven years having passed since the valuation date, property owners have far greater ability to appeal and challenge assessments than they would if New Castle County assessed properties at their present fair market value.

Just as Delaware policy makers have long recognized the problems that the lack of accurate property assessments creates for the public schools, they have also recognized that the outdated assessments facilitate challenges to valuations and cause appeals to proliferate. The 2008 Reassessment Committee made the following observation:

> Businesses such as Verizon and DuPont have successfully challenged their assessments throughout the State based on lack of comparable technology on which to assess the property. Updating property assessments statewide will help ease the number of appeals to local assessment boards and provide the counties with more accurate property data.

JX 3 at 6.

---

City's tax rate is 1.995% of assessed value. The total loss in assessed value is therefore $126,265,664.16. *See* JX 95 at 101; Dkt. 306 at 52–53.

In the eleven years since this determination, the issue has only gotten worse. In 2018, *The News Journal* quoted New Castle County's current chief executive as saying that recent judicial decisions had "'throw[n] the math that [New Castle County] use[s] to assess properties based on 1983 values into a crazy place, into the twilight zone.'"[7] He added that the decisions "made it easier for companies to challenge their assessments." Jedra, *supra* (internal quotation marks omitted).

### F.     This Litigation

In January 2018, the NAACP-DE and the DEO filed this litigation. Both are non-profit, non-partisan, civic-oriented institutions with a strong interest in Delaware's schools.

The NAACP-DE is the Delaware affiliate of the National Association for the Advancement of Colored People (the "NAACP"). Like its parent organization, the NAACP-DE's mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. *See* JX 62 at 92. As part of its mission, the NAACP-DE seeks to ensure that all students in Delaware have an equal opportunity to obtain a high quality public education. *See id.* at 81, 83. The organization has worked since its founding to remove barriers to the education of minority students on a fully equal basis and to ensure that all students receive the services they need. As part of the NAACP's strategic plan for the twenty-first century, the organization seeks to ensure

---

[7] JX 55 at 2 (quoting Christina Jedra, *Wilmington mayor accuses county of 'bleeding' its tax dollars*, The News Journal (Mar. 16, 2018), https://www.delawareonline.com/story/news/local/2018/03/15/wilmington-mayor-county-costing-us-alarming-amount-tax-revenue/428768002/).

that "[e]very child will receive a free, high quality, equitably-funded, public pre-K and K-12 education." JX 62 at 85. Over the years, the NAACP-DE, its national affiliate, and their leaders and members have achieved important victories in service of these goals. *See, e.g.*, *Brown v. Bd. of Educ.*, 349 U.S. 294, 301 (1955), *aff'g Belton v. Gebhart*, 87 A.2d 862 (Del. Ch. 1952) (Seitz, C.). The NAACP-DE has seven branches located throughout the state. The members of the NAACP-DE and its branches include residents of all three counties.

The DEO is an association of Delawareans who joined together to improve Delaware's system of public education so that all children have a meaningful opportunity to obtain an adequate education regardless of where they live, their economic circumstances, their health, their disability status, or their first language. *See* JX 58 at 221. The DEO's approximately thirty members include residents of all three counties. Street Tr. 61.

The NAACP-DE and the DEO filed this action because they believe that Delaware's public schools are not providing an adequate education to Disadvantaged Students. They point to a broken system for funding the public schools as one reason why Delaware's public schools fall short. They challenged the counties' assessment practices as one of the causes of the broken system.

In their original complaint, the NAACP-DE and the DEO sued the county officials responsible for supervising the assessment process and collecting local taxes. The county officials moved to dismiss the complaint, and the court denied the motion. *See*

26

*Delawareans for Educ. Opportunity v. Carney* (*DEO I*), 2018 WL 4849935 (Del. Ch. Oct. 5, 2018).

The NAACP-DE and the DEO also sued various state officials who are responsible for Delaware's public schools, contending that they have failed to provide an adequate education for Disadvantaged Students. The state officials moved to dismiss the complaint, and the court denied the motion. *See Delawareans for Educ. Opportunity v. Carney* (*DEO II*), 199 A.3d 109 (Del. Ch. 2018).

With the claims against the state officials and the county officials both moving beyond the pleading stage, the court bifurcated the litigation into a "State Track" and "County Track." *See* Dkt. 67. After bifurcation, the NAACP-DE and the DEO filed an amended complaint which asserted that the indefinite-base-year method of assessing property also violated the Uniformity Clause. *See* Dkt. 77. In February 2019, the court bifurcated the County Track litigation again, separating the merits phase from the remedial phase. *See* Dkt. 98.

Meanwhile, in January 2019, the City of Wilmington moved to intervene to assert claims against New Castle County. Dkt. 89. New Castle County opposed intervention. Dkt. 104. On March 1, the court granted the City's motion. *See* Dkts. 110, 121. Later that month, the City filed its complaint against New Castle County. *See* Dkt. 111.

On June 7, 2019, just forty days before trial, the counties moved for summary judgment, arguing that the NAACP-DE and the DEO lacked standing to sue. *See* Dkt. 156. New Castle County separately moved to dismiss the City of Wilmington's claims for lack of standing. *See* Dkt. 163. Because of the imminence of trial and the possibility that the

27

NAACP-DE and the DEO would present evidence that could be relevant to the issues of standing, the court denied the motions without prejudice. *See* Dkts. 205, 206. Trial was held on July 17 and 18, 2019.

## II. LEGAL ANALYSIS

The NAACP-DE and the DEO contend that Sussex County, Kent County, and New Castle County employ assessment methodologies that violate the True Value Statute and the Uniformity Clause, thereby interfering with the ability of school districts to raise local taxes and undermining Delaware's system of funding its public schools. For its part, the City of Wilmington contends that New Castle County violates the Assessment Roll Statutes, the True Value Statute, and the Uniformity Clause. The City separately contends that New Castle County violates what this decision refers to as the Same Rate Statute, which is a provision that the NAACP-DE and the DEO have not invoked. The City's claims overlap, because the City contends that New Castle County violates the Assessment Roll Statutes by failing to comply with the True Value Statute, the Uniformity Clause, and the Same Rate Statute.

To parse through these issues, this decision begins with the True Value Statute, then turns to the Uniformity Clause, then analyzes the Same Rate Statute. Having analyzed the these requirements both for purposes of the claims asserted by the NAACP-DE and the DEO, as well as for purposes of the predicate breaches on which the City of Wilmington relies, this decision addresses the City's claim under the Assessment Roll Statutes.

28

## A. The Counties' Compliance With The True Value Statute

The NAACP-DE and the DEO contend that the counties are violating the True Value Statute. The City of Wilmington contends that New Castle County is violating the Assessment Roll Statutes by failing to comply with the True Value Statute.

The True Value Statute requires that property be assessed for tax purposes at its "true value in money." 9 *Del. C.* § 8306(a). The Delaware Supreme Court has held that a property's true value in money "is the same as its fair market value." *New Castle Cty. Dep't of Fin. v. Teachers Ins. & Annuity Ass'n*, 669 A.2d 100, 102 (Del. 1995). Fair market value is "the price which would be agreed upon by a willing seller and a willing buyer, under ordinary circumstances, neither party being under any compulsion to buy or sell." *Seaford Assocs., L.P. v. Bd. of Assessment Review*, 539 A.2d 1045, 1048 (Del. 1988); *accord Teachers Ins.*, 669 A.2d at 102. Under Delaware law, the fair market value of taxable property means its "present market value." *Stewart*, 378 A.2d at 115. The plain language of the True Value Statute thus requires that property be assessed for tax purposes at its present fair market value.

This statutory requirement, however, does not mean that assessed value must always perfectly match up with present fair market value. Valuation is as much art as science.[8]

---

[8] *See Brennan v. Black*, 104 A.2d 777, 795 (Del. 1954) ("'The valuation of real estate and improvements has always been difficult and presents many problems, and even with the applied science for valuation and appraisal, the true value cannot be obtained with mathematical exactitude . . . .'" (quoting *Conory v. City of Battle Creek*, 222 N.W.2d 275, 278 (Mich. 1946))); JX 7 at 7 ("Market value is a concept in economic theory and cannot be observed directly.").

Determining the value of a property costs time and money, and market values invariably change, sometimes rapidly. Given these realities, there will always and necessarily be some divergence between assessed values and market value. In my view, to evaluate compliance with the True Value Statute, the operative question is whether the assessments fall within a reasonable range of present fair market value, taking into account related considerations such as legitimate governmental interests in efficiency and administrative convenience and the constitutional mandate of uniform treatment. *Cf. Stewart*, 378 A.2d at 115-16 (weighing similar considerations when evaluating compliance with Uniformity Clause).

In this case, the plaintiffs proved that the counties' assessments deviate from present fair market value to an unacceptable degree. Although the base-year methodology remains a theoretically viable approach in the abstract, the indefinite-base-year method that the counties employ has reached the point where it generates arbitrary assessed values divorced from any reasonable approximation of present fair market value. The evidence on this point was one-sided and overwhelming.

### 1. The Expert Analysis Of The Level Of Assessment

To demonstrate that the counties' assessments fail to comply with the True Value Statute, the plaintiffs presented expert testimony from Richard R. Almy. The defendants chose not to present any expert testimony.

Almy is a professional assessor who is an expert in property tax policy and administration, valuation, computer-assisted mass-appraisal, land information management, performance audits, and ratio studies. Almy's qualifications to testify as an expert were not disputed. Indeed, both Kent County and New Castle County have retained

Almy's firm in the past to evaluate the need for a general reassessment. *See* Almy Tr. 129. Almy was a candid, forthright, and highly credible witness.

Expert assessors like Almy evaluate whether property tax systems comply with valuation requirements like the True Value Statute by conducting sales ratio studies. To reiterate, a sales ratio captures the relationship between the assessed value of a property and its fair market value by expressing the former as a function of the latter: The sales ratio is derived by dividing the assessed value by the price paid in a recent arms' length sale. PTO ¶ 93. In a perfect system, the sales ratio would be 1.0, because the taxable assessed value would equal 100% of its fair market value.

The parties agree that a sales ratio study is an accepted and effective method for evaluating whether properties are assessed at their present fair market value. *Id.* ¶ 89. The International Association of Assessing Officers (the "IAAO") is a nonprofit, educational, and research association of government assessment officials and others interested in the administration of property taxes. JX 61 at 2 n.2; *see* Almy Tr. 127. The IAAO has promulgated standards for conducting sales ratio studies, which are widely accepted. *See* JX 61 at 2 n.2. The principal set of standards is the 2013 Standard of Ratio Studies. *See* JX 7.

Almy worked for the IAAO from 1969 until 1991. He started as a research assistant, rose through the ranks, and served as executive director from 1981 through 1991. *See* Almy Tr. 126–27. While working for the IAAO, he played a leading role in the IAAO's efforts to develop and maintain standards for conducting and interpreting ratio studies. *See id.* at 128. In 1991, Almy left the IAAO and started a consulting practice, primarily providing

31

advice to taxing agencies at the state and local levels. *See id.* at 129. While in private practice, Almy remained involved with the IAAO as a member and continued to play a significant role in the ongoing development of standards for ratio studies. *See id.* at 130. He has written a textbook titled *Fundamentals of Mass Appraisal* that was published by the IAAO. *See id.* at 131–32.

For this case, Almy conducted a series of ratio studies using data from twelve Excel files that the plaintiffs obtained in discovery from the counties. The initial sample contained the following numbers of transactions:

|  | Kent | New Castle | Sussex |
| --- | --- | --- | --- |
| Residential | 16,535 | 166,919 | 25,284 |
| Commercial and Industrial | 645 | 8,834 | 500 |
| Vacant Land | 5,522 | 165 | 3,087 |
| Mobile Homes | -- | -- | 1,231 |

Almy determined that vacant land in New Castle County was too small a sample for study. He proceeded to examine the other categories.

Before making any calculations, Almy converted the assessed values for Sussex and Kent County into their full-value equivalents to correct for Sussex County's practice of assessing properties at 50% of the values that became effective in 1974 and Kent County's practice of assessing properties at 60% of the values that became effective in 1987. Converting the Sussex and Kent assessments into their 100% equivalents allowed Almy to evaluate sales ratios consistently and in accordance with the IAAO standards. *See* Almy Tr. 147–48; JX 61 at 3. Almy also conducted a multi-step process to clean and screen the counties' data so that it only included what were likely to be arms' length transactions. *See*

32

Part II.E.6, *infra*. During this process, Almy calculated and reviewed different measures of central tendency to determine which would be the most reliable and informative. *See* JX 7 at 13, 27. Almy decided to use the median, which is the standard measure of central tendency used in ratio studies. *See* Almy 137–38; JX 7 at 13.

To comply with the IAAO standards, the calculated measure of central tendency should fall between 0.90 and 1.10. PTO ¶ 94; JX 7 at 17. A measure of central tendency within this range indicates that the jurisdiction assesses property at between 90% and 110% of its fair market value. If the measure of central tendency is below 0.90, then the assessed values are too low. If the measure of central tendency is above 1.10, then the assessed values are too high. *See* Almy Tr. 149–50. In addition, each class of property should be within 5% of the overall level of appraisal in the jurisdiction. PTO ¶ 94; JX 7 at 17.

Using the sales ratios that he calculated, Almy analyzed how the level of assessed value compared to fair market value in each county. He examined the county as a whole and the individual school districts within the county. If a school district spanned more than one county, he examined the property in that school district that was located in the pertinent county. When the data was available, Almy separately examined residential property, commercial property, vacant land, and mobile homes. If a single recent year provided a sufficient number of transactions, then Almy only used transactions from that year. For example, for residential property in Kent County, Almy only used transactions from 2018. For commercial property and vacant land in Kent County, however, Almy used five years of sales data from 2014 to 2018. *See* JX 61 at 11–12. If a county or school district lacked a sufficient number of transactions during the five-year period to perform a reliable

33

calculation for a particular type of property, then Almy did not include the calculation in his analysis.

### a. The Level Of Assessment In Sussex County

Almy calculated an overall sales ratio for Sussex County of 0.1687. *Id.* at 18. This result indicates that the full-value assessments of property in Sussex County reflect only 16.87% of their fair market value. Because Sussex County in fact uses 50% of its assessments for tax purposes, Sussex County actually uses assessments that reflect just 8.435% of fair market value. Under the IAAO standards, a measure of less than 90% is unacceptable.

In addition to a county-wide sales ratio for all types of property, Almy calculated sales ratios derived from the full-value assessments for four specific types of property: residential property, commercial property, vacant land, and mobile homes. For each property type, he calculated sales ratios for each school district and for the county as a whole. The following chart presents the resulting median sales ratios:

| Jurisdiction | Median Ratio for Residential Property | Median Ratio for Commercial Property | Median Radio for Vacant Land | Median Ratio for Mobile Homes |
|---|---|---|---|---|
| Indian River | 0.1695 | 0.1427 | 0.0289 | 0.1891 |
| Laurel | 0.1758 | 0.1228 | 0.0571 | 0.2013 |
| Seaford | 0.1808 | 0.1671 | 0.0652 | 0.2143 |
| Milford | 0.1769 | 0.1065 | 0.0198 | 0.2065 |
| Woodbridge | 0.1830 | 0.1718 | 0.0524 | 0.2163 |
| Cape Henlopen | 0.1458 | 0.0840 | 0.0312 | 0.1837 |
| Delmar | 0.1599 | 0.1101 | 0.0135 | 0.1993 |
| Countywide | 0.1622 | 0.1307 | 0.0299 | 0.1927 |
| IAAO Min. | 0.9000 | 0.9000 | 0.900 | 0.9000 |

As the chart shows, the median sales ratios range from a low of 0.0135 for vacant land in Delmar to a high of 0.2163 for mobile homes in Woodbridge. Reframed as percentages, the full assessed value of vacant land in Delmar reflects 1.35% of its fair market value, and the full assessed value of mobile homes in Woodbridge reflects 21.63% of its fair market value. Because Sussex County in fact uses 50% of its assessments for tax purposes, the values actually range from a low of less than 1% of fair market value for vacant land in Delmar to a high of 10.815% of fair market value for mobile homes in Woodbridge.

Countywide, the full assessed value of residential property in Sussex County reflects 16.22% of its fair market value, the full assessed value of commercial property in Sussex County reflects 13.07% of its fair market value, the full assessed value of vacant land in Sussex County reflects 2.99% of its fair market value, and the full assessed value of mobile home properties in Sussex County reflect 19.27% of its fair market value. Because Sussex County actually uses 50% of its assessments for tax purposes, Sussex County uses assessments for residential property that reflect 8.11% of fair market value, for commercial property that reflect 6.535% of fair market value, for vacant land that reflect 1.495% of fair market value, and for mobile home properties that reflect 9.635% of fair market value. To reiterate, under the IAAO standards, assessments are unacceptable when they reflect less than 90% of fair market value.

### b. The Level Of Assessment In Kent County

Almy calculated an overall sales ratio for Kent County at 0.3440. *Id.* at 13. This result implied that the full value assessments of property in Kent County reflect only

34.40% of fair market value. Because Kent County in fact uses 60% of its assessments for tax purposes, Kent County's actual assessments reflect only 20.64% of fair market value. Under the IAAO standards, a measure of less than 90% is unacceptable.

In addition to a county-wide sales ratio for all types of property, Almy calculated sales ratios derived from the full-value assessments for three specific types of property: residential property, commercial property, and vacant land. For each property type, he calculated sales ratios for each school district and for the county as a whole. The following chart presents the resulting median sales ratios:

| Jurisdiction | Median Sales Ratio for Residential Property | Median Sales Ratio for Commercial Property | Median Sales Ratio for Vacant Land |
|---|---|---|---|
| Caesar Rodney | 0.3611 | 0.3379 | 0.1667 |
| Capital | 0.3820 | 0.3210 | 0.2089 |
| Lake Forest | 0.3397 | 0.3439 | 0.1756 |
| Milford | 0.3449 | 0.3609 | 0.2413 |
| Smyrna | 0.3365 | 0.3144 | 0.1454 |
| Woodbridge | NA[9] | NA[10] | 0.1956 |
| Countywide | 0.3535 | 0.3370 | 0.1813 |
| IAAO Minimum | 0.9000 | 0.9000 | 0.9000 |

As the chart shows, the median sales ratios range from a low of 0.1667 for vacant land in the Caesar Rodney School District to a high of 0.3820 for residential property in the Capital School District. Reframed as percentages, the full assessed value of vacant land

---

[9] Woodbridge did not have a sufficiently large sample of residential sales in Kent County to produce a reliable result. *Id.* at 11.

[10] Woodbridge did not have a sufficiently large sample of commercial sales in Kent County to produce a reliable result. *Id.* at 11–12.

in the Caesar Rodney School District reflects 16.67% of its fair market value, and the full assessed value of residential homes in the Capital School District reflects 38.20% of its fair market value. Because Kent County in fact uses 60% of its assessments for tax purposes, the values actually range from a low of 10% of fair market value for vacant land in the Caesar Rodney School District to a high of 22.92% of fair market value for residential property in the Capital School District.

Countywide, the full assessed value of residential property in Kent County reflects 35.35% of its fair market value, the full assessed value of commercial property in Kent County reflects 33.70% of its fair market value, and the full assessed value of vacant land in Kent County reflects 18.13% of its fair market value. Because Kent County in fact uses 60% of its assessments for tax purposes, Kent County actually assesses residential property at 21.21% of fair market value, commercial property at 20.22% of fair market value, and vacant land at 10.88% of fair market value. To reiterate, under the IAAO standards, assessments are unacceptable when they reflect less than 90% of fair market value.

### c. The Level Of Assessment In New Castle County

Almy performed similar calculations for New Castle County. But when typing in the statistical formula to calculate the ratios for commercial properties, he inadvertently left out part of the function. The counties identified this problem after reviewing his report and supporting documentation, but they did not present an expert of their own who would have identified the error, and they chose not to depose Almy and question him about it before trial. They raised this issue for the first time on cross examination during trial, when it was too late for the error to be corrected. That was their tactical prerogative, but it

37

interfered with the truth-seeking function of the proceeding.[11] Almy therefore was unable to present any sales ratio data for commercial properties in New Castle County.

Almy nevertheless opined regarding the reliability of the overall sales ratio in New Castle County by assuming that commercial properties were assessed perfectly at fair market value.[12] On a county-wide basis, making that assumption, the overall sales ratio for New Castle County was 0.5127. In other words, even assuming that New Castle County values commercial property perfectly at 100% of fair market value, New Castle County assesses property overall at just 51.27% of its fair market value. To reiterate, under the IAAO standards, assessments are unacceptable when they reflect less than 90% of fair market value.

---

[11] *See* D.R.E. 611 ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . make those procedures effective for determining the truth . . . ."); *see also Buckham v. State*, 185 A.3d 1, 9 (Del. 2018) (recognizing the "the trial's truth-seeking function" and instructing trial judges to exercise their discretion over witness testimony in service of it); *Hoey v. Hawkins*, 332 A.2d 403, 405 (Del. 1975) (explaining that "a trial decision should result from a disinterested search for truth from all the available evidence rather than tactical maneuvers based on the calculated manipulation of evidence and its production" (internal quotation marks omitted)). *See generally* Daniel L. Herrmann, *The New Rules of Procedure in Delaware*, 18 F.R.D. 327, 339 (1956) (explaining that under the Delaware rules, "surprise has been reduced to a minimum and the 'sporting theory of justice' has been eliminated in the interest of the ascertainment of truth"; noting that "[t]he exponents of surprise testimony as the best weapon against a perjurious adversary become fewer and fewer as experience proves the contrary view").

[12] The record demonstrates that this assumption, while favorable to New Castle County, is counterfactual. *See* PTO ¶¶ 48–49; Dkt. 127, Ans. ¶ 32.

In addition to a county-wide sales ratio for all types of property, Almy calculated sales ratios for residential property and commercial property. He did not analyze vacant property because there were not enough transactions to provide reliable data. Once the counties identified the error in his formula for commercial property, he conceded that his values for the commercial property were incorrect, leaving only his values for residential property. The following chart presents the resulting median sales ratios:

| Jurisdiction | Median Sales Ratio for Residential Property |
|---|---|
| Brandywine | 0.3023 |
| Red Clay | 0.3123 |
| Christina | 0.3166 |
| Colonial | 0.3104 |
| Appoquinimink | 0.2845 |
| Smyrna | 0.3197 |
| City of Wilmington | 0.3242 |
| County ex. Wilmington | 0.2986 |
| Countywide | 0.3038 |
| IAAO Minimum | 0.9000 |

As the chart shows, the median sales ratios range from a low of 0.2845 for residential property in the Appoquinimink School District to a high of 0.3242 for residential property in the City of Wilmington. Reframed as percentages, the full assessed value of residential property in the Appoquinimink School District reflects 28.45% of its fair market value, and the full assessed value of residential homes in the City of Wilmington reflects 32.42% of its fair market value. To reiterate, under the IAAO standards, assessments are unacceptable when they reflect less than 90% of fair market value.

### d. Almy's Opinions Regarding The Level Of Assessment

Based on his analysis, Almy opined that the counties do not value property at its fair market value. Almy Tr. 150, 153–54. Almy further opined that the counties' use of an indefinite-base-year method of assessment is not a professionally defensible approach for properties that did not exist in the base year. JX 61 at 20. He explained that "[a]n assessor simply cannot take into account all changes in the supply and demand factors that define real estate markets while preserving the logic of base-year values. The result is assessments based on a non-uniform hodge-podge of factors that reflect values as of various dates." *Id.* He also noted that "it is virtually impossible to conclude what the market value of a property would have been much before it existed." *Id.*

### 2. The Factual Record On The Level Of Assessment

Separate and apart from Almy's expert testimony, the factual record establishes that the counties are violating the True Value Statute by failing to assess property at present fair market value. By their own admission, the counties do not assess property at present fair market value.

- Sussex County assesses property at 50% of the value it would have had if it existed in its present condition when Sussex County's last general assessment became effective in 1974. PTO ¶¶ 32–36. The resulting assessed values have no correlation with present fair market value. *Id.* ¶ 37.

- Kent County assesses property at 60% of the value it would have had if it existed in its present condition when Kent County's last general assessment became effective in 1987. *See id.* ¶¶ 68, 70. The resulting assessed values do not reflect present fair market value. Durham Dep. 27.

- New Castle County uses the value that the property would have had if it existed in its present condition when New Castle County's last general assessment became

40

effective in 1983. PTO ¶ 51. The resulting assessed values are substantially different than their present fair market values. *Id.* ¶ 59; Gregor Dep. 21, 60, 68–69.

New Castle County further recognizes that the ranges of deviations from present fair market value are quite broad. In its answer to the City of Wilmington's complaint, New Castle County "[a]dmitted that the Assessment Ratios for residential properties in the County may be less than 20% of fair market value or greater than 50% of current fair market value." Dkt. 127, Ans. ¶ 32. New Castle County also "[a]dmitted that for commercial properties in the County, the comparative ratios may vary by an even greater amount." *Id.*

The total taxable assessed value of taxable properties on the New Castle Assessment Roll for fiscal year 2018 was $19,438,388,450. PTO ¶ 48. In this litigation, the then-incumbent Chief Financial Officer of New Castle County acknowledged that the same properties have a present fair market value of $58 billion (plus or minus 10%). *Id.* ¶ 49. Based on the testimony of New Castle County's then-Chief Financial Officer, the overall sales ratio for all property in New Castle County is approximately 33%.

The counties' admissions in this case comport with other evidence in the record. In 2017, New Castle County analyzed the divergence between assessed values and fair market values when evaluating the prospect of a general reassessment. *See* JX 10 at 5, 17; JX 11 at 3–4; JX 12 at 10, 12. One graph showed the median sales ratio for New Castle County declining from 1.0 in 1983 to below 0.30 in 2017. *See* JX 10 at 5; JX 12 at 10; *see also* JX 76 at 3 (reporting that a random sample of properties in New Castle County had a median

41

sales ratio of 0.2820, that 69% of the properties had sales ratios between 0.24 and 0.31, and that the range of the sales ratios in the sample was 0.168 to 0.727).

The 2008 Reassessment Committee concluded that Delaware's counties were not assessing property at fair market value, observing that "many properties are assessed at rates as low as 6% of market value" and that "[b]ecause assessments have not kept pace with increases in market values, Delaware's statewide assessed valuation represents just 21% of the market value." JX 3 at 6.

The Equalization Committee has conducted sales ratio studies that reveal a wide divergence between assessed values and fair market value. In its recommendations for 2017, 2018, and 2019, the Equalization Committee determined that the divergence was so great that it could not make an equitable recommendation as to the allocation of Equalization Funding. *See* Almy Tr. 157; JX 9 at 10, 13–14, 16; JX 13 at 9, 12–13, 15; JX 21 at 9, 12–13, 15; *see also* JX 84.

In the 2017 Division III Study, Professor Ratledge demonstrated that Delaware's counties do not assess property at fair market value. Professor Ratledge calculated an overall sales ratio for property in Sussex County of 0.08, an overall sales ratio for property in Kent County of 0.21, and an overall sales ratio for property in New Castle County was 0.30. JX 84 at 12. The study also included a table showing steadily declining sales ratios from 1996 until 2016 as market values diverged from assessed values. *Id.* at 13.

For New Castle County, where Almy provided the least data because of the typographical error in his formula for commercial properties, the 2017 Division III Study

reported the following sales ratios as of September 2016 for the school districts in New Castle County.

| Jurisdiction in New Castle County | Business Property | Farmland | Residential Property | Vacant Land | Total |
|---|---|---|---|---|---|
| Appoquinimink | 0.339 | 0.260 | 0.286 | 0.112 | 0.289 |
| Brandywine | 0.339 | 0.260 | 0.279 | 0.112 | 0.296 |
| Christina | 0.339 | 0.260 | 0.298 | 0.112 | 0.313 |
| Colonial | 0.339 | 0.260 | 0.290 | 0.112 | 0.313 |
| Red Clay | 0.339 | 0.260 | 0.294 | 0.112 | 0.300 |
| Smyrna (in NCC) | 0.339 | 0.260 | 0.290 | 0.112 | 0.284 |

*Id.* at 37; *see also id.* at 13, 20.

The factual record also provides support for Almy's opinion that the counties' indefinite-base-year system is professionally indefensible. The 2008 Reassessment Committee noted that "[t]he current industry standard is to evaluate the actual market value of properties at least once every six years." JX 3 at 6. The IAAO standards promulgated by the IAAO recommends that "ratio studies made by assessors should be conducted at least annually." JX 7 at 10.

### 3. This Court's Findings Regarding The Counties' Compliance With The True Value Statute

The plaintiffs proved by a preponderance of the evidence that the counties violate the True Value Statute by using an indefinite-base-year method of assessment that produces assessed values that diverge wildly from present fair market value. Sussex County violates the True Value Statute by using an indefinite-base-year method that assesses property at 50% of the value it would have had when its last general assessment went into effect in 1974. Kent County violates the True Value Statute by using an indefinite-base-year method that assesses property at 60% of the value it would have had when its last

43

general assessment went into effect in 1987. New Castle County violates the True Value Statute by using an indefinite-base-year method that assesses property at the value it would have had when its last general assessment went into effect in 1983. The assessed values in each county do not reflect present fair market value.

Despite this overwhelming evidence, the counties claim that the plaintiffs failed to carry their burden of proof because the evidentiary standard is "a very heavy one." Dkt. 223 at 82 (internal quotation marks omitted). For this proposition, they cite the Delaware Supreme Court's observation in *Brennan* that when a "taxpayer is seeking . . . to set aside [an] entire assessment on the ground that the Board [of Assessment Review] has completely disregarded the applicable constitutional and statutory provisions in the performance of its duty . . . the burden resting on the taxpayer is a very heavy one." 104 A.2d at 792–93. The reference to a "very heavy" burden did not alter the preponderance-of-the-evidence standard. The Delaware Supreme Court was rather emphasizing that a single taxpayer cannot overturn an overall scheme of assessments "by showing that his own assessment is unreasonably high." *Brennan*, 104 A.2d at 793.

In this case, the plaintiffs introduced persuasive evidence of systemic problems with the counties' assessments. Even assuming that the evidentiary standard was a higher one, the plaintiffs presented clear and convincing evidence that the counties fail to comply with the True Value Statute.

**B.     The Counties' Compliance With The Uniformity Clause**

The NAACP-DE and the DEO contend that the counties are violating the Uniformity Clause. The City of Wilmington contends that New Castle County is violating the Assessment Roll Statutes by failing to comply with the Uniformity Clause.

Under the Uniformity Clause, "[a]ll taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, except as otherwise permitted herein, and shall be levied and collected under general laws passed by the General Assembly." Del. Const. art. VIII, § 1. The Uniformity Clause "requires that all taxpayers of the same class residing within the same tax district be treated equally." *Stewart*, 378 A.2d at 116. Uniformity "is achieved when all taxpayers of the same general class and within the territorial limits of the authority are treated the same." *Seaford Assocs.*, 539 A.2d at 1049.

Perfect uniformity is neither possible nor expected. "Taxation is not an exact science and, therefore, the uniformity clause does not require that all taxes be assessed with computer precision against all taxpayers equally." *Stewart*, 378 A.2d at 115. Property values change over time, particularly in a dynamic economy, and the reality of "frequent economic change will strain any system of assessment which seeks to be uniform." *Id.* at 116. "Optimally, every system of assessment will incorporate both the preference for present market value and the requirement of uniformity into its general scheme; but, when these two concepts cannot be accommodated under the facts of a specific case, the former must give way to the latter as the true measure of assessment." *Id.* at 115–16.

45

The Uniformity Clause requires a uniform method of assessment because "in the taxation of real property [uniformity] cannot be achieved without a uniform system of assessment." *Id.* at 115. The base-year method, when properly employed, balances the preference for assessing property at its present fair market value with the need to ensure that all taxpayers of the same general class and within the territorial limits of the authority are treated the same. *See id.*

In this case, the plaintiffs proved that the counties are using indefinite-base-year methods that do not generate anything approaching acceptable levels of uniformity. The counties have used the same assessed values for so long that taxpayers of the same general class and within the territorial limits of the authority are not treated the same. Instead, taxpayers experience quite different effective rates of taxation. The fact that property owners pay the same nominal rates creates a mirage of uniformity. The underlying assessed values diverge from present fair market value to such a degree that the reality is a profound lack of uniformity. As with the counties' violations of the True Value Statute, the evidence on this point was one-sided and overwhelming.

### 1. The Expert Analysis Of Uniformity

To address the issue of uniformity, the plaintiffs again relied on expert testimony and analysis from Almy. Once again, the defendants chose not to present any expert testimony. Once again, Almy provided credible and persuasive analysis.

Expert assessors like Almy assess uniformity in tax systems by comparing sales ratios using statistical methods. The parties agree that a sales ratio study is an accepted and effective method for evaluating whether taxes are being levied uniformly. PTO ¶ 90.

46

Expert assessors study sales ratios to evaluate the relative levels at which properties are assessed, thereby exposing how a property tax system allocates the real burden of taxation, as opposed to the nominal burden of taxation. Even if properties are taxed at the same nominal rate per dollar of assessed value, the properties that are assessed at a higher ratio to present fair market value will pay taxes at a higher effective rate. The relatively higher-valued properties pay a relatively higher share of the tax burden, which may cause the system to be non-uniform. *See* Almy Tr. 141–42; JX 61 at 2, 4.

Expert assessors consider at least three different dimensions of uniformity. One dimension examines the sales ratios of similar types of properties. In a uniform system, similar types of property will have similar sales ratios. In a non-uniform system, the sales ratios of properties within the same category will diverge, resulting in the higher-valued properties paying a higher effective rate and bearing a greater relative share of the relative tax burden. Almy referred to this dimension of his analysis as the issue of horizontal equity. This decision refers to the issue as "within-category uniformity," because the analysis tests whether similar properties that are grouped together in a category receive uniform treatment. *See* Almy Tr. 139; JX 61 at 4.

A second dimension of uniformity compares the sales ratios of one category (such as residential property) with the overall sales ratio for all properties or with the sales ratios for properties in another category (such as commercial property). In a uniform system, the sales ratios will be similar. In a non-uniform system, the sales ratios will diverge, with the category of property with a higher sales ratio paying a higher effective rate and bearing a relatively greater share of the tax burden. *See* Almy Tr. 139; JX 61 at 3. Almy regarded

47

this dimension of uniformity as a second aspect of horizontal equity. This decision refers to it as "cross-category uniformity," because it examines whether properties in different categories receive uniform treatment.

A third dimension of uniformity compares the sales ratios of lower-value properties with the sales ratios of higher-value properties. In a uniform system, sales ratios will be similar regardless of property value. In a non-uniform system, the sales ratios at one end of the valuation spectrum may be higher than the sales ratios at the other end of the valuation spectrum. Once again, even if the properties are taxed at the same nominal rate per dollar of assessed value, the properties assessed at a higher level pay a higher effective tax rate, causing them to bear a greater relative share of the tax burden per dollar of true value. *See* Almy Tr. 141–42; JX 61 at 2, 4. This decision refers to this dimension of uniformity as "price-related uniformity."

A lack of price-related uniformity could favor either higher-value properties or lower-value properties. Generally speaking, if the higher-value properties have a lower sales ratio, then the owners of lower-value properties bear a greater relative share of the tax burden, and the system is regressive. If the higher-value properties have a higher sales ratio, then the owners of lower-value properties bear a smaller relative share of the tax burden, and the system is progressive. The IAAO standards state that "[a]ppraisals made for tax purposes of course should be neither regressive nor progressive." JX 7 at 14.

### a.      Within-Category Uniformity

To measure within-category uniformity, expert assessors use a statistical measure of variability called the coefficient of dispersion. PTO ¶ 96. To derive this measure, the

assessor identifies a statistically significant group of properties within the category being examined, then calculates sales ratios for the properties within the group. The coefficient of dispersion measures the extent to which the sales ratios of individual properties within the group deviate on a percentage basis from the median sales ratio for the group. In a category with a low coefficient of dispersion, similar properties have similar sales ratios. When graphed, the observations clump together, indicating a high degree of uniformity. In a category with a high coefficient of dispersion, similar properties have divergent sales ratios. *See* Almy Tr. 138–39; JX 61 at 4; PTO ¶¶ 97–98.

The IAAO has established ranges of acceptable coefficients of dispersion for different types of properties in jurisdictions similar to the counties. For residential properties, the range is 0.05 to 0.15. JX 7 at 19.[13] For commercial or business properties, the range is 0.05 to 0.20. JX 7 at 19; *see* PTO ¶ 100. For vacant land, the range is 0.05 to 0.25. JX 7 at 19; *see* PTO ¶ 101. *See generally* Almy Tr. 140; JX 7 at 19, 34.

_____

[13] In the pre-trial order, the parties stipulated that the IAAO standards set the range for the coefficient of dispersion for residential properties as 0.05 to 0.20. *See* PTO ¶ 99. In tension with this stipulation, the IAAO standards state that the range is actually 0.05 to 0.15. JX 7 at 19. Given the clarity of the IAAO standards, this decision uses the official standard, rather than the parties' stipulation. "Courts have broad discretion in determining whether to hold a party to a stipulation and may set aside a stipulation where enforcement would not be conducive to justice." 73 Am Jur. 2d *Stipulations* § 12, Westlaw (database updated Feb. 2020) (footnote omitted); *accord Perry v. Neupert*, 2019 WL 719000, at *28 (Del. Ch. Feb. 15, 2019). The misstatement of the IAAO standards was an obvious mistake, and it would be unjust to apply it.

### i. Within-Category Uniformity In Sussex County

Almy calculated coefficients of dispersion for each school district located in Sussex County and for the county as a whole. He again examined residential property, commercial property, vacant land, and mobile homes. The following chart presents the results:

| Jurisdiction | COD for Residential Property | COD for Commercial Property | COD for Vacant Land | COD for Mobile Homes |
|---|---|---|---|---|
| Indian River | 0.260 | 0.495 | 0.943 | 0.245 |
| Laurel | 0.249 | 0.556 | 0.691 | 0.217 |
| Seaford | 0.246 | 0.440 | 0.626 | 0.198 |
| Milford | 0.219 | 0.533 | 2.039 | 0.201 |
| Woodbridge | 0.231 | 0.359 | 0.611 | 0.195 |
| Cape Henlopen | 0.299 | 0.610 | 0.875 | 0.317 |
| Delmar | 0.292 | 0.490 | 1.1948 | 0.231 |
| Countywide | 0.277 | 0.527 | 0.988 | 0.252 |
| IAAO Max. | 0.150 | 0.200 | 0.250 | 0.200 |

For residential property, commercial property, and vacant land, the coefficients of dispersion exceed the maximums deemed acceptable by the IAAO in every school district and for the county as a whole. For mobile homes, the coefficients of dispersion equal or are slightly below the maximum in two districts, while exceeding the maximum in five districts and for the county as a whole.

### ii. Within-Category Uniformity In Kent County

Almy calculated coefficients of dispersion for each school district located in Kent County and for the county as a whole. He again examined residential property, commercial property, and vacant land. The following chart presents the results:

| Jurisdiction | COD for Residential Property | COD for Commercial Property | COD for Vacant Land |
|---|---|---|---|
| Caesar Rodney | 0.161 | 0.323 | 0.491 |
| Capital | 0.196 | 0.400 | 0.434 |
| Lake Forest | 0.167 | 0.427 | 0.452 |
| Milford | 0.202 | 0.347 | 0.398 |
| Smyrna | 0.158 | 0.380 | 0.623 |
| Woodbridge | NA[14] | NA[15] | 0.369 |
| Countywide | 0.182 | 0.377 | 0.488 |
| IAAO Max. | 0.150 | 0.200 | 0.250 |

For each category of property, the coefficients of dispersion exceed the maximums deemed acceptable by the IAAO in every school district and for the county as a whole.

### iii.     Within-Category Uniformity In New Castle County

Almy calculated coefficients of dispersion for each school district located in New Castle County and for the county as a whole. He examined both residential and commercial property, but because of the error in his formula for commercial property, those results could not be used. The following chart presents the results for residential property:

---

[14] Woodbridge School District did not have a sufficiently large sample of residential sales in Kent County to produce reliable results. JX 61 at 11.

[15] Woodbridge School District did not have a sufficiently large sample of commercial sales in Kent County to produce reliable results. *Id.* at 11–12.

| Jurisdiction | COD for Residential Property |
|---|---|
| Brandywine | 0.344 |
| Red Clay | 0.311 |
| Christina | 0.288 |
| Colonial | 0.272 |
| Appoquinimink | 0.173 |
| Smyrna | 0.380 |
| Wilmington | 0.360 |
| County ex. Wilmington | 0.235 |
| Countywide | 0.288 |
| IAAO Max. | 0.150 |

The coefficients of dispersion for residential property exceed the maximums deemed acceptable by the IAAO for every school district, for the City of Wilmington, for the county excluding the City, and for the county as a whole. Almy Tr. 151.

### iv. Almy's Opinions Regarding Within-Category Uniformity

Based on his analysis, Almy opined that Sussex County and Kent County do not tax real property in a uniform manner. JX 61 at 20. Almy also opined that New Castle County does not tax property in a uniform manner, but because his analysis of commercial property could not be used, his opinion was limited to New Castle County's taxation of residential property. *Id.*

### b. Cross-Category Uniformity

To analyze cross-category uniformity, professional assessors compare the measures of central tendency for different categories of property, both among themselves and with the overall level of assessment. Under the IAAO standards, levels of assessment are unacceptable when they differ by more than 5% from each other or from the overall level of assessment. JX 7 at 17. For example, if the overall sales ratio for a jurisdiction is 0.80,

then each category of property should have an assessment ratio between 0.76 and 0.84. A jurisdiction with assessments falling in this range would be achieving uniformity by taxing different categories of property at similar levels. A jurisdiction that taxed one or more categories of property at 75% or less of fair market value or 85% or more of fair market value would not be achieving uniformity, because it would be taxing different categories of property at unacceptably different levels. *See* JX 61 at 3; JX 7 at 18–19.

### i.  Cross-Category Uniformity In Sussex County

To assess cross-category uniformity in Sussex County, Almy compared the sales ratios for residential property, business property, and vacant land with the overall sales ratio for the county. The overall sales ratio for Sussex County was 0.1687. The residential sales ratio was 0.1622, a figure 3.85% less than the county-wide ratio. The business sales ratio was 0.1307, a figure 22.53% less than the county-wide ratio. The vacant land sales ratio was 0.0299, a figure 82.28% less than the county-wide ratio. Almy opined that based on these competing ratios, Sussex County fails to value different categories of property in a uniform manner. *See* JX 61 at 20. For tax purposes, the differential for residential property falls within levels that the IAAO views as acceptable, but business property is undervalued and vacant land is significantly undervalued. *See id.* at 18. Relative to owners of residential property, owners of business property pay less than their fair share, and owners of vacant land pay far less than their fair share.

### ii.  Cross-Category Uniformity In Kent County

To assess cross-category uniformity in Kent County, Almy compared the sales ratios for residential property, business property, and vacant land with the overall sales

ratio for the county. The overall sales ratio for Kent County was 0.3440. The residential sales ratio was 0.3535, a figure 2.76% greater than the county-wide ratio. The business sales ratio was 0.3370, a figure 2.03% less than the county-wide ratio. The vacant land sales ratio was 0.1813, a figure 47.30% less than the county-wide ratio. Almy opined that based on these competing ratios, Kent County fails to value different categories of property in a uniform manner. *See Id.* at 20. The differential between residential property and commercial property falls within levels that the IAAO views as acceptable, meaning that as between those two categories, property valuations are relatively uniform. Vacant land, however, is significantly undervalued. *See id.* at 13. Relative to owners of residential property and business property, owners of vacant land pay far less than their fair share.

### iii.    Cross-Category Uniformity In New Castle County

To assess cross-category uniformity in New Castle County, Almy compared the sales ratios for residential property and commercial property with the overall sales ratio for the county. Because Almy's formula for calculating ratios for commercial property contained an error, his comparisons were flawed and could not be used.

Almy separately examined the cross-category uniformity of residential property in the City of Wilmington with the county as a whole. The county-wide median ratio for residential property was 0.3038. The median sales ratio for the City was 0.3242, a figure 6.71% greater than the county-wide ratio and outside the range that the IAAO regards as acceptable. Almy opined that as between the City and the county as a whole, New Castle County is not valuing different categories of property in a uniform manner. *See* Almy Tr.

152; JX 61 at 20. Relative to owners of residential property in the county as a whole, owners of residential property in the City pay more than their fair share.

### c. Price-Related Uniformity

To examine price-related uniformity, professional assessors use two measures: (i) the coefficient of price-related bias and (ii) the price-related differential. The coefficient of price-related bias is derived by conducting a regression of the percentage differences in assessed values against a measure of value that equally weights assessed values and sales prices. If the coefficient is not statistically significant, then the analysis does not indicate any bias. If the coefficient is significant and exceeds plus or minus 0.05, then the regression indicates bias. A coefficient outside a range of -0.10 to 0.10 indicates an unacceptable level of price-related bias. *See* Almy Tr. 140–42; JX 7 at 19, 29; JX 61 at 4.

The price-related differential divides the mean sales ratio for a group of properties by the weighted mean ratio for the same group of properties. In an ideally uniform jurisdiction, the ratios would be the same, so the result would equal 1.0. A price-related differential that exceeds 1.0 indicates that higher-value properties are taxed at a lower percentage of fair market value than lower-value properties, signaling a regressive system. A price-related differential that is less than 1.0 indicates that higher-value properties are taxed at a higher percentage of fair market value than lower-value properties, signaling a progressive system. Under the IAAO standards, the price-related differential for a jurisdiction should not be less than 0.98 or greater than 1.03. *See* Almy Tr. 141–42; JX 7 at 14, 19, 29, 36; JX 61 at 4

Almy calculated price-related differentials but provided them for "information purposes only." JX 61 at 3. He did not offer any opinions on price-related differentials. Almy Tr. 191. He also testified on cross-examination that his analysis of price-related uniformity only related to whether a tax system was progressive or regressive, which he regarded as a different inquiry than whether the level of assessments fell within an acceptable range or whether the system was sufficiently uniform. *See* Almy Tr. 306. For purposes of Delaware law, however, a system that is overly regressive or overly progressive would not comply with the Uniformity Clause, because similarly situated taxpayers would not be treated similarly.

### i. Price-Related Uniformity In Sussex County

To examine price-related uniformity in Sussex County, Almy calculated county-wide coefficients of price-related bias for residential property, commercial property, vacant land, and mobile homes. For residential property, Almy reported a statistically significant coefficient of price-related bias of -0.133, which indicates that with each doubling of fair market value, the level of assessed value of a residential property decreases by 13.3%. *See* JX 61 at 16. For commercial property, Almy reported a statistically significant coefficient of price-related bias of -0.054, which indicates that with each doubling of fair market value, the assessed value of a commercial property decreases by 5.4%. *See id.* at 17. For vacant land in Sussex County, Almy reported a statistically significant coefficient of price-related bias of -0.134, which indicates that with each doubling of fair market value, the assessed value of a vacant land decreases by 13.4%. *See id.* at 17. For mobile homes in Sussex County, Almy reported a statistically significant coefficient of price-related bias of -0.149,

56

which indicates that with each doubling of fair market value, the assessed value of a mobile home decreases by 14.9%. *See id.* at 18. In each case, the coefficients imply that the system of tax assessments in Sussex County is unacceptably regressive, resulting in owners of lower-value properties paying more than their fair share of property taxes. *See generally* JX 7 at 19.

For informational purposes, Almy reported the price-related differentials for each school district located in Sussex County and for the county as a whole. He again examined residential property, commercial property, vacant land, and mobile homes. The following chart presents the results:

| Jurisdiction | PRD for Residential Property | PRD for Commercial Property | PRD for Vacant Land | PRD for Mobile Homes |
|---|---|---|---|---|
| Indian River | 1.178 | 1.377 | 1.631 | 1.098 |
| Laurel | 1.097 | 1.043 | 1.686 | 1.091 |
| Seaford | 1.023 | 1.546 | 1.719 | 1.043 |
| Milford | 1.020 | 1.415 | 2.136 | 1.046 |
| Woodbridge | 1.103 | 1.429 | 1.834 | 1.070 |
| Cape Henlopen | 1.208 | 1.060 | 1.536 | 1.295 |
| Delmar | 1.144 | 0.802 | 2.036 | 1.050 |
| Countywide | 1.203 | 1.329 | 1.652 | 1.135 |
| IAAO Range | 0.980 to 1.030 | 0.980 to 1.030 | 0.980 to 1.030 | 0.980 to 1.030 |

For the county as a whole, the price-related differentials for every category of property exceeded the maximum deemed acceptable by the IAAO. In each case, the price-related differentials were greater than one, indicating a non-uniform system in which higher-value properties are assessed at a lower percentage of fair market value than lower-value properties. Under this regressive system, owners of lower-value properties bear a greater relative share of the tax burden.

Within specific school districts, only Seaford and Milford had price-related differentials for residential property that fell within the acceptable range. All others fell outside the maximum range.

With one exception (commercial property in Delmar), all of the price-related differentials exceeded one, indicating that higher-value properties are assessed at a lower percentage of fair market value than lower-value properties. Under this regressive system, owners of lower-value properties bear a greater relative share of the tax burden.

### ii.     Price-Related Uniformity In Kent County

To examine price-related uniformity in Kent County, Almy calculated county-wide coefficients of price-related bias for residential property, commercial property, and vacant land. For residential property, Almy reported a statistically significant coefficient of 0.033, which indicated that with each doubling of fair market value, the assessed value of a property increased by 3.3%. This result indicates that the overall system of tax assessment for residential property in Kent County is progressive and results in owners of higher-value properties bearing a relatively greater share of the tax burden. *See* JX 61 at 11. The coefficient for commercial property was not statistically significant. Almy reported a statistically significant coefficient for vacant land of -0.098, which indicated that with each doubling of fair market value, the assessed value of a property decreased by 9.8%. This result indicates that the overall system of tax assessment for vacant land in Kent County is regressive and results in owners of higher-value properties bearing a relatively lower share of the tax burden. *See id.* at 12.

58

For informational purposes, Almy reported the price-related differentials for each school district located in Kent County and for the county as a whole. He again examined residential property, commercial property, and vacant land. The following chart presents the results:

| Jurisdiction | PRD for Residential Property | PRD for Commercial Property | PRD for Vacant Land |
|---|---|---|---|
| Caesar Rodney | 1.009 | 0.959 | 1.164 |
| Capital | 1.037 | 1.168 | 1.335 |
| Lake Forest | 1.020 | 1.273 | 1.179 |
| Milford | 1.035 | 1.255 | 1.209 |
| Smyrna | 1.000 | 1.623 | 1.092 |
| Woodbridge | NA[16] | NA[17] | 1.173 |
| Countywide | 1.019 | 1.211 | 1.208 |
| IAAO Range | 0.980 to 1.030 | 0.980 to 1.030 | 0.980 to 1.030 |

For the county as a whole, the price-related differentials for commercial property and vacant land exceeded the maximum acceptable range. The price-related differential for residential property fell within the acceptable range.

Except for Smyrna, the price-related differentials for residential property in specific school districts were all greater than one, indicating that higher-value properties are taxed at a lower percentage of fair market value and resulting in a regressive system. In the Caesar Rodney and Lake Forest school districts, the extent of the mispricing fell within the

---

[16] Woodbridge School District did not have a sufficiently large sample of residential sales in Kent County to produce reliable results. *Id.* at 11.

[17] Woodbridge School District did not have a sufficiently large sample of commercial sales in Kent County to produce reliable results. *Id.* at 11–12.

acceptable range. For Smyrna, there was no mispricing. For the other districts, the price-related differentials for residential property show price-related bias.

Except for Caesar Rodney, the price-related differentials for commercial property were all greater than one, indicating that higher-value properties are taxed at a lower percentage of fair market value and resulting in a regressive system. In Caesar Rodney, the price-related differential was less than one, indicating that higher-value properties are taxed at a higher percentage of fair market value and resulting in a progressive system. All of the values fell outside the acceptable range, indicating price-related basis.

For vacant land, all of the price-related differentials fell outside the acceptable range. All were greater than one, indicating an unacceptable level of regressive, price-related bias.

### iii.    Price-Related Uniformity In New Castle County

To examine price-related uniformity in New Castle County, Almy calculated a statistically significant coefficient of price-related bias for residential property of -0.252. The coefficient indicates that with each doubling of fair market value, the assessed value of a property decreases by 25.2%. This indicates that the overall system of tax assessments in New Castle County is regressive and results in owners of higher-value properties bearing a relatively lower share of the tax burden. *See id.* at 14.

For informational purposes, Almy reported price-related differentials for each school district in the county, for the City of Wilmington, for the county excluding the City, and for the county as a whole. He examined both residential and commercial property, but because of the error in his formula for generating ratios for commercial property, the results

60

for commercial property could not be used. The following chart presents the results for residential property:

| Jurisdiction | PRD for Residential Property |
|---|---|
| Brandywine | 1.163 |
| Red Clay | 1.124 |
| Christina | 1.121 |
| Colonial | 1.121 |
| Appoquinimink | 1.081 |
| Smyrna | 1.196 |
| Wilmington | 1.181 |
| County ex. Wilmington | 1.099 |
| Countywide | 1.132 |
| IAAO Range | 0.980 to 1.030 |

All of the price-related differentials exceed the maximum deemed acceptable by the IAAO.

## 2. The Factual Record On Uniformity

The factual record on uniformity its more limited than the factual record on the level of assessment, but it nevertheless corroborates Almy's analysis and supports a finding of non-uniformity. The factual evidence at trial demonstrated, and the counties did not dispute, that (i) property values have changed dramatically since the counties conducted their last general assessments, and (ii) property values have not appreciated at uniform rates within each county. *See* PTO ¶¶ 17, 58, 77, 79; JX 6; JX 71; JX 72. The operation of these trends over the intervening decades since the counties established their base-year valuations has resulted in assessed values that are disparate and non-uniform within the counties. Similar properties are not valued similarly, and owners of similar properties do not pay similar rates of taxation. *See* PTO ¶¶ 80–81.

County officials implicitly recognized the lack of uniformity by testifying about the need for a general reassessment. A Kent County official admitted that the county should

conduct a general reassessment "for equity purposes." *Id.* ¶ 84 (internal quotation marks omitted). A New Castle County official admitted that the county should conduct a general reassessment "so that the application of real estate taxes across the county would be equitable." *Id.* ¶ 61 (internal quotation marks omitted). He further agreed that the divergent levels of assessment have become "an issue of credibility that we are applying things in such a way that you can have predictable results." Gregor Dep. 77.

The 2008 Reassessment Committee observed that "[n]ot conforming to [assessment standards] creates many equity issues throughout the State and could potentially be a violation of the Uniformity Clause under Article VIII, § 1 of the Delaware Constitution." JX 3 at 6. The committee noted that "[m]any properties that were given the same valuation in the last assessment have substantially different market values today." *Id.* Because of the lack of uniformity, the 2008 Reassessment Committee recommended that the State "take on the role of implementing a comprehensive statewide reassessment of all property" and called for "[a]ll properties [to] be assessed at 100% of market value with annual revaluations." *Id.* at 4. The committee observed that a statewide reassessment would "restore the integrity and equity to the property tax base," thus recognizing that the assessments as they existed in 2008 lacked integrity and were not equitable. *Id.* at 12. The evidence at trial demonstrates that since then, the situation has only gotten worse. *See* JX 84 at 6.

### 3. The Court's Findings On Uniformity

The plaintiffs proved by a preponderance of the evidence that the counties violate the Uniformity Clause by persistently using valuations from 1974, 1983, and 1987. Both the expert analysis and the factual evidence support this finding.

Almy's expert analysis demonstrates a pervasive lack of uniformity. It can be said with some irony that the counties' assessments are uniformly non-uniform. Not only are the assessments themselves non-uniform across each of the critical dimensions, but the levels of non-uniformity vary, with certain types of property, in certain districts or counties, and for particular dimensions exhibiting non-uniformity to more extreme degrees.

Almy's analysis admittedly identifies isolated instances of uniformity for certain types of property in particular districts, and there are also specific categories of property where Almy's analysis would not support a finding of non-uniformity in isolation. In Sussex County, the assessments for mobile homes in two school districts exhibit an acceptable degree of within-category uniformity, and the level of assessment for residential property exhibits cross-category uniformity with the level of assessment for the county as a whole. Otherwise, Sussex County's assessments are unacceptably non-uniform across all three dimensions of uniformity, for the county and in each school district, and for all types of property. In Kent County, the levels of assessments for residential and commercial property exhibit cross-category uniformity as between themselves, and the coefficient of price-related bias for commercial property was not statistically significant. Otherwise, Kent County's assessment are unacceptably non-uniform across all three dimensions of uniformity, for the county and in each school district, and for all types of property. In New

Castle County, because of the error in his formula, Almy's analysis does not support findings of non-uniformity as to commercial property, not is it possible to evaluate cross-category uniformity between commercial and residential property. New Castle County's assessments of residential property fail to meet the standards for within-category uniformity and price-related uniformity, and the assessments fail to meet the standard for cross-category uniformity when the assessments for properties in the City of Wilmington are compared with the assessments for properties in the rest of New Castle County.

On the whole, Almy's analysis demonstrates that the counties are operating unconstitutionally non-uniform systems of taxation. The factual evidence points to the same conclusion.

In response, the counties argue that they comply with the Uniformity Clause because they uniformly use the same stale base-year valuations for all properties, and each property owner pays taxes at the same nominal rate. As Almy explained, "The true test of uniformity is whether effective property tax rates (taxes as a percentage of market value) are reasonably uniform. . . . Consistent application of outdated valuation tables, when based on decades-old evidence, such as construction costs, sales, or net incomes, has no probative force." JX 61 at 1.

The counties persist in applying decades-stale assessments, creating an appearance of uniformity. Because present fair market values have diverged from the assessments to such a degree as to make the assessments arbitrary, property owners who pay the same nominal rates in reality pay quite different effective tax rates. The appearance of uniformity

64

is an illusion. The counties' nominally uniform use of the indefinite-base-year method treats similar taxpayers differently.

As with their showing for purposes of the True Value Statute, the plaintiffs introduced persuasive evidence of systemic problems with the counties' indefinite-base-year methods of tax assessment. Those problems are so pervasive as to render the counties' systems of tax assessment unconstitutional.

## C.    New Castle County's Compliance With The Same Rate Statute

The City of Wilmington contends that New Castle County fails to comply with the Same Rate Statute. This statute states that "[r]eal property, all of which shall be taxed at the same rate, shall consist of the following: (1) Land; (2) Buildings; (3) Improvements; (4) Special Betterments." 9 *Del. C.* § 8101(b). The City contends that the Same Rate Statute mandates more than just the same nominal rate of taxation. The City argues that it requires the same or substantially similar effective rates of taxation.

When interpreted against the backdrop of the Uniformity Clause and the True Value Statute, the plain language of the Same Rate Statute cannot be read to address effective rates of taxation. The plain language of the Same Rate Statute seeks to achieve cross-category uniformity among the four identified categories by requiring that the same nominal tax rate be used for each category. If New Castle County also complied with the True Value Statute, then the combination of the two statutes would result in uniform effective rates of taxation. New Castle County's system of assessments has become non-uniform and currently violates the Uniformity Clause because the county has failed to comply with the True Value Statute, not the Same-Rate Statute.

A fair and equitable system of taxation must necessarily take into account effective rates of taxation. If the Same Rate Statute were the only tax provision on the books, then perhaps it could be construed broadly to encompass effective tax rates. When read in conjunction with the Uniformity Clause and the True Value Statute, the Same Rate Statute only addresses nominal tax rates.

The City of Wilmington has not shown that New Castle County fails to apply the same nominal tax rates to all four categories of real property. Judgment will be entered in favor of New Castle County on this aspect of the City's claims.

## D. New Castle County's Compliance With The Assessment Roll Statutes

The City of Wilmington contends that New Castle County violates the Assessment Roll Statutes. These statutes authorize any municipality in the state to "elect to use the assessments and supplementary assessments for property in the municipality as established annually or quarterly by the [county] in which such municipality is located, subject to statutory judicial appeals, as the assessment roll of such municipality for municipal taxation." 22 *Del. C.* § 1101. The City has adopted an ordinance electing to use the assessments established by New Castle County. *See* JX 8.

Once a municipality has elected to use county assessments for municipal tax purposes, it "shall be entitled to receive a copy of the county assessments for the properties in the municipality . . . ." 22 *Del. C.* § 1103. Under the Assessment Roll Statutes, the pertinent county officials "shall certify the total assessed valuation for properties in the municipality to each municipality . . . ." *Id.* § 1104.

66

The City of Wilmington proved at trial that New Castle County's use of the indefinite-base-year method results in inaccurate assessment rolls and an inaccurate certification of total value. The sources of these inaccuracies are New Castle County's failure to comply with the True Value Statute and the Uniformity Clause, which this decision has already addressed. By failing to provide the City with accurate assessment rolls and an accurate certification of total value, New Castle County violates its statutory obligations under the Assessment Roll Statutes and deprives the City of its right to elect to use New Castle County's assessment rolls and certification.

### 1. The City Of Wilmington's Right To Use The New Castle County Assessment Roll

New Castle County maintains that the Assessment Roll Statutes do not grant the City of Wilmington a "right" to use the county's assessment roll. To support this position, New Castle County cites Section 1101, which uses the words "may . . . elect," and points out that the "may" is permissive. *See* Dkt. 223 at 78 & n.280 (quoting 22 *Del. C.* § 1101). The statute is permissive in the sense that it permits a municipality to decide whether to use the county's assessment roll. Section 1101 thus does not require the City to use New Castle County's assessment roll, and New Castle County could not force the City to use its assessment roll.[18]

---

[18] *See id.* at 78 & n.281 (citing *Senior Tour Players 207 Mgmt. Co. LLC v. Golftown 207 Hldg. Co. LLC*, 853 A.2d 124, 127 n.5 (Del. Ch. 2004) (explaining that 6 *Del. C.* § 18-108, which states that "a limited liability company may, and shall have the power to, indemnify and hold harmless any member or manager . . . ," is permissive and does not create a *per se* right to indemnification); then citing *Reynolds v. City & Cty. of S.F.*, 125 Cal. Rptr. 673, 673 (Cal. Ct. App. 1976) (explaining that statute providing that money other

Once a municipality exercises its right to use a county's assessment roll, then the county must comply with its statutory obligations. The plain language of the Assessment Roll Statutes grants municipalities in Delaware the right to elect "to use" the county's assessment roll. 22 *Del. C.* § 1101. By granting municipalities this right, the General Assembly relieved municipalities (and, indirectly, municipal taxpayers) of the duplicative costs associated with performing and defending assessments. *See* 57 Del. Laws ch. 278 (1969) (adopting "*AN ACT TO PERMIT MUNICIPALITIES TO ADOPT COUNTY ASSESSMENTS FOR PURPOSES OF MUNICIPAL TAXATION AND PROVIDING FOR THE IMPLEMENTATION THEREOF*").

The City of Wilmington has exercised its right to use New Castle County's assessment roll. At this point, New Castle County is depriving the City of its statutory right to rely on the county's assessment roll by persisting in using valuations from 1983.

### 2. The Proper Defendant For A Violation Of The Assessment Roll Statutes

To dodge its statutory obligations, New Castle County points out that under Section 1104, the Board of Assessment Review is obligated to "certify the total assessed valuation for properties in the municipality to each municipality." Dkt. 223 at 79 (citing 22 *Del. C.*

---

than taxes "may" be returned was permissive and did not create right of recovery); then citing *State ex rel. Scherer v. Madison Cty. Comm'rs*, 527 N.W.2d 615, 620 (Neb. 1995) (explaining that statute providing that county board "may" remove snow from certain streets did not impose duty to do so); and then citing *Affrunti v. Zwirn*, 892 F. Supp. 451, 459–60 (E.D.N.Y. 1995) (explaining that statute providing that members of town zoning board "may" be compensated did not create a right to compensation), *aff'd*, 100 F.3d 943 (2d Cir. 1996)).

§ 1104). New Castle County points out that the City has failed to sue the members of the Board, concluding that the City's claim must fail.

The steps in the process by which New Castle County generates its assessment roll demonstrate that the county and its employees dominate the process. Each year, the Office of Finance prepares the tax assessment roll. PTO ¶ 43; *see* 9 *Del. C.* § 1322(a). Each year, the Office of Finance must certify to the Chief Financial Officer that the assessments are correct. *See* 9 *Del. C.* § 1322(b). Each year, the Chief Financial Officer must "'certify to the County Council the total value of all property in the County and the total value of all property which has been assessed and is subject to taxation.'" PTO ¶ 45 (quoting 9 *Del. C.* § 1322(b)). The Chief Financial Officer is ultimately responsible for ensuring that New Castle County's tax assessments comply with Delaware law. *Id.* ¶ 42; *see* 9 *Del. C.* § 1322(b).

The role of the Board of Assessment Review in this process is important but limited: it reviews and approves the roll and the methods that the Director of Finance uses to establish the assessments. *See* 9 *Del. C.* § 1318. When the Board certifies the assessments, it implicitly relies on New Castle County's work, and it effectively passes on New Castle County's numbers.

The primary actor for purposes of the Assessment Roll Statutes and throughout the process of property tax assessment is thus New Castle County. The City of Wilmington has properly sought relief from New Castle County to fix the problems that the county has created under the Assessment Roll Statutes by using its indefinite-base-year method of valuation.

### 3. Unclean Hands

In one short paragraph, New Castle County argues that "the City has ignored its own obligation to assist [New Castle County] in tax appeals regarding City property, even when asked to do so, and is routinely derelict in providing permit information to [New Castle County] necessary to increase the assessed value of properties in the City." Dkt. 223 at 74 (footnotes omitted). According to New Castle County, "[t]he City seeks absolution from this Court for its complicity in the alleged problems with its property assessments." *Id.* New Castle County later reiterates this point, asserting that if its assessments are unlawful, then "the City has been *knowingly* taxing its own residents in an unconstitutional manner for years by using [New Castle County's] assessment." *Id.* at 79. According to New Castle County, the City's claim under the Assessment Roll Statutes should therefore "be dismissed under the doctrine of unclean hands." *Id.* at 80.

Conceptually, New Castle County is wrong. The City of Wilmington is not seeking absolution for any past complicity involving property assessments. The City is only seeking prospective relief. It wants the system to work going forward. If the City were seeking to recover damages from New Castle County for problems with past assessments, then New Castle County's argument would have more force. In a suit for prospective relief, however, the equities favor the City. "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat. Bank & Trust Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).

Doctrinally, this case does not warrant application of the doctrine of unclean hands. Before the doctrine will apply, the improper conduct must "relate directly to the underlying

70

litigation" in the sense of having an "'immediate and necessary'" relation to the claim for which relief is sought. *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998) (quoting *Kousi v. Sugahara*, 1991 WL 248408, at *2 (Del. Ch. Nov. 21, 1991)). The City of Wilmington's claims in this case turn on New Castle County's indefinite-base-year methodology. The City was not involved in setting that methodology, nor in using it to conduct property assessments. The City's past reliance on New Castle County's assessments does not have an immediate or necessary connection to the gravamen of the claim on which the City seeks relief.

> Nor does the public policy that undergirds the doctrine apply on these facts.
>
> The unclean hands doctrine is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case. The Court invokes the doctrine when faced with a litigant whose acts threaten to tarnish the Court's good name. In effect, the Court refuses to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals.

*Id.* The City of Wilmington has not taken any action that would "tarnish the Court's good name." Rather than shielding the court, applying the doctrine in this case would shield New Castle County from its obligation to comply with the Uniformity Clause and the True Value Statute, which in turn results in New Castle County failing to fulfill its obligations under the Assessment Roll Statutes.

## E.     The Counties' Evidentiary Objection To Almy's Analysis

In an effort to short circuit the plaintiffs' case, the counties contend that Almy's analysis is so unreliable as to be inadmissible under Delaware Rule of Evidence 702. In support of this argument, the counties cite three ways in which Almy departed from the

IAAO standards: (i) his report did not recite the confidence intervals for his median sales ratios, coefficients of dispersion, and coefficients of price-related bias; (ii) he did not use time-adjusted sales data or investigate whether a major economic shock occurred during his sales-price window, and (iii) he used procedures to clean and screen his data, then used techniques to reduce the effect of outliers, rather than validating every sale on which he relied. These objections do not fatally undermine Almy's analysis. The plaintiffs proved by a preponderance of the evidence that Almy's analysis was reliable and admissible. Even after giving weight to the counties' concerns, the court finds Almy's analysis persuasive.

### 1.    The Standards For Admissibility Under Rule 702

Under Delaware Rule of Evidence 702, an expert witness may testify in the form of an opinion or otherwise if:

   (a)    The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

   (b)    The testimony is based on sufficient facts or data;

   (c)    The testimony is the product of reliable principles and methods; and

   (d)    The expert has reliably applied the principles and methods to the facts of the case.

D.R.E. 702. Delaware Rule of Evidence 702 is identical to Federal Rule of Evidence 702, and the Delaware Supreme Court has endorsed the interpretations given to Rule 702 by the Supreme Court of the United States in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *M.G. Bancorp.,*

*Inc. v. Le Beau*, 737 A.2d 513, 522 (Del. 1999); *accord Bowen v. E.I. DuPont de Nemours & Co.*, 906 A.2d 787, 794 (Del. 2006).

### 2. The Court's Gatekeeper Obligation

Under Rule 702, the trial judge has a "special obligation" to act as a "gatekeep[er]" to ensure that expert testimony "is not only relevant, but reliable." *M.G. Bancorp.*, 737 A.2d at 522 (internal quotation marks omitted). The special gatekeeper obligation predominantly operates in cases that will be tried before a jury, where the judge acts as gatekeeper to ensure that "unreliable expert testimony does not carry too much weight with the jury." *United States v. Ozuna*, 561 F.3d 728, 737 (7th Cir. 2009); *accord In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006). "[T]here is less of a basis to use [the rule] to exclude testimony entirely in a bench trial because the judge can consider any shortcomings in the expert's testimony that are drawn out through cross-examination." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 593 n.122 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010); *accord Cornell Glasgow, LLC v. La Grange Props., LLC*, 2012 WL 6840625, at *21 n.237 (Del. Super. Dec. 7, 2012).

When making a gatekeeping assessment of reliability, the trial judge is primarily concerned with the "principles and methodology" used by the expert and whether they have "a reliable basis in the knowledge and experience of the relevant discipline." *Bowen*, 906 A.2d at 794 (internal quotation marks and alterations omitted). The trial judge therefore considers

(1) whether a theory or technique has been tested;

(2) whether it has been subjected to peer review and publication;

73

(3) whether a technique had a high known or potential rate of error and whether there are standards controlling its operation; and

(4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Bowen*, 906 A.2d at 794 (citing *Daubert*, 509 U.S. at 590–94). "[A]n expert's methodology must be not only reliable intrinsically but also be reliably applied to the facts of the specific case . . . ." *Gen. Motors Corp. v. Grenier*, 981 A.2d 524, 529 (Del. 2009). "The party seeking to introduce the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence." *Bowen*, 906 A.2d at 795.

There is no meaningful basis to dispute that the "principles and methodology" that Almy applied had "a reliable basis" in his discipline. Almy grounded his opinions and analysis on a sales ratio study, which the parties agree is a generally accepted method of analysis that is widely used to determine the extent to which assessments diverge from fair market value and to evaluate the uniformity and fairness of systems of taxation. *See* PTO ¶¶ 89–90. As a general matter, no one disputes this point, and provisions in the Delaware Code specifically call for the use of sales ratio studies.[19]

---

[19] The process of allocating Equalization Funding involves the use of a sales ratio study. *See* 14 *Del. C.* § 1707(b)(11). In making its recommendations for 2017, 2018, and 2019, the Equalization Committee examined sales ratio studies that used methodologies broadly consistent with Almy's approach and which identified prevailing sales ratios broadly consistent with Almy's findings. *See* Almy Tr. 157; JX 9 at 10, 13–14, 16; JX 13 at 9, 12–13, 15; JX 21 at 9, 12–13, 15; *see also* JX 84. The Delaware Code also calls for using a sales ratio study when a school district crosses county lines, making it necessary for the school district to true up the differences between levels of assessments in the counties so that properties are taxed uniformly. *See* 14 *Del. C.* § 1913(b).

What the counties really dispute are not the overarching principles on which Almy relied or the basic methodology that he employed, but rather the specific details of how he applied those principles and methods in the current case. Objections of this type "go to the weight of the evidence, not to its admissibility." *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001).

### 3. Almy's Ability To Make Judgments Under The IAAO Standards

Under the IAAO standards, Almy had the ability and obligation as an assessor to make judgments about whether to comply strictly with the standards or to make case-specific adjustments. Almy was uniquely situated to make judgments about whether to depart from the IAAO's standards, because he helped draft them, then played a major role in keeping them updated and determining how they should be applied. *See* Almy Tr. 126–28, 130, 131–32.

The IAAO standards make clear that an assessor must make judgments. The standards explain that "[t]he first step in any ratio study is to determine and state clearly the reason for the study," which "determines the specific goals, scope, content, depth and required flexibility." JX 7 at 8. In designing the study, "the assessor must consider the quantity of sale data and the resources available for conducting the ratio study. Although absolute accuracy cannot be ensured, all reasonable, cost-effective steps should be taken to maximize reliability." *Id.* The IAAO standards require only that "[t]he findings of a ratio study should be sufficiently detailed and documented to meet the needs of the users of the study." *Id.* at 16.

In this case, the purpose of the study was twofold. Its first purpose was to determine

75

the extent to which the counties' persistent use of valuations from 1974, 1983, and 1987 results in assessments that depart from present fair market value. Its second purpose was to determine whether continuing to use those valuations despite changes in property values since 1974, 1983, and 1987 results in a non-uniform system of taxation. *See* JX 61 at 1. Almy appropriately evaluated the extent of the analysis that he needed to conduct to address these issues. Both issues notably involve price changes of great magnitude and massive deviations from the ranges of value deemed acceptable by the IAAO. Almy was not charged with assessing the effect of a far shorter time period or smaller degree of variation, where more detailed investigation and finer-grained analysis might have been warranted. Almy properly chose to depart in minor instances from the IAAO standards given the reasons for his study.

When choosing to depart from the IAAO standards, Almy also took into account that he was acting as a litigation expert, and the IAAO standards were not drafted for litigation experts. They were intended for two categories of users: (i) local assessment districts evaluating their own taxation practices, and (ii) state supervisory and equalization agencies that oversee local assessment districts. Almy Tr. 136; *see* JX 7 at 7. The standards thus anticipate the existence of a client that will (i) possess and furnish the analyst with more extensive data than Almy received and (ii) help the analyst interpret the data. If the counties had hired Almy to evaluate their tax systems, as Kent County and New Castle County previously did in 1993 and 1994, then they doubtless would have furnished Almy with additional data, responded to his questions, and helped him analyze it. Instead, the plaintiffs had to obtain the data from the counties through discovery, and Almy had to

screen it, clean it, and analyze it on his own. Then, after reviewing Almy's report and the supporting information, the counties informed the plaintiffs that they would not be deposing Almy, nor would they be presenting an opposing expert. As a result, they did not raise certain easily correctable issues with Almy until trial, when it was too late for Almy to fix them.

As a general matter, Almy acted reasonably when departing from the IAAO standards. The counties' three specific objections to Almy's work do not alter the overall picture of thoughtfulness, conscientiousness, and reliability. Evidencing the reasonable and non-controversial nature of Almy's decisions, Professor Ratledge made similar decisions when preparing the 2017 Division III Study. *See* JX 84 at 8–14.

### 4. The Confidence Intervals

In their principal evidentiary argument, the counties contend that Almy's report is so unreliable as to be inadmissible under Rule 702 because the report did not identify the confidence intervals surrounding Almy's measures of central tendency. In making this argument, the counties rely on an IAAO standard which instructs that a sales ratio study "should" include the "confidence interval (measures of reliability) about the measures of central tendency." JX 7 at 16–17. Elsewhere, the IAAO standards explain the role of the confidence interval as follows:

> While the theoretically desired level of appraisal is 1.00, an appraisal level between 0.90 and 1.10 is considered acceptable for any class of property. However, each class of property must be within 5 percent of the overall level of appraisal of the jurisdiction . . . . Both criteria must be met. By themselves, the calculated measures of central tendency provide only an indication, not proof, of whether the level meets the appropriate goal. Confidence intervals and statistical tests should be used to determine whether it can be reasonably

77

concluded that appraisal level differs from the established goal in a particular instance. Additionally, when uniformity measures show considerable variation between ratios, level measurements may be less meaningful.

*Id.* at 17–18.

In his report, Almy stated that "[m]easures of central tendency and the coefficient of price-related bias were computed at the 95% level of confidence." JX 61 at 4–5. Almy thus represented that the measurements in his report fell within the requisite range 95% of the time. That range is the confidence interval.[20] Almy's report noted when his results were not statistically significant. *See* JX 61 at 7, 11, 14, 15, 17. If there had been results that fell outside of the confidence interval, Almy's report would have noted them.

The counties maintain that by failing to provide a specific confidence interval for each measurement in his report, Almy violated a bright-line requirement that renders the report useless. The IAAO standards state that a report "should" include confidence intervals, not that it "must" do so. The real concern with a failure to include confidence intervals is that the lower or upper bound for a particular measurement might fall within the acceptable ranges that the IAAO standards identify. Although Almy did not include his

---

[20] *See* JX 7 at 40 ("**Confidence interval.** A range of values, calculated from the sample observations, that are believed, with a particular probability, to contain the true population parameter (mean, median, COD). . . . **Confidence level.** The degree of probability associated with a statistical test or confidence interval, commonly 90, 95 or 99 percent. For example, a 95 percent confidence interval implies that were the estimation process repeated again and again, then 95 percent of the calculated intervals would be expected to contain the true population measure (such as the median, mean, or COD).").

confidence intervals in his report, he did provide them to the counties during expert discovery. Almy Tr. 169, 174–75. The counties never identified a measurement where the upper or lower bound was problematic. Their fastidious cross-examination of Almy demonstrates that they would have pointed out a problematic measurement if they had been able to do so.

Almy testified at trial that his measures of central tendency were within the required confidence intervals. *See id.* at 168–69. Almy was a highly credible witness. The counties dismiss this testimony as *ipse dixit*, *see* Dkt. 223 at 97, but that suggests they do not understand that term. Almy grounded his testimony on his analysis and underlying data, including the confidence intervals that he provided to the counties. Along similar lines, the counties object to Almy's testimony as having turned "the process of challenging an expert's reliability into a game of whack-a-mole . . . ." Dkt. 223 at 96. To the contrary, the counties received Almy's report and all of his underlying data. They chose not to depose Almy before trial or offer an expert of their own. When the counties questioned Almy about his confidence intervals for the first time at trial, Almy was entitled to explain how he treated that issue. If the counties had wanted to know what Almy would say before trial, they could and should have deposed Almy. *See Project Boat Hldgs., LLC v. Bass Pro Gp., LLC*, 2018 WL 3814930, at *2 (Del. Ch. Aug. 10, 2018) (explaining that a party "need not provide every nuance or detail of the expert's opinion in a pretrial disclosure (whether by report or interrogatory response), particularly given that our rules of procedure . . . allow for expert depositions").

In any event, too much should not be made of the 95% confidence interval, at least on the facts of this case. As Judge Posner has explained, a bright-line threshold like this is "arbitrary" and

> influenced by the fact that scholarly publishers have limited space and don't want to clog up their journals and books with statistical findings that have a substantial probability of being a product of chance rather than of some interesting underlying relation between the variables of concern. Litigation generally is not fussy about evidence; much eyewitness and other nonquantitative evidence is subject to significant possibility of error, yet no effort is made to exclude it if it doesn't satisfy some counterpart to the 5 percent significance test. A lower significance level may show that the correlation is spurious, but may also be a result of "noise" in the data or collinearity (correlation between independent variables . . . ); and such evidence, when corroborated by other evidence, need not be deemed worthless. Conversely, a high significance level may be a misleading artifact of the study's design; and there is always the risk that the party's statistical witness ran 20 regressions, one and only one of which supported the party's position and that was the only one presented, though, in the circumstances, it was a chance result with no actual evidentiary significance. (Careful pretrial discovery by the other party should unmask this trick.)

> The question whether a study is responsible and therefore admissible under the *Daubert* standard is different from the weight to be accorded to the significance of a particular correlation found by the study. It is for the judge to say, on the basis of the evidence of a trained statistician, whether a particular significance level, in the context of a particular study in a particular case, is too low to make the study worth the consideration of judge or jury.

*Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362–63 (7th Cir. 2001). Almy had the training and experience necessary to prepare a reliable study worthy of consideration.

Consistent with the approach that Almy took, Professor Ratledge of the University of Delaware did not report explicit confidence intervals in the 2017 Division III Study. Like Almy, he explained that his results fell within the 95% confidence interval and noted those instances where they did not. *See* JX 84 at 7, 10.

Almy testified credibly about his treatment of the confidence intervals. Moreover, his report contained persuasive analysis of the extent to which property values have diverged from fair market value over the past three and four decades, and his analysis and conclusions are corroborated by other evidence in the case, including the admissions of the defendants and their witnesses. *See* Part II.E.7, *infra.* On the facts of this case, Almy's failure to include specific confidence intervals in his written report is not a sufficient basis to exclude his report and testimony.

### 5. The Timing Of Sales Within The Observation Window

The counties also argue that Almy's report is so unreliable as to be inadmissible because when calculating sales ratios, Almy sometimes included sales data from multiple years when necessary to develop a sufficient sample. For example, although he used one year of data for sales of residential property in each county, he used five years of data for sales of commercial property in Kent and Sussex County. *See* JX 61 at 11–12, 16–18. When Almy used multiple years of sales data, he did not adjust the prices from earlier years so that all prices were expressed in constant dollars. For example, he did not adjust the price of a sale in 2017 so that it would be comparable in inflation-adjusted dollars to a sale in 2018. Almy also did not analyze whether there had been any significant economic shifts during his multi-year windows that might have affected the comparability of the sales prices. These are unpersuasive quibbles with Almy's analysis.

In making this argument, the counties rely on the following language from the IAAO standards: "To develop an adequate sample size, the sales used in ratio studies can span a period of as long as five years provided there have been no significant economic

81

shifts or changes to property characteristics and sales prices have been adjusted for time as necessary." JX 7 at 10. The counties again treat the language of the IAAO standards as an ironclad rule, rather than a standard that the assessor can tailor for the study in question. The IAAO standards make clear that the latter, not the former, is the correct approach. *See id.* at 8, 16. The IAAO standards also emphasize that the "value of more reliable information must be balanced against the costs of obtaining that information." *Id.* at 31.

Almy did not time-adjust sales because doing so would not have had a significant effect on the results. As Almy explained in his report, "the interest here was in examining assessment accuracy over several decades," and therefore "adjusting sales prices for changes in market conditions either within each year or since the last general reassessment was considered neither important nor practicable . . . ." JX 61 at 10. As he testified at trial, adjusting prices would "have been a big expenditure of resources for very little gain." Almy Tr. 187. Put differently, when comparing assessed values from 1974 with sales prices from 2014 through 2018, it makes little difference whether the prices are measured in 2014 dollars or 2018 dollars. Almy also testified that during the sales windows, prices generally increased. Almy Tr. 208; *see* JX 6; JX 71; JX 72. If Almy had brought the prices forward to constant 2018 dollars, it would have resulted in a higher measure of fair market value and a greater disparity between fair market value and assessed value. Almy's decision not to adjust sales prices thus favored the counties.

The counties' concern about Almy not investigating whether there was a significant economic shift during any of his pricing windows criticizes Almy for failing to look for something that wasn't there. The counties have not pointed to any significant economic

82

shift that might have affected property values, and the counties certainly had the knowledge to advance such an argument if they could have supported it. Almy was familiar with economic trends generally, and he had access to data on pricing trends nationally, within Delaware, and within the counties. *See* JX 6; JX 71; JX 72. Almy made a reasonable judgment not to expend resources investigating further.

Consistent with the approach that Almy took, Professor Ratledge did not make time-based adjustments to the transactions in his sales window when preparing the 2017 Division III Study. He generally described trends in property values, but like Almy, he did not expressly state whether he looked for significant economic shifts. *See* JX 84 at 8–14.

### 6. The Validation Of Sales Prices

In their third and final argument, the counties contend that Almy's opinions and analyses are so unreliable as to be inadmissible because Almy did not independently verify each sale relied on in his sales ratio study to determine whether it was conducted at arms' length. In making this argument, the counties rely on the following statement in the IAAO standards: "Sales must be screened to eliminate those that don't meet the requirements of arm's-length, open market sales." JX 7 at 8. Elaborating, the IAAO standards explain that "[i]n general, a ratio study is valid to the extent that the sample is sufficiently *representative* of the population." *Id.* at 11. The IAAO standards further explain that "representativeness is improved when . . . [s]ales have been appropriately screened and validated," and this "requirement generally is met when the sales to be used in the sample are properly screened, adjusted if necessary, and validated." *Id.*

During discovery, the plaintiffs obtained twelve Excel files from the counties that contained the sales data that Almy used. Unlike in the collaborative process that the IAAO standards contemplate, the counties did not help Almy understand the data. Almy instead carefully assembled, screened, and cleaned his data set through a multi-phase process so that it only included what were likely to be open-market, arms' length sales. JX 61 at 7.

Almy's screening process had three phases. During the first phase, Almy inspected the data for transactions that were missing information, such as omitted property identification numbers, assessments of zero, or sales prices of zero. Almy excluded these transactions. Even after doing so, Almy observed that the "range in assessed values and sales prices were extremely broad." *Id.* at 8. He also observed anomalies such as "future dates of sale and constructions years" and "large numbers of sales with the same sale price." *Id.* He therefore determined that additional screening was necessary.

During the second phase, Almy excluded transactions where the data appeared to be unreliable, such as:

- Sales prices that were too low to be plausible, such as a sale price less than $10.

- Properties with implausibly high sales prices.

- Properties that were exempt from taxation.

- Multiple records where the same property was given different assessed values.

- Multi-parcel sales where the files lacked information that would allow Almy to link up the parcels.

- Properties ostensibly sold before their construction date.

- New construction.

84

- Construction spanning multiple years.

- Properties classified as vacant with substantial non-land values.

- Properties classified as residential with very large lot sizes/values.

*See id.* at 7–9. Even after this second level of screening, Almy continued to observe "considerable variability" in the total assessed values and sales prices. *Id.* at 9. After calculating sales ratios using the data, he also observed extreme variability in the sales ratios. *Id.*

During the third phase, Almy trimmed the data for outliers by following the IAAO's "Outlier Trimming Guidelines." JX 7 at 53. In substance, he divided the data set into quartiles, then used a statistical technique to exclude roughly the upper half of the first quartile (essentially the uppermost 12.5% of the data set) and roughly the lower half of the fourth quartile (essentially the bottommost 12.5% of the data set). *See* JX 61 at 9. For New Castle County, he separately trimmed the data sets for residential and commercial properties. *Id.* at 10. Through this process, Almy eliminated the portions of his data set that were most likely to contain unreliable outliers, while leaving a large data set that he could use to calculate sales ratios and render opinions.

Having conducted this screening process, Almy inspected the data further to determine what measures of central tendency would be most reliable and informative. He calculated medians, arithmetic means, and weighted means for each county and for each school district, then considered the advantages and disadvantages of each metric.

- The median identifies the middle sales ratio when the ratios are arrayed in order of magnitude. Because it is unaffected by outliers at the ends of the array, the median

is generally preferred as the measure of central tendency when evaluating a system of assessments.

- The arithmetic mean (or average) is the sum of the individual ratios divided by the number of ratios. The value of the arithmetic mean is strongly affected by the values of extreme ratios, making it less reliable as a measure of central tendency.

- The weighted mean is (1) the sum of the assessed values divided by (2) the sum of the sales prices. The value of the weighted mean is strongly affected by the ratios of high-value properties. The value-weighting feature makes the weighted mean the preferred measure of central tendency when considering the total value of property within a district.

Because the arrays continued to have outlying results, Almy determined that the arithmetic mean was not a reliable measure of central tendency, and he did not rely on it. For similar reasons, he did not use the weighted mean. Almy instead decided to use the median, which is the standard measure of central tendency used in ratio studies and further reduced the risk of error from outliers in his data. *See* Almy Tr. 137–38; JX 7 at 27.

At trial, the counties questioned Almy about types of sales that the IAAO standards recommend excluding, such as "sales regarding government agencies or public utilities," "transfers to financial institutions, such as deeds in lieu of foreclosure," "intrafamily or intracorporate transfers," and "forced sales, such as foreclosures or tax sales." Almy Tr. 204. Almy agreed that he had not attempted to exclude these types of transactions. Almy also agreed that he did not retain a third party to verify the individual sales.

As with Almy's decision on time-adjusting his sales, Almy had to make decisions about how to generate a reliable dataset without incurring unnecessary expense. Almy made reasonable decisions. He carefully screened the data by following a logical and reasonable process. He opted not to screen the data further, and he testified that in his fifty-

86

year career as professional assessor, he had never retained a third party to verify individual sales. Almy Tr. 205. Unlike the case the counties most heavily rely on, Almy's statistics did not lack "randomness, representative[ness] and sufficient editing" or include "obvious errors" such as using sales from the wrong years. *In re Rosewell*, 478 N.E.2d 343, 347 (Ill. 1985).

If the counties had hired Almy to conduct a sales ratio study in the ordinary course then they likely would have assisted Almy in screening his data further. They also might have helped him verify third party sales. In the adversarial posture of litigation, Almy did not have the benefit of the counties' expertise. Nor did Almy or the court have the benefit of a competing presentation by an expert hired by the counties. If the counties had retained an expert of their own, then their expert could have screened the data further and shown that the results would be different. But the counties did not hire an expert of their own.

Almy's screening methods reliably narrowed the counties' data to those transactions that were most likely to include arms' length sales. When preparing the 2017 Division III Study, Professor Ratledge of the University of Delaware followed a cleaning and screening procedure that closely resembled Almy's. He did not explicitly screen out certain types of transactions, nor did he validate each individual sale. *See* JX 84 at 8–10.

### 7. The Court's Ruling On Admissibility

The plaintiffs proved by a preponderance of the evidence that Almy's report and analysis were sufficiently reliable to be admissible. Almy thoroughly understood the IAAO standards, having played a leading role in preparing them. He understood the overall purposes of the IAAO standards and could evaluate when it made sense not to adhere to

87

them strictly. Almy persuasively explained his departures from the IAAO standards. The plaintiffs proved that Almy's departures from the IAAO standards did not materially affect his opinions or analyses. They instead were cost-effective methods of proving what the counties had essentially already admitted: that their indefinite-base-year methods of assessment do not value properties at their present fair market value and fail to produce uniform levels of taxation. On each issue where the counties' objected, Almy followed an approach similar to how Professor Ratledge proceeded when preparing the 2017 Division III Study. *See id.* at 8–14.

The counties raised theoretical reasons to doubt portions of Almy's report, but those theoretical doubts were not supported by any facts challenging Almy's findings. The counties could have retained their own expert, presented their own analysis, or deposed Almy before trial. Instead, they decided to reserve their few "gotcha" points for trial.

Other sources of evidence corroborated the substance of Almy's opinions and analyses. Almy's analysis and opinions were broadly consistent with the findings and observations by the 2008 Reassessment Committee. *See* JX 3 at 6. Almy's results were broadly consistent with the assessment ratios in the 2016 Equalization Report, the 2017 Equalization Report, the 2018 Equalization Report, and the 2017 Division III Study. *See* Almy Tr. 157; JX 9 at 10, 13–14, 16; JX 13 at 9, 12–13, 15; JX 21 at 9, 12–13, 15; JX 84 at 13, 36–37. Almy's results were broadly consistent with a high-level internal assessment of assessment ratios that New Castle County prepared in 2017. *See* JX 10 at 5, 17; JX 11 at 3–4; JX 12 at 10, 12. His findings matched up with admissions made by county officials during discovery. *See* Gregor Dep. 77; Durham Dep. 111–12.

Overall, the plaintiffs proved by a preponderance of the evidence that Almy's opinions were sufficiently reliable to be admissible. His report and testimony is therefore admitted.

## III.    STANDING

As their principal defense to the case, the counties argue that the plaintiffs lack standing to sue. In contrast to the counties' position on the merits, where they introduced neither evidence nor expert testimony and advanced only a handful of arguments, the counties' position on standing bristles with points and counterpoints. Contrary to the counties' position, the plaintiffs have standing to pursue the claims they have asserted.

### A.    General Principles Of Standing

"The term 'standing' refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or to redress a grievance." *Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003). The issue of standing is concerned "only with the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy." *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991).

#### 1.    State Court Standing Versus Federal Court Standing

Federal courts have developed an extensive body of standing jurisprudence that interprets Article III of the United States Constitution and the limitations it imposes on the scope of federal judicial power. The Delaware Supreme Court has noted that the standards for evaluating standing under federal law "are generally the same as the standards for determining standing to bring a case or controversy within the courts of Delaware." *Dover*

89

*Historical Soc'y*, 838 A.2d at 1110. The application of those standards may differ, however, because "[u]nlike the federal courts, where standing may be subject to stated constitutional limits, state courts apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are 'mere intermeddlers.'" *Id.* at 1111 (quoting *Stuart Kingston*, 596 A.2d at 1382). As the counties' counsel noted at post-trial argument, standing doctrine in the state courts is predominantly discretionary and prudential. Dkt. 306 at 26 ("[A]ll of standing in other Delaware law is prudential."); *see also id.* at 58 (arguing that "public importance standing . . . is prudential standing").

Based on the structure of our cooperative federal system, state court standing doctrine is appropriately more flexible than federal standing doctrine, because the state courts play a different and more expansive role than the federal courts. *See generally* John Dimanno, *Beyond Taxpayers' Suits: Public Interest Standing in the States*, 41 Conn. L. Rev. 639, 658–63 (2008) (collecting authorities). State courts draw their power from the original sovereignty of the several states as governments with plenary and unenumerated powers. The federal courts, by contrast, can only exercise the sovereign power that the states delegated to the United States as a limited government with enumerated powers.[21]

---

[21] *See, e.g.*, U.S. Const. amend. X; *Murphy v. Nat'l Collegiate Athletic Ass'n*, --- US ---, 138 S.Ct. 1461, 1475–77 (2018). *See generally* Randy J. Holland, *State Constitutions: Purpose and Function*, *in The Delaware Constitution of 1897: The First One Hundred Years* 3, 13–14, 16 (Randy J. Holland & Harvey Bernard Rubenstein eds. 1997) [hereinafter *First One Hundred Years*].

"State courts, of course, may impose more lenient standing requirements than federal courts, because state courts are not bound by the federal Constitution's 'case or controversy' requirement." Eli Savit, *States Empowering Cities*, 52 U. Mich. J.L. Reform 581, 605 (2019); *see ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) ("We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability."). "'State courts need not become enmeshed in the federal complexities and technicalities involving standing and are free to reject procedural frustrations in favor of just and expeditious determination on the ultimate merits.'" Helen Hershkoff, *State Courts and the "Passive Virtues": Rethinking the Judicial Function*, 114 Harv. L. Rev. 1833, 1857 (2001) (quoting *State ex rel. Ohio Acad. of Trial Lawyers v. Sheward*, 715 N.E.2d 1062, 1081-82 (Ohio 1999) (quoting 59 Am. Jur. 2d *Parties* § 30 (1987))).

The Delaware Constitution contains provisions that illustrate the broader expanse of state court power. One is Article I, Section 9, which provides that "[a]ll courts shall be open; and every person for any injury done him or her in his or her reputation, person, movable or immovable possessions shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land . . . ." Del. Const. Art. I, § 9. This provision traces its lineage through Article I, Section 9 of the Delaware Constitution of 1792, to Article 22 of the Delaware Declaration of Rights of 1776, and ultimately to Chapter 40 of Magna Charta. *See* Randy J. Holland, *The Delaware State Constitution* 64–65 (2011). "Under this section, the courts have a duty to afford a

remedy for every substantial wrong; the volume of cases, danger of fraudulent claims, or difficulty of proof do not eliminate this requirement." *Id.* at 65; *see also* Maurice A. Hartnett, III, *Delaware's Charters and Prior Constitutions*, *in First One Hundred Years*, *supra*, at 29 ("The Delaware Declaration of Rights, somewhat uniquely, provided a 'remedy at law for any injury.' A similar provision still remains in the Delaware constitution.").

Another significant provision is Article I, Section 10, which vests in the Court of Chancery "the general equity jurisdiction of the High Court of Chancery of Great Britain as it existed prior to the separation of the colonies" and was "intended to establish for the benefit of the people of the state a tribunal to administer the remedies and principles of equity." *Du Pont v. Du Pont*, 85 A.2d 724, 727, 729 (Del. 1951). The power of a court of equity to hear claims has always been and necessarily remains broad and flexible. "Historically, equity jurisdiction has taken its shape and substance from the perceived inadequacies of the common law and the changing demands of a developing nation." *Schoon v. Smith*, 953 A.2d 196, 204 (Del. 2008) (internal quotation marks omitted). To administer a system of equity,

> the Chancellor always has had, and always must have, a certain power and freedom of action, not possessed by the courts of law, of adapting the doctrines which he administers. He can extend those doctrines to new relations, and shape his remedies to new circumstances, if the relations and circumstances come within the principles of equity, where a court of law in analogous cases would be powerless to give any relief.

*Id.* at 204–05 (internal quotation marks omitted). The Court of Chancery thus "has an expansive power, to meet new exigencies" and "to meet changing needs." *Id.* at 205 n.24,

92

206 (internal quotation marks omitted). Equity will not suffer a wrong without a remedy. *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, at v (2d ed. 2019) (listing "THE MAXIMS OF EQUITY").

One example of Delaware's broader approach to standing involves its treatment of taxpayer suits. Under Delaware law, "[e]ven absent the showing of a particularized injury, . . . a plaintiff may have standing, as a taxpayer, to enjoin the unlawful expenditure of public money or the misuse of public property." *Reeder v. Wagner*, 2009 WL 1525945, at *2 (Del. June 2, 2009) (TABLE). "A taxpayer has a direct interest in the proper use and allocation of tax receipts. That interest gives the taxpayer a sufficient stake in the outcome of the suit to allow him to challenge improper uses of tax funds." *City of Wilm. v. Lord* (*Lord II*), 378 A.2d 635, 637 (Del. 1977). For purposes of Delaware law, "a taxpayer does have standing to sue to enjoin the unlawful expenditure of public money, or misuse of public property, regardless of any showing of special damages." *Id.*

Delaware's approach to standing diverges significantly from the federal model, where taxpayer standing is quite narrow.[22] Delaware's approach accords with other states, where taxpayer actions "are for the most part uncontroversial."[23] The plaintiffs do not rely

---

[22] *See Flast v. Cohen*, 392 U.S. 83, 102–03 (1968); *Frothingham v. Mellon*, decided with *Massachusetts v. Mellon*, 262 U.S. 447, 488–89 (1923); Hershkoff, *supra*, at 1853.

[23] Hershkoff, *supra*, at 1855; *accord* Susan L. Parsons, *Taxpayers' Suits: Standing Barriers and Pecuniary Restraints*, 59 Temple L.Q. 951, 962 (1986) ("Despite strict

on taxpayer standing in this case, but the doctrine demonstrates that Delaware courts can and do apply the principles of standing more broadly than their federal counterparts, consistent with the different nature of state-court jurisdiction and the authority granted by the Delaware Constitution.

### 2. The Elements Of Standing

For a plaintiff to have standing to sue in its own right, the plaintiff must identify (i) an injury to a legally protected interest and (ii) demonstrate that the interest they seek to vindicate is "arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question." *Gannett Co., Inc. v. State*, 565 A.2d 895, 897 (Del. 1989); *accord Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 903 (Del. 1994). The injury element is itself multi-faceted:

> (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;
>
> (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and
>
> (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Dover Historical Soc'y*, 838 A.2d at 1110 (formatting altered and internal quotation marks omitted); *accord Oceanport*, 636 A.2d at 904.

---

standing requirements at the federal level, states generally have taken an increasingly more permissive stance toward taxpayers' actions." (footnote omitted)).

In addition to these basic principles of individual standing, this case implicates other standing doctrines. The first is the ability of a sovereign to assert claims on behalf of its citizens by suing as *parens patriae*. For a government or agency to invoke this doctrine, it must show that it possesses the necessary attributes of sovereignty and that it seeks to protect a quasi-sovereign interest. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600–08 (1982).

The second is the ability of an organization to sue on behalf of its members, a doctrine sometimes called associational standing. An institution can rely on associational standing if "1) the interests to be protected by the suit are germane to the organization's purpose; and 2) neither the claim asserted nor the relief requested requires the participation of individual members; and 3) the organization's members would otherwise have standing." *Oceanport*, 636 A.2d at 902; *accord Dover Historical Soc'y*, 838 A.2d at 1115.

A third is policy-based or public-interest standing, which permits a suitable plaintiff to raise constitutional and statutory issues of substantial public importance, whose impact on the law is real, and where the ongoing violations are likely to continue and to evade judicial review. This doctrine is only invoked rarely and in exceptional cases. *See* Part III.E, *infra*.

The City of Wilmington asserts standing to sue in its own right to address injures it has suffered due to New Castle County's violations of the Assessment Roll Statutes, the Uniformity Clause, and the True Value Statute. The City also asserts standing as *parens patriae* to sue for its residents and property owners. The DEO relies on the doctrine of associational standing. The NAACP-DE contends it has standing to sue in its own right for

95

injury to its organizational interests. All three maintain that, regardless, the court should recognize their standing to sue because this is an exceptional case where doing so would promote the public interest.

## B.     The City Of Wilmington's Standing To Sue

The City of Wilmington asserts three claims against New Castle County that warrant consideration for purposes of standing.

- Count I of the City's complaint asserts that New Castle County's indefinite-base-year method of conducting property assessments violates the Uniformity Clause.

- Count III of the City's complaint asserts that New Castle County's indefinite-base-year method of conducting property assessments violates the True Value Statute.

- Count IV of the City's complaint asserts that New Castle County's indefinite-base-year method of conducting property assessments deprives the City of its rights under the Assessment Roll Statutes.[24]

New Castle County contends that the City lacks standing to assert these claims.

### 1.     The City Of Wilmington's Standing To Sue For Violations Of The Assessment Roll Statutes

New Castle County contends that the City of Wilmington lacks standing to sue the county for failing to fulfill its obligations under the Assessment Roll Statutes. According to New Castle County, the City failed to prove injury. *See* Dkt. 223 § II.D. The City proved

---

[24] In Count II of its complaint, the City asserts a violation of the Same Rate Statute. Although New Castle County at times seemed to defend against this claim using the language of standing, its arguments addressed the merits of what the Same Rate Statute requires. This decision has agreed with New Castle County's arguments on the merits. *See* Part II.C, *supra*. Because the claim failed on the merits, and because the analysis of standing is already lengthy and complex, this decision does not address the City's standing to sue under the Same Rate Statute.

at trial that New Castle County's method of assessing property for tax purposes generates inaccurate assessments, resulting in an unreliable assessment roll and an inaccurate certification of total assessed value. *See* Part I.E, *supra.* By depriving the City of its rights under the Assessment Roll Statutes, New Castle County has injured the City, which therefore has standing to sue. The City therefore also has standing to litigate *why* New Castle County's practices violate the Assessment Roll Statutes, which the City standing to prove that New Castle County's practices violate the Uniformity Clause and the True Value Statute.

### a. The City Of Wilmington's Injury In Fact For Purposes Of The Assessment Roll Statutes

For a plaintiff to have standing to sue in its own right, the plaintiff must have suffered an injury in fact. As discussed previously, the Assessment Roll Statutes authorize any municipality in the state to "elect to use the assessments and supplementary assessments for property in the municipality as established annually or quarterly by the [county] in which such municipality is located, subject to statutory judicial appeals, as the assessment roll of such municipality for municipal taxation." 22 *Del. C.* § 1101. Once a municipality has elected to use county assessments for municipal tax purposes, the municipality "shall be entitled to receive a copy of the county assessments for the properties in the municipality . . . ." *Id.* § 1103. In addition, the pertinent county officials are obligated to "certify the total assessed valuation for properties in the municipality to each municipality . . . ." *Id.* § 1104.

By ordinance, the City of Wilmington has elected to take advantage of the Assessment Roll Statutes and exercised its right to use the assessments established by New Castle County. *See* JX 8. The City has been injured because the evidence shows that New Castle County's indefinite-base-year method for assessing property fails to provide the City with accurate assessments, an accurate assessment roll, or an accurate certification of total assessed value that the City can use for purposes of municipal taxation. The City has the right to receive accurate materials and to rely on them. New Castle County is depriving the City of that statutory right.

The City of Wilmington has also been injured because the City cannot effectively and fairly administer its property tax system using New Castle County's assessments. New Castle County's persistent use of an indefinite-base-year system has generated a decades-long and ever-growing gulf between the true value of City properties and their value under New Castle County's methodology, giving property owners ample grounds to appeal assessed valuations. The Delaware Supreme Court strengthened one ground for appeal by holding that the assessed value of a commercial property must take into account depreciation. *See Commerce Assocs., LP v. New Castle Cty. Office of Assessment*, 159 A.3d 1206, 1208–09 (Del. 2017). When applied in the context of New Castle County's indefinite-base-year system, the ability of commercial property owners to seek reductions in assessed value based on more than three decades of depreciation created a valuation gyre. Frequent appeals, together with New Castle County's understandable practice of settling them, have led to losses of recurring revenue for the City, which destabilizes its

budget and impairs its ability to plan for future expenditures. *See* Taylor Tr. 95–97, 101; *see also* JX 38 at 13–15; JX 55 at 2–5, 9–12; JX 95.

The City of Wilmington has shown that a favorable ruling in this case is likely to remedy its injury. One certainly hopes and would expect that if the Delaware courts concluded that New Castle County is failing to comply with the Assessment Roll Statutes, then New Castle County would change its methodology to bring itself into compliance. In an earlier phase of the case, in an effort to defeat jurisdiction in this court, New Castle County represented that it would do precisely that. *See DEO I*, 2018 WL 4849935, at *8. Doing so would address the City's injury. And if New Castle County did not change its methodologies, then the City could seek further remedies.

In response to the City of Wilmington's showing, New Castle County offers a series of off-point objections. First, New Castle County complains that "approximately 35-40% of the assessed value of property in the City is exempt from taxation because of the *City's* decision to grant those exemptions." Dkt. 223 at 9. That is a *non sequitur*. By making this argument, New Castle County implies that if the City could make up for the injuries that New Castle County has inflicted by ordering its affairs differently, then the City would not have suffered an injury. To the contrary, the City still would have suffered an injury; it just would have found a way to compensate. "A plaintiff suffers an injury even if it can avoid that injury by incurring other costs." *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015).

Second, and relatedly, New Castle County maintains that the City of Wilmington could choose to conduct its own property assessments rather than exercising its statutory

99

right to rely on New Castle County's assessments under Section 1101. Dkt. 223 at 80. Here again, New Castle County takes the position that if the City could do something to compensate for the injuries that New Castle County has inflicted, then the City has not suffered an injury. But the City is entitled to exercise a right that the General Assembly has given to municipalities, namely the right to rely on the tax assessments that the counties prepare. The City's legislative body has exercised its sovereign authority by choosing to exercise that right and accept that benefit. By failing to comply with its statutory and constitutional obligations, New Castle County deprives the City of its right and injures the City. If the City were forced to choose to change its own laws and conduct its own general reassessments, then New Castle County would be depriving the City of its "sovereign interest in the power to create and enforce a legal code." *Texas v. United States*, 787 F.3d at 749 (internal quotation marks omitted); *see* 15 James William Moore et al., *Moore's Federal Practice* § 101.60[4][a], at 101-210.2 (3d ed. 2019) (explaining that interference with "the state's ability to enforce its own laws" constitutes an injury to the state's sovereign interests). "[A] forced choice . . . is itself sufficient to support standing." *Texas v. United States*, 497 F.3d 491, 497 (5th Cir. 2007).

Third, New Castle County observes that because a major issue in recent assessment appeals is the treatment of depreciation, and because the Delaware Supreme Court held in the *Commerce Associates* case that depreciation must be taken into account when assessing commercial property, then "[t]here is no connection as a matter of law between [New Castle County's] use of the 1983 base year and commercial property owners filing property tax appeals . . . ." Dkt. 223 at 72. That is not accurate. The valuation issues raised by tax

100

appeals are a matter of degree. If New Castle County were using a current or reasonably recent base year, then the valuation issues, including the obligation to take depreciation into account, would be less problematic. New Castle County's insistence on using an indefinite-base-year methodology that relies on valuations now thirty-seven-years stale creates major complications for everyone and becomes a destabilizing source of disputes. The crux of the problem is not the inclusion of depreciation or the ability of taxpayers to appeal, but New Castle County's persistence in using an indefinite-base-year methodology, because the latter feature is what exacerbates the effect of depreciation and enables property owners to leverage that issue in tax appeals. Eliminating any doubt on this point, New Castle County's current chief executive has recognized that under the current system, "the math that [New Castle County] use[s] to assess properties" is in "a crazy place" which he likened to "the twilight zone." JX 55 at 2 (internal quotation marks omitted). He agreed that the current system makes "it easier for companies to challenge their assessments." Jedra, *supra* (internal quotation marks omitted).

Fourth, New Castle County attacks the sufficiency of the City of Wilmington's evidence, insisting that the City had to show injury with far greater precision. *See* Dkt. 223 at 73. If the City were claiming damages and seeking to recover a specified sum, then it is possible that a more specific showing could have been necessary. But the City is not seeking a monetary remedy. It is seeking prospective relief that would require New Castle County to comply with clear and unambiguous requirements of the True Value Statute and the Uniformity Clause, where New Castle County neither disputes the contents of those requirements nor contends that it is complying with them, and where New Castle County's

101

own witnesses agree that New Castle County's assessments do not reflect present fair market value and are not uniform.

The City of Wilmington has suffered an injury in fact as a result of New Castle County's assessment practices, which deprive the City of its rights under the Assessment Roll Statutes. As a result, the City has standing to litigate New Castle County's violations.[25]

        **b.**      **The City Of Wilmington's Ability To Prove Violations Of The Uniformity Clause And The True Value Statute As A Result Of Its Standing To Sue Under The Assessment Roll Statutes**

Because it has standing to sue under the Assessment Roll Statutes, the City of Wilmington has standing to prove that New Castle County is violating the Uniformity Clause and the True Value Statute. As the basis for its claim that New Castle County is violating the Assessment Roll Statutes, the City contends that New Castle County is violating the Uniformity Clause and the True Value Statute. New Castle County denigrates this as bootstrapping, but it merely reflects a litigation reality: the City is entitled to prove *how* New Castle County is violating its obligations under the Assessment Roll Statutes.

---

[25] New Castle County does not expressly make a zone-of-interests argument against standing based on the Assessment Roll Statutes. Implicitly, New Castle County advances a zone-of-interests argument against all of the City's theories by contending that "[n]one of the four claims asserted in the City Complaint is directed at the issue of [New Castle County] resolving tax appeals regarding properties located in the City." *Id.* at 9. By making this argument, New Castle County appears to contend that for an injury to fall within the zone of interests, the language of the statute or constitutional provision must speak directly to the specific injury that the plaintiffs' claim. As discussed below, the zone-of-interests test is not so narrow. Regardless, the City falls squarely within the zone of interests protected by the Assessment Roll Statutes. That statute grants municipalities the right to rely on the tax assessments prepared by the county in which they are located, and the City is entitled to invoke that right.

The City can therefore obtain determinations as to New Castle County's compliance with those provisions *en route* to proving a violation of the Assessment Roll Statutes.

**2. The City Of Wilmington's Standing To Sue For Violations Of The Uniformity Clause And The True Value Statute**

New Castle County argues that without the Assessment Roll Statutes, the City of Wilmington would not have standing to assert claims in its own right under the Uniformity Clause and the True Value Statute. New Castle County maintains that without the Assessment Roll Statutes, the City cannot point to an injury in fact that falls within the zone of interests that the provisions protect. To the contrary, the City can satisfy both requirements.

**a. The City Of Wilmington's Injury In Fact For Purposes Of The Uniformity Clause And The True Value Statute**

To support its claims under the Uniformity Clause and the True Value Statute, the City of Wilmington identifies two injuries. The first does not support standing; the second does.

The first injury is to the City of Wilmington's revenue stream and budgeting process. That injury is sufficient to support standing to sue under the Assessment Roll Statutes, but in a hypothetical world without the Assessment Roll Statutes, the City would not have the right to use New Castle County's assessments, so the injury to its revenue stream and budgeting process would not exist. That injury therefore cannot give the City standing to prove violations of the Uniformity Clause and the True Value Statute in its own right (as opposed to in its capacity as *parens patriae* or when proving a violation of the Assessment Roll Statutes).

The second injury flows from the consequences of an assessment scheme that forces owners of property in the City of Wilmington to bear a relatively greater share of the tax burden. *See* Part II.B.1.b.iii, *supra*. As a result, owners of property in the City pay a relatively greater share of the tax burden for New Castle County services and the public schools, which creates a disincentive to own property in the City. *See* Dkt. 216 at 82 (noting that relatively higher assessments "operate[] as a disadvantage to property ownership within the City"); Dkt. 306 at 48. The City would suffer this injury regardless of the existence of the Assessment Roll Statutes. This is an injury in fact that results directly from New Castle County's failure to comply with the Uniformity Clause and the True Value Statute and which would be redressed by orders enforcing those provisions. It therefore satisfies the injury requirement for purposes of the City's standing to sue under those provisions.

### b. The Zone Of Interests For The City Of Wilmington's Claims Under The Uniformity Clause And The True Value Statute

New Castle County separately argues that the City of Wilmington lacks standing to sue in its own right under the Uniformity Clause and the True Value Statute "because both of those provisions exist to protect taxpayers, not taxing authorities." Dkt. 223 at 66. This is an argument that the interests that the City seeks to vindicate do not fall within the zone of interests that the Uniformity Clause and the True Value Statute seek to protect.

Under controlling Delaware Supreme Court authority, a plaintiff must show that the interest it seeks to vindicate is "arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question." *Gannett*, 565 A.2d at 897;

104

*accord Dover Historical Soc'y*, 838 A.2d at 1110; *Oceanport*, 636 A.2d at 903. When initially adopting and subsequently applying the zone-of-interests test in *Gannett*, *Oceanport*, and *Dover Historical Society*, the Delaware Supreme Court endorsed the law governing this aspect of federal standing doctrine as it then existed. *See, e.g.*, *Gannett*, 565 A.2d at 897 (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153–54 (1970)).

When endorsed by the Delaware Supreme Court, the federal zone-of-interests test was a prudential and plaintiff-friendly aspect of standing doctrine. The Supreme Court of the United States had stressed that the conspicuous inclusion of the word "arguably" means that "the benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). The test does not require any "indication of [legislative] purpose to benefit the would-be plaintiff." *Id.* (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987)). The test foreclosed suit "only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399). If the interest had "a plausible relationship to the policies underlying" the provision, then that is sufficient. *Clarke*, 479 U.S. at 403.

More recently, the Supreme Court of the United States has tightened federal standing doctrine. It has restricted its plaintiff-friendly interpretations of the zone-of-interests test to the Administrative Procedure Act and stated that the zone-of-interests test will apply differently under other statutes. It has also held that the zone-of-interests test is a mandatory aspect of the injury requirement for purposes of Article III standing. *See, e.g.,*

105

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130–31 (2014). The lower federal courts have responded to these developments by limiting standing. *See, e.g.*, *Lee v. McCardle* (*In re Peeples*), 880 F.3d 1207, 1213 (10th Cir. 2018). The counties rely on these and other recent cases to argue for a stricter interpretation of the zone-of-interests test. *See* Dkt. 306 at 26–27, 29–30; Dkt. 223 at 46.

The parties agree that the Delaware Supreme Court has not had the opportunity to consider whether to endorse the narrowing of standing doctrine. Dkt. 306 at 38. When considering a comparable tightening of the pleading requirements under Rule 12(b)(6), the Delaware Supreme Court declined to adopt more recent interpretations by the Supreme Court of the United States. *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).[26] Following that lead, this decision continues to apply the older framework that the Delaware Supreme Court endorsed. It therefore does not address the many recent federal authorities that the counties have submitted in favor of more restrictive approaches to the zone-of-interests test.

By seeking to vindicate an injury resulting from a non-uniform tax system that imposes a greater burden on property owners in the City of Wilmington, the City is pursuing an interest that falls within the zone of interests protected by the Uniformity

---

[26] The traditional pleading standard uses the concept of conceivability and builds on *Conley v. Gibson*, 355 U.S. 41 (1957). *See, e.g.*, *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 326 (Del. 1993) (citing *Conley*). In the first decade of the current millennium, the Supreme Court of the United States abrogated *Conley* and adopted a new standard of plausibility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 670 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–65 (2007).

Clause and the True Value Statute. The Delaware Supreme Court has recognized that one purpose of the Uniformity Clause is to ensure equal treatment of taxpayers.[27] Both the Delaware Supreme Court and the Delaware Superior Court have recognized that the True Value Statute seeks to achieve accurate assessments and promote the fairness in the assessment process.[28] The City is suing to require New Castle County to implement a system that results in accurate assessments, equal treatment of taxpayers, and a fair system of taxation.

---

[27] *See Stewart*, 378 A.2d at 115 ("Article VIII, s 1 simply requires that all taxpayers of the same class residing within the same tax district be treated equally."); *In re Estate of Zoller*, 171 A.2d 375, 381 (Del. 1961) ("So long as the burden of taxes levied and collected within a taxing district, to raise revenue for that district, is equally and fairly borne by all taxpayers within that district, the fundamental requirement of uniformity is satisfied. It is in the light of this fundamental principle that our constitutional provision should be construed."). New Castle County also cites two non-Delaware cases that express similar sentiments. *See* Dkt. 223 at 66 n.30 (citing *Colvard v. Ridley*, 128 S.E.2d 732, 734 (Ga. 1962) (interpreting uniformity requirement as ensuring "that all taxable property within the county is returned and assessed for taxes at its just and fair value and that valuations as between the individual taxpayers are fairly and justly equalized so that each taxpayer shall pay as near as may be only his proportionate share of taxes"); and then citing *State ex rel. La Follette v. Torphy*, 270 N.W.2d 187, 193 (Wis. 1978) ("The uniformity clause is intended to protect the citizen against unequal and unjust taxation. The clause requires that taxation act alike on all persons similarly situated." (citation omitted))).

[28] *See Seaford Assocs.*, 539 A.2d at 1048 ("Accurate valuation of the property is essential to fairness in the assessment process."); *Excelsior Assocs., L.P. v. New Castle Cty. Dept. of Fin.*, 1995 WL 347380, at *7 (Del. Super. Ct. Jan. 31, 1995) ("In order to assure fairness in the assessment process, it is essential to determine an accurate valuation of the property.").

107

Neither the provisions themselves nor any of these cases state that the provisions only protect taxpayers or that only taxpayers can sue under them.[29] They instead indicate that the zone of interests protected by the Uniformity Clause and the True Value Statute encompasses the interest that the City seeks to vindicate.

To recognize that the Uniformity Clause and the True Value Statute protect a broad zone of interests comports with how Delaware courts have interpreted zoning ordinances and regulations. Although the restrictions technically apply only to the property owner in

---

[29] The out-of-state authorities are mixed. New Castle County cites *In re Martin*, 209 S.E.2d 766 (N.C. 1974), which dismissed a lawsuit by Mecklenburg County which challenged the constitutionality of a North Carolina statute that classified certain personal property stored in public warehouses as nontaxable. Mecklenburg County alleged that the statute deprived it of tax revenue in violation of North Carolina's uniformity clause, and the Supreme Court of North Carolina held that this injury did not fall within the zone of interests protected by the clause. *See id.* at 773 ("Under our Constitution uniformity in taxation relates to equality in the burden on the State's taxpayers. The interests of [the] County in collecting tax revenues . . . is not within the zone of interest intended to be protected by Article V, Section 2 of our State Constitution."). By contrast, the City of Wilmington relies on *Millcreek Township School District v. County of Erie*, 714 A.2d 1095 (Pa. Commw. Ct. 1998), in which a township litigated a challenge under Pennsylvania's uniformity clause. New Castle County correctly observes that the *Erie* decision did not rule explicitly on standing, but that case and others involving municipalities or school districts suggest that standing would not be a bar to suit under the uniformity clause of that state. *See, e.g.*, *Wilkinsburg Sch. Dist. v. Bd. of Prop. Assessment*, 797 A.2d 1034 (Pa. Commw. Ct. 2002); *Bald Eagle Area Sch. Dist. v. Cty. of Centre*, 745 A.2d 689 (Pa. Commw. Ct. 1999); *City of Harrisburg v. Dauphin Cty. Bd. of Assessment Appeals*, 677 A.2d 350 (Pa. Commw. Ct. 1996); *City of Lancaster v. Cty. of Lancaster*, 599 A.2d 289 (Pa. Commw. 1991); *see also State ex rel. State Bd. of Tax Comm'rs v. Marion Superior Court*, 392 N.E.2d 1161, 1164–65 (Ind. 1979) (holding that county had standing to test the legality of action taken by Indiana's state tax board); *cf. Proviso Twp. High Sch. Dist. No. 209 v. Hynes*, 417 N.E.2d 1290, 1291 (Ill. 1980) (acknowledging that "there may be a question as to the plaintiff's standing" because they are school districts challenging constitutionality of property tax exemption, the proceeds of which they receive, but "elect[ing] to consider the case on its merits").

question, Delaware courts have held that their "real design and purpose" is "to make the locality a better place in which to live [and] to protect the value of the property and provide for the health and safety of those who live there." *Harvey v. Zoning Bd. of Adjustment*, 2000 WL 33111028, at *6 (Del. Super. Nov. 27, 2000) (citing *In re Auditorium, Inc.*, 84 A.2d 598, 602 (Del. Super. 1951)). Delaware decisions therefore have recognized that other owners have standing to sue and that their claims fall within the zone of interests protected by the ordinances. *See id.* at *7. *See generally Dover Historical Soc'y*, 838 A.2d at 1116. The real design and purpose of the Uniformity Clause and the True Value Statute is to promote a fair, uniform, and transparent tax system that benefits communities as well as taxpayers. Parties other than the taxpayers directly affected by the assessments therefore can have standing to sue.

New Castle County argues that the True Value Statute should be interpreted to deny the City of Wilmington standing to sue because "(i) 'statutes relating to taxation and collection of taxes should not be given breadth greater than that which is clearly apparent from the wording of the statute,' and (ii) 'statutes providing for assessments upon property must be construed strictly and given an interpretation favorable to the property owner.'" Dkt. 223 at 67 (quoting *New Castle Cty. v. Chrysler Corp.*, 681 A.2d 1077, 1082 (Del. Super. 1995), *aff'd*, 1996 WL 145806 (Del. 1996) (TABLE)). The *Chrysler* decision and the cases it cited are distinguishable. The *Chrysler* case addressed whether New Castle County had a statutory right to appeal from an administrative hearing. Because "[t]he appellate jurisdiction of Delaware courts is limited by the Delaware constitution and statutes," the court looked to whether the statute granted the county a right to appeal and

109

found that the plain language of the statute controlled. *Chrysler*, 681 A.2d at 1081–82. The court mentioned the two interpretive canons in passing, citing cases that dealt with quite different situations.[30] Regardless, in this case, the interpretation "favorable to the property owner" permits the City to sue to enforce the Uniformity Clause and the True Value Statute. New Castle County's interpretation would prevent the City from filing suit and enable New Castle County to continue assessing property in the City using decades-old valuations that do not reflect present fair market value and which impose a disproportionate burden on City properties.

New Castle County's efforts to deny standing to the City of Wilmington therefore fail. Even without the Assessment Roll Statutes, the City of Wilmington would have standing to assert claims in its own right under the Uniformity Clause and the True Value Statute.

---

[30] The *Chrysler* court cited *Wilmington Trust Company v. Caratello*, 385 A.2d 1131 (Del. Super. 1978), for the first canon. There, the Delaware Superior Court recited the proposition that "statutes relating to taxation and collection of taxes should not be given breadth greater than that which is clearly apparent from the wording of the statute" in the course of rejecting New Castle County's contention that delinquent sewer service charges were taxes that enabled a subject property to be sold for nonpayment, even though a Delaware statute specified that the charges had to be delinquent for five years before that remedy was available. *Id.* at 1135. For the second canon, the *Chrysler* court cited *Riley v. Banks*, which found "the general rule to be, that statutes providing for local improvements and assessments upon the property to be benefitted thereby, must be strictly construed and given an interpretation favorable to the owner of the property to be assessed." 62 A.2d 229, 234 (Del. Super. 1948) (*en banc*). The *Riley* decision held that insufficient notice had been given before a hearing on a proposed sanitary district, rendering invalid the assessment approved at the meeting. *Id.* at 235–36.

**3. The City Of Wilmington's Standing To Sue As *Parens Patriae***

As an additional basis for having standing to sue under the Uniformity Clause and the True Value Statute, the City of Wilmington relies on the doctrine of *parens patriae*. This doctrine gives the City standing to sue.

"*Parens patriae* means literally 'parent of the country.'" *Alfred L. Snapp*, 458 U.S. at 600. Under this doctrine, a state can sue to protect the "quasi-sovereign interests" that it has "in the well-being of its populace." *Id.* at 602. These quasi-sovereign interests fall into two general categories: "First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607.

The power to sue under the doctrine of *parens patriae* belongs in the first instance to the State of Delaware. The General Assembly chose to grant municipalities the right to assume sovereignty for themselves by declaring themselves to be "home rule cities." 22 *Del. C.* § 802 (the "Home Rule Act"). The General Assembly provided that if a municipality exercised this right, then it would "have and assume all powers which, under the Constitution of this State, it would be competent for the General Assembly to grant by specific enumeration and which are not denied by statute." *Id.* The Home Rule Act contained only two exceptions to this authorization to take up the tools of sovereignty: "This grant of power does not include the power to enact private or civil law governing civil relationships except as an incident to an exercise of an independent municipal power, nor does it include power to define and provide for the punishment of a felony." *Id.*

111

"The purpose of the home rule provisions was to enable municipalities to exercise the powers of the sovereign except as limited by either the State Constitution or State statute." *Schadt v. Latchford*, 843 A.2d 689, 691 (Del. 2004) (internal quotation marks omitted). The City of Wilmington has exercised its right to become a home rule city. The City charter provides:

> Pursuant to 22 *Del. C.* ch. 8 . . . the city shall have and exercise all express and implied powers and authority of local self-government and home rule, which, under the Delaware Constitution, it would be competent for the General Assembly to grant the city by specific enumeration and which are not denied by general statute; and the city shall have complete powers of legislation and administration in relation to its municipal functions, including any additional powers and authority which may hereafter be granted to it.

Wilm. C. § 1-101. Through this provision, the City "became a sovereign power as far as local self-government was concerned." *City of Wilm. v. Lord* (*Lord IV*), 340 A.2d 182, 182 (Del. Super. 1975).

The General Assembly's expansive grant of "all powers which, under the Constitution of this State, it would be competent for the General Assembly to grant by specific enumeration and which are not denied by statute" logically includes the power to sue as *parens patriae*. Although the decision was abrogated on other grounds, the United States District Court for the District of Delaware held that the combination of the broad grant of authority under the Home Rule Act and the City of Wilmington's broad assertion of all power within its reach meant that the City had the capacity to sue the State of Delaware for equitable relief:

> Nothing has been found in either the Delaware Constitution or the Delaware Code which would prohibit the City from seeking equitable relief against the State. It seems plain that the General Assembly could have expressly

112

> permitted the City to file an action such as this one. The broad delegation of the [Home Rule Act], the definite intent of the City to assume all powers within its reach, and the absence of any relevant limitation on the City's power to sue in either the Delaware Constitution or the Delaware Code persuade the Court that the City has the capacity to sue the State.

*Nat'l Ass'n for Advancement of Colored People v. Wilm. Med. Ctr., Inc.*, 426 F. Supp. 919, 927 (D. Del. 1977), *abrogated on other grounds by Chowdhury v. Reading Hosp. & Med. Ctr.*, 677 F.2d 317, 321 (3d Cir. 1982). By parity of reasoning, the Home Rule Act conferred on the City the ability to sue in *parens patriae*.

New Castle County attempts to swat away the City of Wilmington's ability to sue as *parens patriae* by citing a law review article for the assertion that "nearly every court to have addressed the issue of municipal authority to proceed in *parens patriae* has held that the municipality lacks sufficient sovereignty to do so." Dkt. 223 at 69 (citing Savit, *supra*, at 605 n.38). The law review article in fact argues *in favor* of recognizing the ability of cities to sue as *parens patriae*, notes that "state courts have occasionally held (or suggested) that cities enjoy authority to sue on behalf of their residents as *parens patriae*," and expresses regret that other cases have rejected this basis for standing by citing federal precedent that the article views as inapposite. Savit, *supra*, at 605–06. This case is different because the General Assembly enacted the Home Rule Act, which delegated to home rule jurisdictions "all powers which, under the Constitution of this State, it would be competent for the General Assembly to grant by specific enumeration and which are not denied by statute." The law review article argues that states can and should delegate to cities the sovereign authority to sue as *parens patriae*. *See* Savit, *supra*, at 609–11. The broad delegation in the Home Rule Act did precisely that.

113

In response to the City of Wilmington's reliance on the Home Rule Act, New Castle County argues that the statute "does not change [the City's] lack of sovereignty, because the City remains subordinate to the State of Delaware." Dkt. 223 at 69. It is of course true that the General Assembly can deny the City powers by enacting general statutes. *See Lord IV*, 340 A.2d at 183–84. It is also true that if a conflict exists between a local ordinance and state law, then state law controls.[31] In either case, however, the General Assembly must have exercised its authority and limited—either explicitly or implicitly—the grant of sovereignty that the Home Rule Act otherwise provides. If the General Assembly has not acted, then the City can exercise sovereignty under the Home Rule Act. The General Assembly has the authority to deny the City the power to sue in *parens patriae*, but it must exercise that authority. The General Assembly has not done so.

Perhaps recognizing the weakness of its argument based on the Home Rule Act, New Castle County fires off four arguments in rapid succession, each supposedly foreclosing the City of Wilmington from having the ability to sue. First, New Castle County claims that the City's authority under the Home Rule Act is "'limited to legislation

---

[31] *See* 22 *Del. C.* § 835(a) ("[The Home Rule Act] shall not permit the amending of a municipal charter so as to . . . (2) Permit any charter amendment in contravention of any general statute of this State."); *FMC Corp. v. Special Servs. Dept.*, 2017 WL 2378002, at *3 (Del. Super. May 31, 2017) (holding that home rule authority conferred on New Castle County does not include the power to expand the jurisdiction of the Delaware courts, which is determined by the Delaware Constitution and by state statute); *Walton v. Baldini Inc.*, 1991 WL 35712, at *2 (Del. Super. Feb. 14, 1991) ("When a conflict between the local ordinance and state law exists, the latter must prevail, unless under the statutes or law of the state the ordinance is given predominance in a particular instance or as to a particular subject matter.").

concerning local matters.'" Dkt. 223 at 69 (emphasis omitted) (quoting *Walton*, 1991 WL 35712, at *2). That is not accurate. It includes the power to sue. *See Wilm. Med. Ctr.*, 426 F. Supp. at 927. New Castle County then suggests that the City's power to litigate should not extend to "matters having implications outside of the confines of the City limits, such as countywide reassessment." Dkt. 223 at 70. Under the structure of the Home Rule Act, New Castle County would need to point to legislation imposing that limitation. New Castle County has not done so, and the holding by the United States District Court for the District of Delaware that the City can sue the State of Delaware points in the opposite direction. *See Wilm. Med. Ctr.*, 426 F. Supp. at 927.

Next, New Castle County cites a Delaware Supreme Court decision which held that "'the doctrine of *parens patriae* is merely a species of prudential standing . . . and does not create a boundless opportunity for governments to seek recovery for alleged wrongs against them or their residents.'" Dkt. 223 at 70 (quoting *State of São Paulo v. Am. Tobacco Co.*, 919 A.2d 1116, 1121 (Del. 2007) (quoting *Serv. Empl's Int'l Union Health and Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1073 (D.C. Cir. 2001))). New Castle County claims that the City of Wilmington is trying to "expand[] this Court's jurisdiction through the invocation of standing in *parens patriae*." *Id.* (citing *FMC Corp.*, 2017 WL 2378002, at *3). Contrary to this conclusory argument, the City is not relying on the Home Rule Act

115

to establish jurisdiction. This court has already held that it has jurisdiction to hear the claims and grant the types of relief at issue in this case. *See DEO I*, 2018 WL 4849935, at *8.[32]

Third, New Castle County posits that even if the City of Wilmington could sue as *parens patriae,* it cannot "simply pursu[e] claims to vindicate the private interests of City taxpayers, which even the State would not have standing to do." Dkt. 223 at 70. This assertion misconstrues the City's claim. The City has not sought to aggregate and vindicate the private interests of City taxpayers. The City is not, for example, attempting to recover a sum of money on behalf of its residents. Instead, the City has asserted an injury to the well-being of its residents and to their confidence in the fairness of the property tax system. *See Alfred L. Snapp*, 458 U.S. at 600, 602. The City seeks to compel New Castle County to comply with clear and undisputed statutory and constitutional requirements that affect the sound administration of the City's tax system as a whole. That is a legitimate quasi-sovereign interest that the City has standing to protect.

Finally, New Castle County argues that under Delaware precedent, taxpayers in the City of Wilmington could pursue claims through a class action. *See Brennan*, 104 A.2d at 792–93; *Cronin v. Greenhouse*, 1992 WL 403111, at *2 (Del. Ch. Dec. 26, 1992), *aff'd,*

---

[32] By contrast, in *FMC Corp.*, the petitioner contended that New Castle County had used its home rule authority to create a right of appeal from a county agency to the Delaware Superior Court. 2017 WL 2378002, at *2. New Castle County argued, and the Superior Court agreed, that New Castle County could not have created a right of appeal to the Superior Court, because the General Assembly established the Court's appellate jurisdiction by statute. *See id.* at *3. Here, the City is not attempting to expand this court's jurisdiction.

623 A.2d 1142 (Del. 1993) (TABLE). New Castle County contends that because a class action could be filed, "they do not need the City to act on their behalf." Dkt. 223 at 70–71.

Neither *Brennan* nor *Cronin* implies that a taxpayer class action is the exclusive means of challenging aspects of the tax assessment system. In *Brennan*, the Delaware Supreme Court did not reach that conclusion. The high court confronted "a taxpayer's class suit to enjoin an entire assessment of all real estate within the jurisdiction of a Board of Assessment" and commented that "[i]n such a case the burden resting upon the taxpayer is a very heavy one." *Brennan*, 104 A.2d at 792–93. In *Cronin*, the Court of Chancery declined to exercise jurisdiction over an individual action in which a plaintiff challenged the application of a base-year valuation to his own property, finding that the plaintiff "has an adequate remedy at law." 1992 WL 403111, at *2. Neither case foreclosed other possible forms of litigation, and neither addressed the possibility of a municipality suing in *parens patriae*.

In the current case, the City of Wilmington has standing as *parens patriae* to assert a claim against New Castle County for violating the Uniformity Clause and the True Value Statute. The City can sue to vindicate its residents' interests in (i) achieving a uniform system of taxation and (ii) avoiding arbitrary and non-uniform assessments. The City can also sue on behalf of its residents who are children, because they face the prospect of attending public schools that receive less funding than they otherwise would if New Castle County updated its assessments. The doctrine of *parens patriae* applies with special force when a sovereign asserts claims on behalf of children. *See Newmark v. Williams*, 588 A.2d 1108, 1116 (Del. 1991).

117

**4.     The Conclusion Regarding The City Of Wilmington's Standing**

The City of Wilmington has standing to assert its claims against New Castle County under the Assessment Roll Statutes, the Uniformity Clause, and the True Value Statute. New Castle County's efforts to foreclose the City from asserting these claims lack merit.

**C.     The DEO's Standing To Sue**

In contrast to the City of Wilmington, which sues in its own right and as *parens patriae*, the DEO relies on the concept of associational standing. That doctrine enables an institution to sue on behalf of its members when "1) the interests to be protected by the suit are germane to the organization's purpose; and 2) neither the claim asserted nor the relief requested requires the participation of individual members; and 3) the organization's members would otherwise have standing." *Oceanport*, 636 A.2d at 902. The third issue—whether the organization's members would have standing to sue—implicates the basic standing requirements that any plaintiff must meet, including the zone-of-interests test and the multi-factor injury test. *See id.* at 903–04.

The counties do not dispute that the DEO has met the first and second elements of the test for associational standing. The question therefore becomes whether the DEO has established that one of more of its members would have standing to sue.

**1.     A DEO Member's Injury In Fact**

To establish associational standing, at least one member of the organization must have suffered an injury in fact, defined as an invasion of a legally protected interest which is (i) concrete and particularized and (ii) actual or imminent, not conjectural or hypothetical. *Dover Historical Soc'y*, 838 A.2d at 1110. At bottom, the plaintiff must have

118

been affected "in a personal and individual manner." *Oceanport*, 636 A.2d at 905. The legally protected interest need not be economic. *See, e.g.*, *Gannett*, 565 A.2d at 897.

Federal decisions have recognized that parents have standing to sue when government policies affect their children's education.[33] Federal decisions have also recognized that standing exists to challenge actions that result in a diminished quality of education or reduced educational opportunities.[34]

The DEO offered evidence that its members include parents who reside in all three counties and whose children have suffered harm because of the failures of Delaware's public schools to meet the needs of Disadvantaged Students. The DEO contends that the counties' assessment practices contribute to these failures by depriving schools of local tax revenue and undermining the State of Delaware's funding scheme.

---

[33] *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (holding that non-profit corporation with parent members had standing to sue school district based upon injuries they could validly claim on behalf of their children); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 225 n.9 (1963) ("The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed. These interests surely suffice to give the parties standing to complain."); *see also Liddell v. Special Admin. Bd. of Transitional Sch. Dist.*, 894 F.3d 959, 965–66 (8th Cir. 2018) ("Parents have standing to sue when practices and policies of a school threaten their rights and interests and those of their children.").

[34] *See Liddell*, 894 F.3d at 965–66 (finding parents of students attending charter schools showed sufficient injury to intervene in action brought to enforce settlement agreement where outcome would result in charter schools losing significant funding with concomitant harm to educational opportunities for their children); *Doe ex rel Doe v. Vermillion Parish Sch. Bd.*, 421 F. App'x 366, 372–74 (5th Cir. 2011) (recognizing that student had standing to challenge policy of same-sex classes based on allegations of injury "resulting from a diminished quality of education").

Jea Street, the President of DEO, testified at trial. He explained that the DEO's members include Wilmington residents whose children are Disadvantaged Students, who attend public school in New Castle County, and who suffer because the public schools lack sufficient funding to meet their educational needs. *See* Street Tr. 62–64, 76–77, 86–87. Street described the problems that Disadvantaged Students face, and he testified from personal knowledge that the problems could have been addressed with additional resources. *See id.* at 86–87. Street's testimony comported with the DEO's interrogatory responses, introduced into evidence at trial, which identified two members residing in New Castle County whose children attend school in the Red Clay Consolidated School District. *See* JX 51 at 3–7.

M.V., a member of the DEO, also testified at trial. She resides in Sussex County and has an eleven-year-old daughter who attended public school in the Indian River School District from kindergarten through fourth grade. While attending public school, M.V.'s daughter qualified for free lunch. M.V. testified about the inadequate services that the school provided to students whose first language is not English. Among other things, M.V. explained that her daughter, who is bilingual, was frequently pulled out of class to help Spanish-speaking children understand material being taught in English. *See* M.V. Tr. 9–11. M.V. also testified about instances when the schools focused on assisting Disadvantaged Students, but did so at the expense of providing learning opportunities to regular students. *See id.* at 9–12. M.V. described large classes and inadequate staffing at the public schools. *See id.* at 13–15, 23. M.V. explained that her experiences and concerns are not limited to her family; Sussex County has a large percentage of Hispanic families

120

who do not speak English or for whom English is not their first language. M.V. described instances when Spanish-speaking families asked her to participate in meetings with school representatives or to translate school communications. *See id.* at 7, 14–15. M.V.'s concerns about the public schools were sufficiently severe that she moved her daughter to a private school. *See id.* at 7–8, 16. After enrolling her daughter in the private school, she learned that her daughter was not performing at grade level and had to do extra work to catch up. *See id.* at 17. M.V. attributed her daughter's struggles to her experience in public schools that lack the resources to provide all students with the education they need. *Id.* at 17.

A.Y. is a member of the DEO who resides in Kent County. She has a daughter and a son, both of whom currently attend high school. Both attended public schools throughout their educational careers. A.Y. Tr. 233–34. A.Y. testified about significant levels of violence and disruption in the public schools and the effect it had on her children. She attributed the problems to the public schools lacking sufficient resources to address the needs of Disadvantaged Students. *See id.* at 235–38. She described other examples of insufficient staffing and the consequences for students. *See id.* at 238, 243–44, 275–76. A.Y. compared her children's experience in the Kent County schools with her personal experience as a student in Maryland and her knowledge of other students' experience in better funded Pennsylvania schools. *See id.* at 239–42, 280, 287.

The counties contend that the testimony from Street, M.V., and A.Y. is insufficient to support standing. Relying on federal case law,[35] they argue that Street's testimony about the DEO's members cannot give the DEO standing to sue for injury because the DEO must identify affected members specifically. The counties have not cited, and research has not identified, any Delaware case adopting this aspect of federal standing doctrine. Before the Supreme Court of the United States required the identification of a specific member, some decisions had rejected the argument, explaining that it

> misconceives the crucial inquiry for standing: while it will often be expedient (if not necessary) to identify particular individuals in order to show with reasonable certainty that there will in fact be a real injury, the "identity" of those injured is not the ultimate goal. Rather, the identity of individual members is only a means to an end, and it should not be confused with the real purpose of the inquiry—that is, for the court to be satisfied that the requisite injury really has occurred or will occur in the future to members of the organizations . . . .[36]

---

[35] *See* Dkt. 223 at 34 n.121 (citing, *e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); and *Nationwide Ins. Indep. Contractors Ass'n, Inc. v. Nationwide Mut. Ins. Co.*, 518 F. App'x 58, 63 (3d Cir. 2013); and *Am. Chemistry Council v. Dept. of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006)).

[36] *Pub. Citizen v. FTC*, 869 F.2d 1541, 1551–52 (D.C. Cir. 1989) (citation omitted); *accord Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008); *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999); *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 313 (D.C. Cir. 1987); *see also N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9 (1988) ("It does not matter what specific analysis is necessary to determine that the members could bring the same suit, for the purpose of the first part of the [associational standing] test is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation.").

From a policy standing, the more flexible approach recognizes that some individuals may be reluctant to seek redress if they can be identified, particularly in cases involving sensitive personal matters or where there may be consequences from taking a public stand.

When a representative of the organization gives credible testimony regarding its members, that should be sufficient for purposes of Delaware law.[37] Street gave credible testimony about the composition of the DEO's membership.[38] Street's testimony is sufficient to give the DEO standing to sue.

The counties next argue that M.V. and A.Y. cannot confer standing to sue upon the DEO because neither was the parent of a Disadvantaged Student. A.Y. admitted that her children are not themselves Disadvantaged Students. M.V. described herself as "low income" and testified that her child qualified for free lunch while attending public school, bringing her within the definition of Disadvantaged Students used by the complaint. The counties dispute that M.V. qualifies as "low income" or "poor," but M.V.'s testimony on this subject was credible.

Assuming for the sake of argument that M.V. and A.Y. are not the parents of Disadvantaged Students, their children still suffered injury. When a school district lacks

---

[37] If I am incorrect and Delaware law requires that an organization identify a specific member by name, then that would only affect the DEO's ability to sue New Castle County.

[38] The counties quibble that Street testified about having "recruited" members to the DEO, without specifying that they actually joined. Dkt. 223 at 8. Street used the word "recruited" in the sense of having completed their recruitment. He thus referred to members he had successfully recruited, not members that he had attempted unsuccessfully to recruit.

sufficient funding to provide an adequate education to Disadvantaged Students, that reality has consequences for all students. M.V. and A.Y. both testified credibly about the consequences for their children that resulted from their schools' inability to meet the needs of Disadvantaged Students.

Although there does not appear to be a Delaware case on point, the injury that students suffer when a school lacks sufficient resources to serve Disadvantaged Students should be sufficient to support standing. The *Dover Historical Society* case is instructive. There, the Delaware Supreme Court held that residents who owned property within the Historic District of Dover had standing to challenge the Dover Planning Commission's grant of a permit to build a new structure in the Historic District. Although the residents were not directly affected by the permitting decision in a tangible or economic way, the high court explained that "aesthetic injuries can constitute an injury in fact that is sufficient to support a plaintiff's standing." *Dover Historical Soc'y*, 838 A.2d at 1113. On the facts presented, the senior tribunal ruled that the residents' "individual concerns about the integrity and cohesiveness of the historical sites in their own backyard" were sufficient to confer standing, distinguishing those interests from "a 'common concern for obedience to the law.'" *Id.* at 1114 (quoting *Pye v. United States*, 269 F.3d 459, 469 (4th Cir. 2001)). Although the analogy is not perfect, the interest that children have in attending schools that provide adequate support for Disadvantaged Students seems at least as weighty as the interest that Dover property owners had in a district that gave adequate consideration to historic sites. These children and their parents have an interest in ensuring that Disadvantaged Students receive services to preserve the integrity and cohesiveness of their

school communities. Likewise, the injury children suffer when their educational opportunities are compromised due to their school's inability to provide adequate support for Disadvantaged Students seems at least as concrete, particularized, and worthy of protection as the interest that Dover property owners had in the administration of a historic district. Where the Dover property owners suffered aesthetic injury, the children suffer the potential lifelong legacy of diminished educational opportunities.

Another instructive decision is *Food & Water Watch v. Delaware Department of Natural Resources and Environmental Control*, 2018 WL 4062112 (Del. Super. Aug. 24, 2018). There, an organization whose members used waterways in Delaware sued the state environmental agency over newly adopted regulations for Concentrated Animal Feeding Operations ("CAFOs"). The regulations established operating standards for CAFOs to meet, but did not require CAFOs to monitor on-site water sources or nearby streams for CAFO-generated pollutants. The agency moved to dismiss the complaint, contending that the organization lacked standing because its members could not show injury from the lack of monitoring standards. The Delaware Superior Court upheld the organization's standing, explaining that "injury due to loss of benefits that might be derived from natural resources such as camping, hiking, fishing, sightseeing and the like" was "enough to support standing." *Id.* at *5 (internal quotation marks and alternations omitted). The court further held that the organization established a sufficient injury to its interests when its members averred that they previously had enjoyed using Delaware waterways for recreation, but had decreased their activities, stopped using certain areas altogether, and were enjoying their recreation less due to fear of contamination. *See id.* Although the analogy is again

imperfect, a child's interest in attending a school that provides adequate support for Disadvantaged Students seems at least as weighty as a nature lover's interest in using waterways for recreation. Likewise, the injury children suffer when their educational opportunities are compromised due their school's inability to provide adequate support for Disadvantaged Students seems at least as concrete, particularized, and entitled to protection as the "loss of benefits that might be derived from natural resources such as camping, hiking, fishing, sightseeing and the like." Just as the members in *Food & Water Watch* established sufficient injury by averring that they were enjoying their recreation less, had diminished their activities, and had stopped using some areas altogether, A.Y. and M.V. testified about their children enjoying school less and learning less, and M.V. testified that she stopped using Delaware's public schools—she withdrew her child and placed her in private school—because of concerns about the problems caused by inadequate resources for Disadvantaged Students.

The counties argue that the DEO cannot rely on the injuries suffered by its members' children who are not Disadvantaged Students because the complaint focuses on harm to Disadvantaged Students. *See* Dkt. 223 at 33–35. The standing inquiry seeks to ensure that a plaintiff has a sufficient interest in the controversy to litigate the case, distinct from the interests of the public in general, and is not an intermeddler. *See Stuart Kingston*, 596 A.2d at 1382. The injuries suffered by the children of DEO members, even if not themselves Disadvantaged Students, are sufficiently concrete and particularized injuries to give the DEO standing to sue.

126

Through the testimony of Street, its President, the DEO has established injury for purposes of its claims against New Castle County. Through the testimony of M.V. and A.Y., the DEO has established injury for purposes of its claims against Kent County and Sussex County.

2. **The Connection Between The DEO Members' Injury And The Counties' Actions**

For an organization to invoke associational standing, the injury suffered by its members must be "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." *Dover Historical Soc'y*, 838 A.2d at 1110 (internal quotation marks omitted). The evidence supports a sufficient connection between the DEO's members and the counties' indefinite-base-year method.

This court has made factual findings establishing that the counties' practice of using stale assessments directly affects school district funding and reduces the level of services that schools can provide. *See* Part I.D, *supra.* As discussed in the Factual Background, the counties' failure to comply with the True Value Statute and the Uniformity Clause reduces the local revenue that schools receive and undermines the State of Delaware's system of Equalization Funding. Delaware policy makers have repeatedly reached the same conclusions. *See* JX 3; JX 4; JX 9; JX 13; JX 21.

The counties contend that the DEO members' injuries are not fairly traceable to the counties' actions because they depend on the involvement of other actors. First, the counties contend that because public schools can obtain more money by raising tax rates

through the referendum process, the counties bear no responsibility. If a referendum fails, the counties say, then that decision is attributable to voters, not the counties' assessment practices. *See* Dkt. 223 at 50–51. They even go so far as to contend that a judicial decision requiring the counties to comply with their constitutional and statutory obligations would have the effect of overturning the results of those referendums. *See id.* at 51 n.184. The answer is that because of inflation, the counties indefinite-base-year method steadily deprives school districts of money. School districts must conduct referendums in an effort to mitigate the harm that that the counties are inflicting. The fact that school districts are forced to conduct referendums is itself part of the harm. That fact alone distinguishes the cases on which the counties rely, all of which involved challenges to the outcomes of elections.[39] The plaintiffs are not challenging an election. They are challenging the broken system of tax assessments that forces school districts to resort to referendums.

---

[39] *See Habecker v. Town of Estes Park*, 518 F.3d 1217, 1225 (10th Cir. 2008) (holding that former member of town's governing board lacked standing to challenge result of recall election where court could not find that the voters' decision to recall him was connected to defendants' alleged wrongful conduct); *Kardules v. City of Columbus*, 95 F.3d 1335, 1355 (6th Cir. 1996) (finding lack of standing where court could not attribute voters' rejection of a proposal to merge two municipalities to the threat that water and sewage rate increases might result from the merger); *League of United Latin Am. Citizens v. Ferrera*, 792 F. Supp. 2d 1222, 1234 (D.N.M. 2011) (concluding that losing candidate lacked standing to challenge result of primary where he could not show he lost because of disciplinary petition filed against him); *Winpisinger v. Watson*, 86 F.R.D. 77, 78–79 (D.D.C.), *aff'd*, 628 F.2d 133 (D.C. Cir. 1980) (holding that supporters of Senator Edward Kennedy lacked standing to challenge results of primary where their injury resulted from "their inability to persuade people to vote for Senator Kennedy").

The counties also argue that to the extent the public schools do not receive accurate allocations of Equalization Funding, then that is a decision attributable to the Equalization Committee, not the counties. Dkt. 223 at 53–54. As a threshold matter, the existence of the Full Value Formula in the Equalization Funding statute demonstrates that the counties' failure to update their assessments directly interferes with the equalization process. If the counties complied with their obligations, then the Full Value Formula would not be necessary, because property would be assessed at its present fair market value. As a factual matter, the gap between the counties' assessed values and present fair market values has grown so great that the Full Value Formula no longer can compensate. As a result, in 2016, 2017, and 2018, the three most recent years in the record, the Equalization Committee was unable to carry out its charge of allocating Equalization Funding. *See* JX 9, JX 13, JX 21. This evidence demonstrates the counties' assessment practices interfere with the Equalization Funding system, which deprives school districts of their proper allocation of funding and inflicts injury on the DEO's members.

At bottom, the counties maintain that the plaintiffs can sue only if their actions are the last link in the causation chain, making them the sole or proximate cause of the plaintiffs' injury. Even under narrower federal standing doctrine, the Supreme Court of the United States has rejected this strict view of traceability, which "wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997). Consistent with this approach, the Supreme Court of the United States has found that

litigants had standing to sue even when the outcome they challenged had multiple causes.

For example:

- In *Regents of University of California v. Bakke*, the Supreme Court of the United States held that a prospective medical student had standing to challenge the affirmative action policy at the school where he applied, even though he could not show that the school would have admitted him but for the policy, and where the evidence instead indicated that the school would not have admitted him even without the policy. 438 U.S. 265, 280 n.14 (1978). The Court reasoned that the policy deprived the prospective medical student of a threshold opportunity to compete. *Id.*

- In *Northeastern Florida Chapter of Associated General Contractors v. City of Jacksonville*, the Supreme Court of the United States held that a contractor had standing to challenge a city's remedial set-aside program, even though the contractor could not prove that the city would have decided to award the contract without the program. 508 U.S. 656, 666 (1993). The Supreme Court of the United States reached the same conclusion in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995).

- In *Parents*, the Supreme Court of the United States considered whether parents had standing to challenge desegregation plans that would consider race as a factor when determining admission to an oversubscribed school. Although the school admission decisions had not yet been made and would depend on the actions of other parents and the schools in question, the *Parents* decision held that the plaintiffs had standing to challenge the desegregation plans. 551 U.S. at 718–19.

Other courts have reached similar conclusions.[40] Under these precedents, a sufficient connection exists between the counties' actions and the injury that the DEO seeks to remedy.

---

[40] *See, e.g.*, *Nw. Requirements Utilities v. FERC*, 798 F.3d 796, 806 (9th Cir. 2015) ("The agency actions need not be the sole source of injury, and a causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible." (internal quotation marks omitted)); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1121 (9th Cir. 2009) (finding standing to sue government where a pharmacist might be fired by a pharmacy because of the pharmacy's reaction to government regulations); *Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d

The counties rely heavily on *Indiana Coalition for Public Education - Monroe County and South Central Indiana, Inc. v. McCormick*, 338 F. Supp. 3d 926 (S.D. Ind. 2018). *See* Dkt. 223 at 55. There, an Indiana statute authorized colleges to sponsor charter schools. Grace College, a religious school, sponsored a charter school that received public resources. The plaintiff sued the state superintendent of schools and the charter school, seeking a declaration that the Indiana statute violated the Establishment Clause, and claiming injury because the public schools received less public resources. The plaintiff did not sue Grace College. The district court identified Grace College as "the actor whose authorization of [the charter school] allegedly violates the Establishment Clause" and which had "caused funds and students to be diverted to [the charter school]." *McCormick*, 338 F. Supp. 3d at 940–41. On that basis, the court found that the injury to the plaintiff was not fairly traceable to the named defendants. If anything, the decision supports standing in this case, because the county defendants are analogous to Grace College in that they are the actors violating the law by collecting taxes based on assessments that violate the Uniformity Clause and the True Value Statute.

The plaintiffs have shown that their injuries are fairly traceable to the counties' failure to comply with the Uniformity Clause and the True Value Statute. This dimension of the standing inquiry is satisfied.

---

458, 467–68 (1st Cir. 2009) (finding plaintiff had standing to sue a government agency for its delay of a decision to certify a project although the failure to certify was only one of several possible causes of plaintiff's injury);

### 3. Whether The Litigation Can Remedy The Injury That The DEO Seeks To Address.

An organization that seeks to invoke associational standing must also show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Dover Historical Soc'y*, 838 A.2d at 1110 (internal quotation marks omitted). It is highly likely that if the Delaware courts determine that the counties' indefinite-base-year method for assessing property violates the Uniformity Clause and the True Value Statute, then the counties will take steps to remedy their violations. When previously seeking dismissal of this case, the counties represented that they would do just that. During post-trial argument, the counties conceded that this court has the power to order a general reassessment if violations are established. *See* Dkt. 306 at 64–65. The court could also deploy other remedies from the judicial toolkit to address the deficiencies that have been identified. Fixing those deficiencies in turn will redress the injuries that the same deficiencies are inflicting on Delaware's public schools.

To argue against redressability, the counties recast the issue as turning on whether this lawsuit will lead to a reassessment that will necessarily generate more money for the public schools. The counties point out that under the Delaware Code, if a county conducts a general reassessment, then each school board must calculate a new tax rate "which, at its maximum, would realize no more than 10% increase in actual revenue over the revenue derived by real estate tax levied in the fiscal year immediately preceding such reassessed real estate valuation." 14 *Del. C.* § 1916(b). The counties argue that because a school board

theoretically could reject the 10% increase in local revenue, the plaintiffs' injury will not be redressed by a favorable decision.

The logjam over the local component of school funding has a key log, and it is the counties' failure assess property in compliance with the True Value Statute and the Uniformity Clause. This litigation can redress that injury directly. Moreover, the outcome of the declaratory judgments that the plaintiffs seek is not a one-time thing. If the Delaware courts determine that the counties' indefinite-base-year method fails to comply with the True Value Statute and the Uniformity Clause, then the counties will be obligated to comply with those requirements on an annual basis. As described in the Factual Background, the evidence demonstrates that ongoing compliance will result in property assessments that rise over time, at a minimum due to inflation and potentially also due to property appreciation. As those assessments improve, schools will receive more local funding, without any need for a re-determination of the applicable tax rate under Section 1916(b).

Regardless, it is highly likely that school districts will happily accept the 10% increase in revenue that would result from a general reassessment. Given that school districts currently call for referendums every three to five years in an effort to mitigate the effects of the counties' failures to comply with their legal obligations, it is unlikely that school districts would reject the increase.

### 4.     The Zone Of Interests For The DEO's Claims

To meet the next requirement for associational standing, the organization must meet the zone-of-interests test. As discussed previously, the plaintiff must demonstrate that the

133

interest it seeks to vindicate is "arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question." *Gannett*, 565 A.2d at 897; *accord Dover Historical Soc'y*, 838 A.2d at 1110; *Oceanport*, 636 A.2d at 903. The interest need only have "a plausible relationship to the policies underlying" the provision. *Clarke*, 479 U.S. at 403.

The DEO seeks to enforce the Uniformity Clause and the True Value Statute to mend one fracture in Delaware's broken system for funding its public schools. The Uniformity Clause and the True Value Statute are twin pillars of Delaware's property tax scheme. The operative question for a zone-of-interests analysis is whether there is a plausible connection between an effort to enforce critical requirements of Delaware's property tax scheme and Delaware's system for funding public schools.

The connection is clear and direct. The General Assembly built Delaware's system for funding its public schools on the legal infrastructure for property tax assessment and collection. Approximately one-third of the funding for Delaware's public schools comes from local taxes levied by individual school districts. The General Assembly provided that when levying taxes for school purposes, "[t]he school board . . . shall use the assessment list of the county in which that district is located as a basis for any school district tax." 14 *Del. C.* § 1912. The General Assembly further provided that "[t]he receiver of taxes and county treasurer shall collect school taxes in the same manner and at the same time as provided by law for the collection of taxes for other purposes . . . ." *Id.* § 1917(a). The General Assembly thus connected the school financing system to the property tax system and its component parts, including the Uniformity Clause and the True Value Statute.

134

An additional component of the funding for Delaware's public schools comes from Equalization Funding. The complex formula used to determine the allocation of Equalization Funding likewise starts with assessed values, then attempts to use sales ratios to correct for the counties' decades-old valuations through the Full Value Formula. *See Id.* § 1707(b)(11). The linkage is sufficiently close that when the Equalization Committee attempted to make its recommendations for the allocation of Equalization Funding in 2017, 2018, and 2019, it concluded on each occasion that the underlying property assessments were so inaccurate as to foreclose any attempt to allocate Equalization Funding fairly. *See* JX 9; JX 13; JX 21. Here again, the General Assembly linked the school financing system to the property tax system and its component parts, including the Uniformity Clause and the True Value Statute.

The counties point out the obvious fact that neither the Uniformity Clause nor the True Value Statute expressly mentions educational funding. *See* Dkt. 223 at 43–44. That is not dispositive. Given that nearly one third of the funding for Delaware's public schools comes from local property taxes, the question is whether the plaintiffs' challenges to the fairness and uniformity of that system and the assessments on which it is based arguably fall within the zone of interests protected by the Uniformity Clause or the True Value Statute. *See Patchak*, 567 U.S. at 225. The direct linkage between school funding and the property tax system makes clear that they do.

The counties also claim erroneously that the zone-of-interests analysis must focus narrowly "on the 'particular provision [of law] upon which the plaintiff relies.'" Dkt. 223

135

at 46 (quoting *Bennett*, 520 U.S. at 176). By excising this phrase from *Bennett* and quoting it out of context, the counties have twisted its meaning. The full passage states:

> Whether a plaintiff's interest is "arguably . . . protected . . . by the statute" within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question (here, species preservation), but by reference to the particular provision of law upon which the plaintiff relies. It is difficult to understand how the Ninth Circuit could have failed to see this from our cases. In *Data Processing* itself, for example, we did not require that the plaintiffs' suit vindicate the overall purpose of the Bank Service Corporation Act of 1962, but found it sufficient that their commercial interest was sought to be protected by the anticompetition limitation contained in § 4 of the Act—the specific provision which they alleged had been violated. [*See Data Processing*, 397 U.S. at 155–56]. As we said with the utmost clarity in [*Lujan v. National Wildlife Federation*], "the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." [497 U.S. 871, 883 (1990)].

*Bennett*, 520 U.S. at 176 (emphasis omitted). Read in context, the passage calls on a court to consider the zone-of-interests protected by the particular provision in question, while not rejecting a zone-of-interests argument based on a general sense of what the overall statute is for. By analogy to *Bennett*, the plaintiffs do not have to show that they are protecting taxpayers, as the counties argue, to fall within the zone of interests protected by the Uniformity Clause and the True Value Statute. It is enough that the plaintiffs seek to vindicate an interest in uniformity (for purposes of the Uniformity Clause) and an interest in having property assessed at its present fair market value (for purposes of the True Value Statute). They do, because both interests are critical to the proper functioning of the system that generates nearly one third of the funding for Delaware's public schools.

Equally important, and contrary to the counties' reading of *Bennett*, a court is *not* precluded from considering the overall purpose of a broader act when considering the zone

136

of interests that a particular provision arguably covers. The Supreme Court of the United States has held expressly that when conducting this inquiry, a court is "not limited to considering the statute under which [the plaintiff] sued, but may consider any provision that helps us understand [the] overall purposes [of the act]." *Clarke*, 479 U.S. at 401. In the course of its analysis, the *Clarke* court considered related statutory provisions that were enacted at different times. *See id.* at 401–02. That is precisely what the plaintiffs do here when drawing the obvious connection between the property tax system and the funding of Delaware's public schools.

In an effort to prevent the plaintiffs from identifying the clear connection between property taxes and school funding, the counties argue that a court can only consider separate statutory provisions under the zone-of-interests test if they have an "'integral relationship.'" Dkt. 223 at 46 (quoting *Air Courier Conference of Am. v. Am. Postal Workers Union, AFL-CIO*, 498 U.S. 517, 530 (1991)). They further argue that to determine whether provisions have an integral relationship, a court should consider "'[1] whether both provisions address similar subject matter, [2] whether legislative history reveals that they share a common purpose, and [3] whether they are located in a common section or subsection of the act.'" Dkt. 223 at 46 (quoting *Programmers Guild, Inc. v. Chertoff*, 338 F. App'x 239, 242 (3d Cir. 2009)).[41] The counties argue that the Uniformity Clause and the

---

[41] The *Programmers Guild* opinion was an unpublished decision written "solely for the benefit of the parties." 338 F. App'x at 240. The Court identified the three elements that the counties enumerate as "[f]actors to consider," not as an exclusive test. *Id.* at 242. The Court noted that "[t]he plaintiff need not show that Congress intended him, in particular, to benefit from the provision." *Id.* The Court also reiterated the admonishment

137

True Value Statute address taxation, not education funding. They point out that the Uniformity Clause was enacted in 1897 and does not appear in the section of the Delaware Constitution addressing education. They likewise point out that the True Value Statute codified separate provisions for each county that had been enacted in 1915, 1917, and 1920, and that it was in the next year—1921—that the General Assembly enacted the provisions that call for school districts to use the county assessments for local school taxes.[42] The Full Value Formula for Equalization Funding had its origins in a later statute enacted in 1949.[43] The counties observe that the True Value Statute is not in the same title of the Delaware Code as the provisions that call for school districts to use the county assessments for local school taxes. *See* Dkt. 223 at 47–48.

If anything, the General Assembly's decision in 1921 to require school districts to use the county assessments for local school taxes, just one year after completing the enactment of county-specific legislation imposing a true-value requirement on each

---

that the zone-of-interests test is "'not meant to be especially demanding.'" *Id.* (quoting *Clarke*, 479 U.S. at 399).

[42] *Compare* 28 Del. Laws ch. 79, § 23 (1915) (codifying for Sussex County provision stating that "[a]ll property . . . shall be assessed at its true value true in money."), *and* 29 Del. Laws ch. 72, § 25 (1917) (codifying for New Castle County provision stating that "[a]ll property [in New Castle County] . . . shall be assessed at its true value in money."), *and* 31 Del. Laws ch. 14, § 8 (1920) (codifying for Kent County provision stating that "[a]ll property . . . shall be assessed at its true value in money."), *with* 32 Del. Laws ch. 160, § 54 (1921) (requiring local school taxes to use county assessments).

[43] *See* 47 Del. Laws ch. 364, § 2.C & D (1949) (providing early version of equalization funding).

county, suggests a close linkage between the two. The counties' arguments and observations also do not undermine the obvious fact that the General Assembly built Delaware's system for funding its public schools on the legal infrastructure for property tax assessment and collection. In light of the obvious linkage between the system for local school taxes and the system of property tax assessment and collection, the fact that the provisions appear in different titles is not dispositive.

By grafting Delaware's system for funding its public schools onto its system for property tax assessment and collection, the General Assembly necessarily incorporated the guarantees of fairness that were part of that scheme, including the Uniformity Clause and the True Value Statute. The General Assembly plainly intended that local school taxes would be levied and collected in a uniform manner, consistent with the Uniformity Clause, and that assessments for local school taxes would be pegged to present fair market value, consistent with the True Value Statute. It is more than plausible that when local school taxes are not being levied and collected in a uniform manner, and when property assessments for local school taxes are not pegged to present fair market value, that the resulting violations arguably fall within the zone of interests protected by the Uniformity Clause and the True Value Statute.

### 5.     The Relationship Between The DEO's Purpose And This Litigation

For an organization to be able to sue on behalf of its members, the interests to be protected by the suit must be "germane to the organization's purpose." *Oceanport*, 636 A.2d at 902. "The question whether one's interest is germane is 'undemanding' and requires only 'mere pertinence between the litigation subject and organizational purpose.'"

139

*Id.* (quoting *Humane Soc'y of U.S. v. Hodel*, 840 A.2d 45, 58 (D.C. Cir. 1988)). This test establishes "a weak standard, barring only those whose litigation goals and organization's purpose are *totally unrelated*." *Id.*

In *Oceanport*, the Delaware Supreme Court held that Wilmington Stevedores, Inc. ("WSI"), a company engaged in the stevedoring business at the Port of Wilmington, met this test for purposes of challenging a decision that resulted in the Secretary of the Department of Natural Resources and Environmental Control ("DNREC") permitting Oceanport Industries, Inc. to operate a docking facility on the Delaware River. *See id.* at 897–98. The high court observed that "[a]rguably, a purpose, if not duty, of WSI is to protect its employees from injurious environmental conditions," holding that this connection "satisfies this part of the test." *Id.* at 902.

The DEO's members joined together to improve Delaware's educational system "so that all children may obtain an adequate education regardless of where they live, their economic circumstances, their health, their disability status or their first language." JX 58 at 221. Pursuing this litigation falls squarely within the DEO's organizational purpose.

### 6. The Need For Participation By Individual Members Of The DEO

Finally, an organization can sue on behalf of its members if "neither the claim asserted nor the relief requested requires the participation of individual members." *Oceanport*, 636 A.2d at 902. The Delaware Supreme Court held in *Oceanport* that WSI, the stevedoring company that sought to challenge a decision permitting a competitor to operate a new docking facility, had satisfied this test where it "challenged the issuance of permits, the ultimate objective of which is to ensure that the Secretary [of DNREC] has

140

lawfully complied with his duties." *Id.* The high court noted that WSI's employees were "not needed to testify in the case or otherwise participate to allow the court to adjudicate the issues on their merits." *Id.* The high court also observed that WSI was "not claiming monetary damages, or seeking other relief in which its employees would be actively affected by a positive disposition." *Id.*

The same is true here. The DEO's members are not necessary parties. The evidence needed to determine whether the counties are violating their statutory and constitutional obligations primarily came from the counties' own documents, most notably the tax assessments that they have been using for over thirty years. Other than to establish standing, evidence from individual DEO members was not required.

### 7. The Conclusion Regarding The DEO's Standing

The DEO has standing to assert claims against the counties for violating the Uniformity Clause and the True Value Statute. The counties' objections to the DEO's standing lack merit.

### D. The NAACP-DE's Standing To Sue

The NAACP-DE asserts standing to sue in its own right for injury it has suffered as an organization. The NAACP-DE has made the necessary showing. It is not a mere intermeddler. *Stuart Kingston*, 596 A.2d at 1382. It is an organization with a longstanding commitment to equity in education and an established track record of securing relief for disadvantaged individuals.

141

### 1. The NAACP-DE's Injury

To establish standing to sue in its own right, the organization must establish "some injury to its own interests." *Oceanport*, 636 A.2d at 903. An organization can establish an injury in fact by identifying a pecuniary loss attributable to the defendant's conduct or by showing that the likelihood of a contingent loss "will be appreciably increased." *Id.* at 905. An organization can also rely on a non-pecuniary injury, as long as the injury "actually affect[s] the plaintiff in a personal and individual manner." *Id.*

Organizations have been held to have a sufficient "stake in the outcome of the controversy" to support standing when the organization had to divert resources to a controversy or where the organization suffered reputational harm as a result of the controversy's existence.[44] There is no requirement that the organization quantify the amount of harm it has suffered. *See Crawford v. Marion Cty. Election Bd.,* 472 F.3d 949, 951 (7th Cir. 2007) ("The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury.").[45]

---

[44] *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982); *see Shukh v. Seagate Tech., LLC*, 803 F.3d 659, 663 (Fed. Cir. 2015); *Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*, 730 F.3d 208, 220–22 (3d Cir. 2013), *abrogated on other grounds by Murphy*, 138 S. Ct. at 1461; *Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 78–79 (3d Cir. 1998).

[45] As with the zone-of-interests test, the counties rely on a battery of recent federal court decisions that have tightened the injury-in-fact requirements for organizations to establish standing. *See* Dkt. 223 at 20–33. The parties agree that the Delaware Supreme Court has not yet adopted any of these approaches. *See* Dkt. 223 at 19; Dkt. 306 at 38. This decision hews to *Gannett*, *Oceanport*, and *Dover Historical Society*, which took a more permissive approach to organizational standing.

The mission of NAACP-DE and its national affiliate is to advance the cause of fairness and justice for people of color throughout the country. Achieving educational equity has always been part of that endeavor. Street testified credibly that the NAACP-DE has diverted resources from other activities so that it could pursue its efforts to obtain equitable funding in the area of education. If the public schools had been better funded, then NAACP-DE could have devoted time and effort to other civil rights issues. Street also testified credibly that the NAACP-DE has suffered reputational harm because of the persistent inadequacy of school funding in Delaware. Because of NAACP-DE's historic and longstanding involvement in the educational system, including its advocacy for school desegregation, people regard the NAACP-DE as bearing a share of the responsibility for the state of Delaware's schools.[46]

The counties' failure to comply with the Uniformity Clause and the True Value Statute harms Delaware's public schools. The inadequacies of Delaware's public schools in turn harm the reputation of NAACP-DE and force the organization to deploy resources in an effort to remedy problems with Delaware's public schools. Through this lawsuit, NAACP-DE seeks to address a longstanding problem with the funding of Delaware's public schools: the absence of a fair and equitable system of property tax assessment. The

---

[46] Relying on recent standing decisions from federal courts that have tightened the requirements for organizational standing, the counties argue that Street's testimony was not sufficient. *See* Dkt. 223 at 21–25. Here again, this decision hews to *Gannett*, *Oceanport*, and *Dover Historical Society*, rather than adopting the more stringent federal standards that are now ascendant.

General Assembly recognized that problem when it established the 2008 Reassessment Committee, the committee then recognized it in its report, and the Equalization Committee recognized it in its reports in 2016, 2017, and 2018. The NAACP-DE therefore can sue under the doctrine of organizational standing.

### 2. The Zone Of Interests For The NAACP-DE's Claims

To establish standing, an organization must also show that the claim it wishes to assert meets the zone-of-interests test. *See Dover Historical Soc'y*, 838 A.2d at 1110. The counties maintain that the NAACP-DE lacks standing to assert claims under the Uniformity Clause and the True Value Statute because those provisions have nothing to do with education. This decision has already rejected that argument. *See* Part III.C.4, *supra*.

### E. Policy-Based Standing

Finally, the plaintiffs contend that they have standing as appropriate parties to raise constitutional and statutory issues of substantial public importance, whose impact on the law is real, and where the ongoing violations are likely to continue and to evade judicial review. This doctrine is only invoked rarely and in exceptional cases, but this is such a case. The doctrine applies with particular salience because the counties' failure to comply with the applicable constitutional and statutory requirements is effectively undisputed, and the counties have made clear that absent a determination by the Delaware courts, they intend to continue violating the law.

In rare situations, Delaware courts have issued rulings even though the traditional requirements for standing were not met. One example involves the ability of a citizen or taxpayer in Delaware to petition for a writ of mandamus to enforce a public duty, without

144

needing to show a special interest in the result of the proceeding or otherwise meet the traditional requirements of standing.[47] Another example is when an issue has been rendered moot, depriving the court of a proper case or controversy, but where the court may render a decision "where the question is of public importance, and its impact on the law is real."[48]

As this court held previously, the plaintiffs in this case could not seek a writ of mandamus because for that writ to be available, the duty that the plaintiff seeks to enforce "must be nondiscretionary or ministerial, meaning that it is prescribed with such precision and certainty that nothing is left to discretion of judgment." *DEO I*, 2018 WL 4849935, at *6 (internal quotation marks omitted) (quoting *Brittingham v. Town of Georgetown*, 113 A.3d 519, 524 (Del. 2015)). This court explained that

> [a] writ of mandamus would not be available in this case. As the County Defendants elsewhere recognize, the Delaware Code does not require that counties conduct general assessments on any regular schedule. If the Delaware Code required that a county conduct a general assessment every year, or on a specific schedule, then a petition for mandamus might be viable.

---

[47] *See State ex rel. Biggs v. Corley*, 172 A. 415, 417 (Del. 1934) (in banc) (permitting citizen and taxpayer to seek a writ of mandamus "to procure the enforcement of public duties" and explaining that "[n]o special interest in the result of the proceedings need be shown" because "[i]t is sufficient that the relator is a citizen and, as such, interested in the enforcement of the laws"); *Hawkins v. Dougherty*, 18 A. 951, 952 (Del. 1980) (holding that member of public had sufficient interest to petition to force tax collector to comply with the law); *see also Plumbers & Pipefitters Local Union 74 v. Gordon*, 2000 WL 1152434, at *1 (Del. 2000) (TABLE) (holding that union lacked organizational standing but remanding because "it does not necessarily follow that its members, in their capacity as citizens and taxpayers, also lack standing" and noting that "[c]itizens have an interest in the enforcement of our laws and the writ of mandamus may be used to procure the enforcement of public duties" (internal quotation marks omitted)).

[48] *McDermott Inc. v. Lewis*, 531 A.2d 206, 211 (Del. 1987); *see Darby v. New Castle Gunning Bedford Educ. Ass'n*, 336 A.2d 209, 209 n.1 (Del. 1975).

145

> But the General Assembly did not prescribe a specific schedule for conducting general assessments. It chose instead to leave the matter to the judgment of the leaders of each county with the expectation that they would take the steps necessary to comply with the [True Value Statute]. A writ of mandamus directing the counties to conduct general assessments could not issue.

*Id.* Lacking the ability to seek a writ of mandamus, the plaintiffs in this case "made a classic appeal to the powers of equity." *Id.* at *7.

Although this case does not involve a writ of mandamus, and although the plaintiffs could not have sought one, the issue for purposes of standing is much the same: the failure of public officials to comply with established constitutional and legal requirements. The counties' failure to comply with the True Value Statute and the Uniformity Clause is all but conceded, yet the counties have made clear that absent a determination by the Delaware courts, they will continue violating the law by persisting in using the indefinite-base-year method of assessment. This is a case in which the City of Wilmington, the DEO, and the NAACP-DE should have standing to sue to enforce the counties' public duties. None are mere intermeddlers. All are legitimately concerned that the counties have become and intend to remain tax-assessment scofflaws.

This matter is also a dispute that otherwise would likely evade review. From time to time, individual property owners have challenged the staleness of their property assessments in tax appeals, but in those cases, the Uniformity Clause operates to foreclose any single property owner from obtaining a valuation different than what the indefinite-

146

base-year method generates.[49] An individual plaintiff might theoretically sue on a class-wide basis, but it would take a brave and civic-minded person to assert the claim. New Castle County has estimated that after a general assessment, approximately half of property owners would have their taxes go up. *See* JX 76 at 10–15. Few people like having their taxes raised, and it is hard to imagine an individual suing to fix a dysfunctional system when the outcome could irritate as many as half of her fellow property owners. The NAACP-DE and the DEO have more systemic interests, such as restoring the integrity of the school-funding mechanism and protecting the interests of minors who are disadvantaged by the current system. They are therefore willing to bring and litigate statutory and constitutional violations that otherwise would go unchallenged. The City of Wilmington is likewise uniquely situated to press claims against New Castle County based on the county's failures to fulfill its obligations under the Assessment Roll Statutes, the True Value Statute, and the Uniformity Clause.

"[L]aw and order exist for the purpose of establishing justice and . . . when they fail in this purpose they become the dangerously structured dams that block the flow of social progress." Martin Luther King, Jr., *Why We Can't Wait* 73 (Penguin Books 2000) (1963).

---

[49] *See, e.g.*, *Commerce Assocs. v. New Castle Cty. Office of Assessment*, 2016 WL 3457820, at *8 (Del. Super. Apr. 1, 2016), *rev'd on other grounds*, 159 A.3d at 1209; *Shahin v. City of Dover Bd. of Assessment Appeals*, 2016 WL 520996, at *2 (Del. Super. Jan. 22, 2016), *aff'd*, 149 A.3d 227 (Del. 2016) (TABLE); *RRHC Wilm., LLC v. New Castle Cty. Office of Finance*, 2014 WL 2538886, at *8–9 (Del. Super. May 30, 2014), *aff'd* 108 A.3d 1226 (Del. 2015) (TABLE); *Bailey v. Bd. of Assessment Review Dept. of Land Use*, 2004 WL 1965867, at *5 (Del. Super. Aug. 19, 2004).

This same is true for justiciability doctrines like standing. Other states have recognized a public interest exception to standing doctrine.[50] To the extent this decision has reasoned incorrectly and the plaintiffs lack standing under traditional Delaware standing doctrine, they have standing as appropriate parties to raise constitutional and statutory issues of substantial public importance, whose impact on the law is real, and where the ongoing violations are likely to continue and to evade judicial review.

## IV.  CONCLUSION

Sussex County, Kent County, and New Castle County use assessment methodologies that violate the True Value Statute and the Uniformity Clause. New Castle County's assessment methodology also violates the Assessment Roll Statutes. New Castle County's assessment methodology does not violate the Same Rate Statute.

---

[50] *See, e.g.*, *Schwartz v. Lopez*, 382 P.3d 886, 894–95 (Nev. 2016) (holding that parents of children had standing to assert challenge under state constitution to educational spending account program where (i) the issue was of "significant public importance," (ii) the plaintiff contended that a legislative expenditure or appropriation violated a specific provision of the state constitution, and (iii) there was "no one else in a better position who will likely bring an action" and the plaintiff was "capable of fully advocating his or her position in court"); *S.C. Pub. Interest Found. v. S.C. Dept. of Transp.*, 804 S.E.2d 854, 858 (S.C. 2017) (permitting a plaintiff to sue under the doctrine of "public importance standing," which is intended to "allow interested citizens a right of action in our judicial system when issues are of significant public importance to ensure accountability and the concomitant integrity of government action" (internal quotation marks and alterations omitted)); *Utah Chapter of Sierra Club v. Utah Air Quality Bd.*, 148 P.3d 960, 972 (Utah 2006) (holding that a party has "alternative standing" when it is able to show that it is "an appropriate party raising issues of significant public importance"); *see also State ex rel. Bronster v. Yoshina*, 932 P.2d 316, 322 (Haw. 1997) ("Given the significant public importance of this issue, which is likely, if not certain, to recur, we hold that the attorney general has standing to raise the claims in this action."). *See generally* Dimanno, *supra*, at 664–77.

The City of Wilmington has standing to assert its claims as an organization that has been injured by New Castle County's violations and as *parens patriae*. The NAACP-DE has standing to assert its claims as an organization that has been injured by the counties' violations. The DEO has standing to assert its claims as an association of individuals who would otherwise have standing to assert its claims. Even if the plaintiffs did not have standing under traditional standing doctrines, all three have standing to sue as appropriate parties to raise constitutional and statutory issues of substantial public importance, whose impact on the law is real, and where the ongoing violations are likely to continue and to evade judicial review.

This decision addresses only the merits of the plaintiffs' claims. It does not address the remedy, which must await further proceedings. Within forty-five days, the parties shall submit a scheduling order to govern the remedial phase.